## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

| | |
|---|---|
| **WILSON RAMOS, As Administrator of the** ) | |
| **Estate of Jose A. Maldonado, and** ) | |
| **Individually,** ) | **Civil Action No.** |
| **Plaintiffs,** ) | **3:16-cv-00166 (VLB)** |
| ) | |
| ) | |
| **V.** ) | |
| ) | |
| **TOWN OF EAST HARTFORD, OFFICER** ) | |
| **JASON KAPLAN, SERGEANT JAMES LIS,** ) | |
| **OFFICER JASON COHEN, and CHIEF** ) | |
| **SCOTT SANSOM OF THE EAST HARTFORD** ) | |
| **POLICE DEPARTMENT** ) | |
| **Defendants.** ) | **JUNE 17, 2019** |

_____)

### MOTION IN LIMINE TO PRECLUDE DEFENDANTS' EXPERT WITNESS,
### MARK W. KROLL, FROM TESTIFYING ON CERTAIN TOPICS

Plaintiffs, Wilson Ramos as Administrator of the Estate of Jose Maldonado and Wilson Ramos individually, move the Court in limine to preclude Defendants' expert witness, Mark W. Kroll, from testifying at trial regarding the comparative safety of Tasers and their social utility, regarding whether Maldonado tore the Taser wire, whether Maldonado resisted handcuffing, regarding the use of Tasers on intoxicated individuals, and regarding Maldonado's cause of death, because these opinions are beyond his expertise, are unreliable, will not assist the jury, and are unfairly prejudicial.

### BACKGROUND

This civil rights case arises out of the homicide of Jose Maldonado while in the East Hartford Police Department on April 13, 2014.  Plaintiffs have alleged

claims of excessive force and deliberate indifference under 42 U.S.C. § 1983 and the state and federal constitutions, as well as claims of negligence, recklessness, wrongful death, bystander emotional distress, false arrest and false imprisonment under the statutory and common law of Connecticut.

Defendants have disclosed Mark W. Kroll to testify to his opinions in his sixty-five page report, which includes numerous opinions on a vast variety of topics.  Kroll purports to be "a Biomedical scientist with a primary specialty in bioelectricity or the interaction of electricity and the body."  (Kroll Report 5, Ex. A).  Kroll has a bachelor's degree in mathematics, a master's degree and Ph.D. in electrical engineering, and an MBA.  (Kroll Dep. 31-33, Ex. B).  He has never attended medical school, has never completed any medical school courses, has never taken any medical school courses in forensic pathology, and has never completed any courses in toxicology.  (Kroll Dep. 33-36).  Kroll has never trained any police officers in the use of force, is not involved in Taser training, and admits that he is "not a trainings expert" and is "no expert on use of force in general on the case law."  (Kroll Dep. 36, 68, 76-77, 80).  Kroll is a consultant and director of Axon Enterprises, Inc., formerly known as TASER International, and owns 52,205 shares in Axon Enterprise, Inc., which at the time of his deposition were worth about $3.7 million.  (Kroll Dep. 8-9, 88-90).

Despite his lack of medical or police practices education or background, Kroll offers various opinions on use of force and medical issues (such as cause of death).[1]  These opinions are inadmissible for the reasons set forth below.

---

[1] All of the other experts disclosed by Plaintiffs (Drs. Myerburg and Gill) and Defendants (Drs. Wetli, Luceri, and Vilke) to testify about the cause of death and/or impact of the Taser on Jose

## STANDARD OF REVIEW

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 262–63 (D. Conn. 2017) (quoting *Highland Capital Mgmt., L.P. v. Schneide*r, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008)). "The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks omitted). "A motion in limine to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence." *Ring's End Inc. v. Black & Decker (U.S.), Inc.*, No. 3:16-CV-375 (VLB), 2017 WL 3698491, at *1 (D. Conn. Aug. 25, 2017) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005)). "Evidence should be excluded on a motion in limine only when the evidence is clearly inadmissible on all potential grounds." *Id.* (quoting *Schneider*, 379 F. Supp. 2d at 470).

## LAW AND ARGUMENT

Rule 702 of the Federal Rules of Evidence, which governs admissibility of expert testimony, provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

Maldonado's heart functions are medical doctors with academic credentials and years of experience in the practice of medicine.

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "Thus, under Rule 702, the district court must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 667 (E.D.N.Y. 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005)). "[T]he relevance and reliability inquiries, as well as the question . . . of whether expert testimony will 'assist the trier of fact,' are separate from the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely*, 414 F.3d at 396 n.11.

The first inquiry—whether the witness is qualified to be an expert—requires the district court to "ascertain whether the proffered expert has the educational background or training in a relevant field." *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 3:16-CV-544, 2018 WL 3752878, at *4 (D. Conn. Aug. 8, 2018) (quoting *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99 CIV. 1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003)). The district court must then "compare the

area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "The expert's knowledge of the subject matter must be 'such that his opinion will likely assist the trier of fact in arriving at the truth.'" *Dominion Res. SVC, Inc.*, 2018 WL 3752878, at *4 (quoting *Valentin v. N.Y. City*, No. 94 CV 3911(CLP), 1997 WL 33323099, at *14 (E.D.N.Y. Sept. 9, 1997)).

The second inquiry—whether the opinion is based upon reliable data and methodology—requires the district court to perform its "gatekeeping" function to ensure that expert testimony "is not only relevant, but reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 147 (1999).  "In assessing reliability, 'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'"  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).

The Supreme Court has set forth additional factors that, while not constituting a "definitive checklist or test," a district court may consider in evaluating whether a proffered expert opinion is reliable.  *Kumho Tire Co.*, 526 U.S. at 149; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–94 (1993). Those factors include whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, what its error rate is, whether there are standards controlling the technique's operation, and

whether the theory or technique is generally accepted in the relevant community. *Kumho Tire Co.*, 526 U.S. at 149; *Daubert, Inc.*, 509 U.S. at 592–94.  "In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions."  *Nimely*, 414 F.3d at 396.  "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Amorgianos*, 303 F.3d at 267.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Thus, the Second Circuit has held that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Nimely*, 414 F.3d at 396–97 (quoting *Amorgianos*, 303 F.3d at 266).

The third inquiry requires that the district court determine whether an expert's testimony on a particular issue will assist the trier of fact.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591–92.

6

"Helpfulness can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *In re Fosamax Prod. Liab. Litig.*, 807 F. Supp. 2d 168, 179 (S.D.N.Y. 2011) (quoting *Daubert*, 509 U.S. at 591), *aff'd*, 707 F.3d 189 (2d Cir. 2013) (per curiam), and *aff'd*, 509 F. App'x 69 (2d Cir. 2013) (summary order).  To be helpful, the testimony must be relevant and must not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Tardif v. City of New York*, 344 F. Supp. 3d 579, 596 (S.D.N.Y. 2018) (quoting *Arista Records LLC v. Lime Grp. LLC,* No. 06 CV5936KMW, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011)).

"The proponent of the expert testimony bears the burden of establishing these admissibility requirements, and the district court acts as a 'gatekeeper' to ensure that the 'expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).

I.    **Kroll's opinions on the comparative safety of Tasers and their social utility are irrelevant, beyond his expertise, and unfairly prejudicial.**

Kroll is expected to testify that Tasers are generally safer than other uses of force available to police officers and that the social benefits outweigh the injuries and deaths that Tasers cause.  This is a topic not put in issue by the pleadings of this case: the question before the jury will be whether the Taser was used improperly by Defendant Kaplan so as to cause the death of Maldonado.

Specifically, Kroll stated in his report that "use of electronic control reduces the suspect injury rate by about 2/3 compared to alternative force

7

options, including hands-on physical force. In other words, the use of other control techniques can triple (3x) the injury rate compared to the use of an electrical weapon."  (Kroll Report 8).  Further, Kroll stated that "[t]he number of law enforcement firearms shootings prevented has been estimated at over 160,000 based on the 3.66 million CEW [Conducted Electrical Weapon] field uses. In agencies using the CEW with minimal restrictions, the fatal officer shooting rate falls by ≈ 2/3."  (Kroll Report 10).  Kroll also claimed the following:

> The very rare risks of CEW complications are swamped by the lives saved and serious injuries minimized from the reductions of ARDs [Arrest-Related Deaths]. For every ARD from a CEW complication (fatal fall or fire) there are 50 ARDs prevented by reducing firearm shootings and over-exertional deaths. Additionally, there is 1 temporal ARD for every 1,000 traditional uses of force, or 1 temporal ARD for every 3,500 uses of CEWs.

(Kroll Report 11).  Lastly, Kroll lists numerous opinions on the comparative safety of Tasers:

> a. The deployment and use of TASER CEWs has been shown to reduce injuries to officers and subjects over other force options, including physical force.
> b. The deployment and use of TASER CEWs has been shown to reduce use-of-force civilian complaints and law enforcement internal affairs complaints against law enforcement officers.
> c. The deployment and use of TASER CEWs has resulted in the reduced need to use of deadly force.
> d. Rates of injury from TASER CEWs is comparable to, or less than, some collegiate contact and exertion sports.
> e. Rates of injury from TASER CEWs is less than several other common law enforcement force options, including, but not limited to: physical force, chemical aerosols, batons, impact tools, canines, rubber bullets, and bean bags.
> f. TASER CEWs are a safer alternative than other comparable law enforcement force options tools or techniques.
> g. TASER CEWs are shown to reduce subject injuries when compared to physical force options.
> h. TASER CEWs have greater accountability features than any other force option.

> **i. TASER CEWs are the most studied force option available to law enforcement.**
> **j. TASER CEWs are the most effective force option in accomplishing intended effects for U.S. law enforcement.**
> **k. TASER CEWs are the most effective force option in gaining compliance without need for deployment or application (up to 81%).**
> **l. According to the peer-reviewed literature, the TASER CEW causes less-severe physiologic and metabolic effects than other force options.**
> **m. According to the peer-reviewed literature, the TASER CEW is the safest force option available to law enforcement.**

**(Kroll Report 63).**

These opinions are inadmissible for three reasons.  First, Kroll is not qualified "by knowledge, skill, experience, training, or education" on a police officer's use of force, police practices, or the reasonableness of differing tactical options officers have at their disposal.  Kroll has never trained any police officers in the use of force, is not involved in Taser training, and admits that he is "not a trainings expert" and is "no expert on use of force in general on the case law." (Kroll Dep. 36, 68, 76-77, 80).  Thus, Kroll is not qualified to testify that firing a Taser was the safest or most effective use of force option for the Defendants here.[2]

Second, Kroll's opinions are irrelevant to the issues in this case. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Kroll's opinion that Tasers are generally safer than other uses of force available to police officers is

---

[2] The parties have disclosed four police practices experts (Dr. Haberfeld and Mr. Clarke for Plaintiffs, and Mr. Stine and Mr. Minor for Defendants) qualified generally by academic background and/or training and experience.

of no consequence in determining this action.[3]  This is also true of Kroll's opinions that the social benefits "swamp" the injuries and deaths that Tasers cause, that Tasers have prevented firearms shootings, that Tasers reduce civilian and internal affairs complaints, that rates of injury from Tasers are comparable to some collegiate contact and exertion sports, that Tasers "have greater accountability features than any other force option," and that Tasers are the most studied and most effective force option available.  These opinions are mostly political in nature and are not tied in any way to the facts of this case.  This case contains no claims against the Taser manufacturer, and this case is not about the general comparative safety of Tasers to firearms or other uses of force.  Rather, this case is about whether the Defendants used excessive force in this particular instance when they fired a Taser directly into Maldonado's bare chest and held him under power for twenty seconds, which resulted in his death.  Kroll's proposed testimony above has no tendency to make a fact of consequence more or less probable than it would be without the testimony, and it is therefore inadmissible under Rule 402.

Third, even assuming arguendo that Kroll's generalities have any probative value, which Plaintiffs dispute, they are substantially outweighed by a danger of unfair prejudice.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."  Fed. R. Evid. 403.  Allowing Kroll to testify to opinions such as that the benefits of Tasers "swamp" the injuries and deaths Tasers cause would unfairly prejudice the jury

---

[3] After all, a handgun is generally safer than an assault rifle, but that does not bear on the issue of liability for a police shooting with a service pistol.

against Plaintiffs and lead the jury to believe that Maldonado's death is insignificant because Defendants used a weapon that has allegedly benefited society in other ways.  That calculus is forbidden by the constitutional values embedded in the history and language of 42 U.S.C. § 1983.

Importantly, Kroll's testimony on these topics has been precluded previously.  *See Khottavongsa v. City of Brooklyn Ctr.*, No. 16-CV-1031 (RHK/DTS), 2017 WL 3822877, at *6 (D. Minn. Aug. 30, 2017) ("Dr. Kroll is not qualified to offer opinions on the force options available to the police officers who responded to the scene here. Nor can he testify that the use of the taser was the 'safest' option the police had. That is simply beyond his expertise.").

Accordingly, Kroll's opinions are irrelevant, beyond his expertise, and unfairly prejudicial.

II.    **Kroll's proposed testimony that Maldonado tore off the bottom probe wire within ¾ seconds is outside Kroll's expertise, is speculation and unreliable, and will not assist the jury.**

Kroll has opined that Maldonado tore the wire off the lower Taser probe within three-fourths of a second after the Taser deployment.  (Kroll Report 8). This opinion is outside Kroll's expertise.  Kroll is not an expert on the tensile strength of particular wires or the strength of the human arm and hand.  Rather, Kroll is "a Biomedical scientist with a primary specialty in bioelectricity or the interaction of electricity and the body."  (Kroll Report 5).  Kroll has no knowledge, skill, experience, training, or education which would permit him to testify as an expert on whether Maldonado tore the bottom probe wire.  Nor does he have

greater expertise than members of the jury in interpreting the visual evidence presented by the holding cell video in evidence.

Further, Kroll's opinion is not based on sufficient and reliable data or methodology.  For example, Kroll has not relied on any data, methodology, tests, or studies showing the tensile strength of this Taser wire, how much force Maldonado theoretically applied to the wire (the video shows no evidence that Maldonado even touched the wire), or that a person with a blood alcohol level of 0.241 who is receiving electrical current from a Taser is capable of deftly removing the wire from the probe and disguising his movements from the video camera.

Rather, Kroll's conclusion rests primarily on the holding cell video.  Kroll asserts that the holding cell video shows Maldonado tearing the wire.  At his deposition, Kroll testified as follows:

> Q. The video doesn't show him pulling the wire out. Can we agree on that?
> A. No, we are not going to agree on that.
> Q. There is no -- the video camera is behind him and does not disclose him pulling the wire out, does it?
> A. I disagree.
> Q. All right. And you claim that you know that he was pulling the wire out because you detected his elbow was bent? Isn't that correct?
> A. His movement -- that is part of it. The movements that he shows around that time are very consistent with someone pulling the probe out. And I have studied a lot of videos of that.
> Q. Well, the probe was never pulled out. It was still in his body when he got to the autopsy; isn't that correct?
> A. Thank you for making me clarify that. I meant to say that he pulled the wire out, but the videos I have reviewed that covered both the wire alone and the probe and wire together being pulled out. Thank you.

(Kroll Dep. 103-04).  However, a review of the holding cell video demonstrates that it is devoid of any evidence that Maldonado ever touched the wires, much less broke them.  (Holding Cell Video 2:04:44-2:04:51).[4]

Kroll's report contains the following screenshots of the video showing the frames on which Kroll relies to conclude that Maldonado tore the wire to the lower probe with his right hand:

 

Figure 7. Maldonado in flexor reflex after probe impact.  Figure 9. Maldonado begins extending his right elbow.

(Kroll Report 21-22).  Neither the video nor these screenshots show any evidence that Maldonado used his right hand to tear the Taser wire.  The probe, wire, and Maldonado's hands are not visible, and contrary to Kroll's claims the video does <u>not</u> show Maldonado extending his right elbow.

Kroll tries to justify his conclusion by pointing to the facts that Defendant Kaplan stated Maldonado "seemed to be trying to pull the dart from his stomach area," and at Maldonado's autopsy the lower probe had no wire attached to it. (Kroll Report 20-22).  However, neither of these facts is reliable or sufficient to support Kroll's conclusion.  Kaplan filed his report nearly a week after the homicide, and he later testified that he did not see a ripped wire.  (Kaplan Dep.

---

[4] The holding cell video is Plaintiffs' Trial Exhibit 9.

163, Ex. H).  Further, at the autopsy, both probes were still embedded in Maldonado and Kroll has not accounted for the fact that the wire could have been broken or removed by one of the officers after the encounter or any of the numerous medical personnel at the scene, in the ambulance, or at the hospital.

Importantly, Kroll's testimony will not be helpful to the jury because it is not based on any specialized knowledge that Kroll possesses; rather, it is based only on Kroll's review of the video, autopsy photographs, and the officers' incident reports, all of which the jury will be able to review on their own.  Kroll has no specialized knowledge about the physics involved in breaking wires that would make his review of these three items more expert than the review that will be done by the jurors.  *See Fate v. Vill. of Spring Valley*, No. 11 CIV. 6838 JPO, 2013 WL 2649548, at *5 (S.D.N.Y. June 13, 2013) (striking "any testimony in which Brave opines on how the use of a taser in this case affected Plaintiff and on the potential health consequences of that use of a taser" because Brave "could do little more than parrot and register his speculative agreement with testimony provided by the officers who witnessed the tasing—adding nothing new or relevant").

Accordingly, Kroll's conclusion that Maldonado tore the Taser wire within three-fourths of a second is outside his expertise, is unreliable, will not assist the jury, and is the product of advocacy on behalf of his employer, not expertise.

III.   **Kroll is not qualified to testify as an expert that Maldonado resisted handcuffing for forty-seven seconds after being Tased and his testimony will not assist the jury.**

Kroll concluded that "Maldonado resisted handcuffing for 47 seconds" after the Taser discharge.[5]  (Kroll Report 8, 25).  Kroll is not qualified "by knowledge, skill, experience, training, or education" to testify on whether a person is resisting a police officer's attempts to handcuff him.  Kroll is not a police officer, he has never trained any police officers in the use of force, and he admits that he is "not a trainings expert" and is "no expert on use of force in general . . . ."  (Kroll Dep. 36, 68, 76-77, 80).  And, as noted earlier, Kroll is not a physician with expertise in sudden cardiac arrest.  Thus, Kroll is not qualified to testify that Maldonado was resisting handcuffing.

Further, Kroll's testimony will not be helpful to the jury.  To reach his conclusion, Kroll relied exclusively on the cell surveillance video to conclude that Maldonado was resisting after being Tased.  (Kroll Dep. 102-04).  Specifically, Kroll testified as follows:

> Q. Can you tell us what the specific behavior was by Jose Maldonado that you considered to have been resisting handcuffing after Officer Kaplan fired the TASER at him?
>
> A. Not without the video. I mean, we could -- some things are obvious. We have him pulling the wire off at 2:04:48 and the 40 second frame. I would consider that resisting. And then in the intervening time, it looks like the officers are working pretty hard to get at his hands for cuffing, but without playing the video in high definition in front of me, I couldn't give you a lot of details.
>
> . . .

---

[5] It is worth noting that Dr. Myerburg, an expert in cardiology and electrophysiology, testified at his trial deposition—which will come into evidence without objection—that Maldonado was unconscious and in cardiac arrest within at most thirteen seconds after Kaplan began firing his Taser.

**Q. Other than reviewing, again, the videotape, you have no recollection of why it was that you claim Jose Maldonado was resisting for 47 seconds after he was TASER'd; is that correct?**

**A. I think it -- I can't think of anything besides the video that we have to go on. There is probably sworn testimony about the delays in handcuffing, but it is not coming to mind right now.**

**(Kroll Dep. 103-04).**

The jury will be able to review the video at trial.  It demonstrates that Maldonado was inert while being handcuffed, and <u>none</u> of the Defendant officers ever claimed any resistance to handcuffing on Maldonado's part after he was Tasered.[6]  Therefore, Kroll's opinion, based only on the video (which contradicts his claims) and no specialized knowledge, will not assist the jury in this case.

IV.     **Kroll's opinions on using Tasers on intoxicated individuals are beyond his expertise, irrelevant, and unfairly prejudicial.**

**Kroll makes the following assertions in his report:**

**The occasional opinion — that electronic control should not be used with the intoxicated — does not comport with the realities of law enforcement. That reality is that well-adjusted and sober members of society do not tend to be involved in forceful arrests as 79% of recipients of force have a history of mental illness or substance abuse and 66% have a documented history of mental illness. More specifically to drug abuse, a large study found that 71% of electronic control subjects had drugs in their urine and 73% had a substance abuse history. A large Canadian forceful-arrest study found that 82% of the subjects were being affected by alcohol, drugs, or emotional disturbance. The suggestion that CEWs not be used on the mentally ill (including those in excited delirium) or those intoxicated by drugs or alcohol would exclude the very people that most often resist arrest. Also, prolonged continuous CEW exposure in the setting of**

---

[6] *See, e.g.*, Cohen Incident Report 2, Ex. E ("I went to Maldonado when he was laying on the ground and handcuffed him with the assistance of Officer Kaplan."); Lis Incident Report 1, Ex. F ("We eventually were able to handcuff Jose and exit the bullpen."); Kaplan Incident Report 4, Ex. G ("I held Maldonado under power of the taser, advising Sergeant Lis and Officer Cohen that he was still under power and to handcuff him. After Maldonado was handcuffed, he seemed to be relaxing and calmer.").

> **acute alcohol intoxication has no clinically significant effect on subjects in terms of markers of metabolic acidosis. The acidosis seen is consistent with what occurs with ethanol intoxication or moderate exertion.**
>
> **Sober and rational people generally do not resist law enforcement officers.**

**(Kroll Report 28-29).**

Kroll is not qualified "by knowledge, skill, experience, training, or education" to testify on whether using a Taser on an intoxicated person "comports with the realities of law enforcement" or what kind of person is more likely to resist law enforcement.  Kroll is not a police officer, he has never trained any police officers in the use of force, and he admits that he is "not a trainings expert" and is "no expert on use of force in general . . . ."  (Kroll Dep. 36, 68, 76-77, 80).  Thus, Kroll's opinions are wholly outside his expertise.

Further, Kroll's opinions are irrelevant to this case.  Whether an "occasional opinion . . . comport[s] with the realities of law enforcement" has no bearing on whether Defendants used excessive force in this instance.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (stating that the "proper application" of "[t]he test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case . . . .").  And Kroll's opinions on drug abuse, mental health, and metabolic acidosis have no bearing on any issue in this case (Maldonado had no history of drug abuse or significant mental health problems and Plaintiffs are not claiming that Maldonado suffered from metabolic acidosis, nor does the autopsy support this claim).

Lastly, any conceivable probative value of Kroll's opinions is substantially outweighed by the danger of unfairly prejudicial effect.  Kroll's stray pronouncements on drug abuse, mental illness, and metabolic acidosis in other individuals nationally or in Canada serve no purpose other than to insinuate to the jury that Maldonado suffered from these.  Further, Kroll's comments that "well-adjusted and sober members of society do not tend to be involved in forceful arrests," that "the very people that most often resist arrest" are "the mentally ill (including those in excited delirium) or those intoxicated by drugs or alcohol," and that "[s]ober and rational people generally do not resist law enforcement officers" are nothing more than attempts to smear the Plaintiffs.  Such statements are intended to make the jury believe that Plaintiffs, because they were arrested, are mentally ill, irrational, and not well-adjusted members of society.  *See Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty.").

Accordingly, the Court should preclude any testimony by Kroll on these topics.

V.      Kroll is not qualified to testify as to Maldonado's cause of death.

Kroll repeatedly opines on medical issues he is not qualified to testify about.  For example, Kroll opines that electrocution was not the cause of death, that the Taser did not contribute to Maldonado's death, that Maldonado went into cardiac arrest at a particular time, and that Maldonado's cardiac arrest rhythm was asystole rather than ventricular fibrillation.  (Kroll Report 8-9, 12-13, 24-25,

28).  Kroll also criticizes the medical conclusions of the State of Connecticut's

medical examiners and Dr. Robert Myerburg, a cardiologist.  (Kroll Report 31-33,

36-46).  Kroll is not qualified to testify to any of these medical opinions.

> In the context of medical opinions, courts have consistently drawn a distinction between the qualifications of medical and non-medical doctors, noting that non-medical doctors who are qualified to diagnose a medical condition may be unable to reliably determine its cause. *Plourde v. Gladstone*, 69 Fed.Appx. 485, 487 (2d Cir. 2003) (Witness who was "a toxicologist and not a medical doctor" was not qualified to opine on specific causation in humans); *Coene v. 3M Co.*, 303 F.R.D. 32, 55 (W.D.N.Y. 2014) ("Although a toxicologist may be qualified to testify as to causation, a toxicologist is generally not qualified to offer a medical diagnosis."); *Munafo v. Metropolitan Transp. Auth.*, No. 98-CV-4572 (ERK)(RLM), 00-CV-0134 (ERK)(RLM), 2003 WL 21799913, at *20 (E.D.N.Y. Jan. 22, 2003) (finding a phsychopharmocologist, who diagnosed and prescribed medication to treat conditions was not qualified to opine on the cause of said condition.).

*N.K. by Bruestle-Kumra v. Abbott Labs.,* No. 14-CV-4875 (RER), 2017 WL 2241507,

at *4 (E.D.N.Y. May 22, 2017), *aff'd*, 731 F. App'x 24 (2d Cir. 2018) (summary order),

*cert. denied sub nom. N.K. ex rel. Bruestle-Kumra v. Abbott Labs.*, 139 S. Ct. 794

(2019).  Kroll, of course, lacks the medical qualifications of the toxicologists and

psychopharmacologist deemed insufficient in the decisions from our Circuit cited

above.

In *N.K. by Bruestle-Kumra*, the plaintiff alleged that the defendant "failed to

adequately warn of the teratogenic effects of its drug, Depakote, which caused

N.K. to suffer from a constellation of severe birth defects."  *Id.* at *1.  The court

held that one of the plaintiff's experts, a teratologist and toxicologist, was not

qualified as an expert on the specific cause of N.K.'s injuries.  *Id.* at *4.  The court

explained that,

> **[The expert] may be qualified to testify that Depakote exposure can cause N.K.'s injuries. However, by his own testimony he has never evaluated children, has never been called upon to diagnose dysmorphic features or autism in a child, and is not a clinician. . . . His expertise is limited to the teratogenic effect of substances, such as valproic acid, in animals generally. . . . This is insufficient to qualify him as an expert on the specific cause of N.K's injuries.**

*Id. See also Donovan v. Centerpulse Spine Tech Inc.*, 416 F. App'x 104, 106 (2d Cir. 2011) (summary order) (holding that, in a products liability action, the plaintiff's metallurgical expert who "considered causation only in respect of the failure of the device itself" was "not qualified to opine on medical causation"); *Demar v. D.L. Peterson Tr.*, No. 1:05-CV-0103, 2006 WL 2987314, at *5 (N.D.N.Y. Oct. 13, 2006) (holding that the defendant's expert, a biomechanical engineer, was "not qualified to testify with respect to the cause of death" because he had "no medical training or background").

Similarly, here, Kroll is not qualified to testify as an expert on these medical issues because he has no knowledge, skill, experience, training, or education as a cardiologist or pathologist.  Kroll has never attended medical school, never completed any medical school courses, and has never taken any medical school courses in forensic pathology, and has never completed any courses in toxicology.  (Kroll Dep. 33-36).  Kroll is not even the type of "non-medical doctor" discussed above.  Rather, Kroll has a bachelor's degree in mathematics, a master's degree and Ph.D. in electrical engineering, and an MBA.  (Kroll Dep. 31-33).  Importantly, Kroll's opinions are directly contradicted by the testimony of medical experts in this case, including the State's Chief Medical Examiner, who

have concluded that the Taser was the cause of death.  (Autopsy Report 5, Ex. C; Myerburg Dep. 135-136, Ex. D).

Therefore, Kroll is not qualified to testify as to the specific cause of death in this case or to criticize the medical diagnoses and conclusions reached by the medical examiners or Dr. Myerburg.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' motion and preclude Kroll from testifying on the topics set forth above.

THE PLAINTIFF, WILSON RAMOS, AS
ADMINISTRATOR OF THE ESTATE OF
JOSE A. MALDONADO, and INDIVIDUALLY

By: /s/ Zachary J. Phillipps
David M. Cohen, Esq. (ct06047)
Leonard M. Braman, Esq. (ct30091)
Zachary J. Phillipps, Esq. (ct30047)
WOFSEY, ROSEN, KWESKIN
& KURIANSKY, LLP
600 Summer Street
Stamford, CT  06901
Tel: (203) 327-2300
Fax: (203) 967-9273
Email: dcohen@wrkk.com
Email: lbraman@wrkk.com
Email: zphillipps@wrkk.com

## CERTIFICATION

I hereby certify that on June 17, 2019, a copy of the foregoing was filed electronically and served by email on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by email or regular mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

Thomas R. Gerarde, Esq.
Alan Raymond Dembiczak, Esq.
Beatrice S. Jordan, Esq.
Howd & Ludorf, LLC
65 Wethersfield Avenue
Hartford, CT 06114-11921
Ph:    (860) 249-1361
Fax:   (860) 249-7665
Email: tgerarde@hl-law.com
Email: adembiczak@hl-law.com
Email: bjordan@hl-law.com

James N. Tallberg, Esq.
Dennis M. Durao, Esq.
Karsten & Tallberg, LLC
500 Enterprise Drive, Suite 4B
Rocky Hill, CT 06067
Ph:    (860) 233-5600
Fax:   (860) 233-5800
Email: jtallberg@kt-lawfirm.com
Email: ddurao@kt-lawfirm.com

Michael Brave, Esq.
17800 N. 85th Street
Scottsdale, AZ  85255
Email:  brave@axon.com


                                        /s/ Zachary J. Phillipps
                                        Zachary J. Phillipps, Esq. (ct30047)

22