# **EXHIBIT A**

# United States District Court

## District of Connecticut

| | |
|---|---|
| Wilson Ramos,<br>　　　　Plaintiff,<br><br>　　　　　v.<br><br>Town of East Hartford, et al,<br>　　　　Defendants. | No. 3:16-cv-00166 (VLB) |

### EXPERT REPORT OF MARK KROLL, PhD, FACC, FHRS, FIEEE, FAIMBE

I, Mark Kroll, being of legal age and under the penalties of perjury, state as follows:

1. I am a competent adult and have personal knowledge of the following facts, or believe them to be true based on information and belief. Facts about which I do not have personal knowledge are of the type reasonably relied upon by experts in this field and have probative value to me in rendering my opinions.

2. Attached hereto is a true and accurate copy of my expert report in this litigation.

3. The report summarizes my analysis and findings and includes a statement of my opinions. The report also includes data and other information considered by me in forming my opinions and sets out my qualifications (including my CV which is an integral part of this report).

4. My opinions are expressed to a reasonable, or higher, degree of professional certainty.

5. I affirm under the penalties of perjury that the foregoing statements are true and correct.

Mark Kroll, PhD, FACC, FHRS, FAIMBE　　　　　　　　24 April 2018

# Brief Summary of Qualifications

I am a Biomedical scientist with a primary specialty in bioelectricity or the interaction of electricity and the body.[*] I have invested most of my career researching and developing electrical devices to diagnose and treat disease. The primary focus is the effect of electrical shocks on the human body.

This involves researching, lecturing, and publishing on electric shocks and their effects on the human body. It includes lectures throughout Europe, South America, and Asia (in 35 countries) as well as at many of the major universities and medical centers of the United States (U.S.). Usually, the typical audience member is a cardiologist electrophysiologist, medical examiner, or forensic pathologist. With 375 issued U. S. patents and numerous pending and international patents, I currently hold the most patents on electrical medical devices of anyone in the world. Over 1 million people have had devices with some of these patented features in their chest, monitoring every heartbeat. http://bme.umn.edu/people/adjunct/kroll.html.

In 2010 was awarded the Career Achievement Award by the Engineering in Medicine and Biology Society (EMBS) of the Institute of Electrical and Electronics Engineers (IEEE) which is the most prestigious award given internationally in Biomedical Engineering.
http://tc-therapeutic-systems.embs.org/whatsnew/index.html

Believed to be the only individual to receive the high "Fellow" honor from both Cardiology and Biomedical societies. To wit:

| | |
|---|---|
| 1997 | Fellow, American College of Cardiology |
| 2009 | Fellow, Heart Rhythm Society |
| 2011 | Fellow, IEEE Engineering in Medicine and Biology Society |
| 2013 | Fellow, American Institute for Medical and Biological Engineering |

Author of over 200 abstracts, papers, and book chapters and also the co-editor of 4 books including the only 2 scientific treatises on Conducted Electrical Weapons (CEW):

1. TASER® Conducted Electrical Weapons: Physiology, Pathology and Law. Springer-Kluwer 2009.
2. Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis: Springer-Kluwer 2012.

---

[*]See current CV for further details and specifics. My curriculum vitae containing details of my relevant formal education, training, experience, and publications authored is attached and made an integral part hereof.

# Brief Abbreviated Summary of Case Specific Opinions

1. The peer-reviewed literature shows that use of electronic control reduces the suspect injury rate by about 2/3 compared to alternative force options, including hands-on physical force.[88-98] In other words, the use of other control techniques can triple (3x) the injury rate compared to the use of an electrical weapon.

2. Mr. Maldonado tore off the bottom probe wire within ¾ second of the CEW probe deployment.

3. Mr. Maldonado received about ¾ second of probe-mode electronic control which is well below any safety limits suggested by any authorities in the world. It is also well below the 30 minutes (not 30 seconds) known to be safe from animal studies.[99] This is also well below the 30 and 45-second durations demonstrated safe in instrumented human studies.[100,101]

4. Mr. Maldonado had essentially normal breathing for 3:14 (minutes:seconds) after the brief CEW current delivery and this *per se* eliminates electrocution as a cause of death.

5. Mr. Maldonado was sitting up for 23 seconds after the brief CEW current delivery and this *per se* eliminates electrocution as a cause of death.

6. Mr. Maldonado resisted handcuffing for 47 seconds after the brief CEW current delivery and this *per se* eliminates electrocution as a cause of death.

7. Mr. Maldonado's cardiac arrest rhythm was asystole (flat-line). This rhythm is not associated with electrocution and this *per se* eliminates electrocution as a cause of death.

8. The ¾ - second electronic control attempt of Mr. Maldonado did not *cause* his unfortunate death. On the contrary, it represented the best opportunity to save his life during his exhibited behaviors and resistance.

9. The ¾ - second electronic control attempt of Mr. Maldonado did not *contribute* to his unfortunate death. Electrocution is a stand-alone cause of death and does not mix with other causes like a soup recipe.

10. No CEW dart was sufficiently close enough to Mr. Maldonado's heart to raise any concern of electrocution.

11. CEWs deliver a safe level of electrical current as specified by the Underwriters Laboratories (UL) and International Electric Fence standards.[102] In fact, they satisfy all relevant electrical safety standards.[5,103] The TASER® X26E™ CEW delivers $\approx$ 1.8 watts (W) which satisfies the UL electric fence safety limit of an equivalent of 5 W and even the more conservative 2.5-W international limit.[104,105]

12. The X26E CEW delivers 1.8 mA (milliamperes) of pulsed Direct Current (DC) which is equivalent to 13 mA of Alternating Current (AC). This is well below the 40 mA of AC considered safe by international electrical safety standards.[106]

13. The X26E CEW used in this incident satisfied the ANSI CPLSO-17:2017 "Electrical Characteristics of ECDs and CEWs" standard.

# Benefits and Risks of Electronic Control

Electronic control benefits are well-established in the peer-reviewed literature and explain why these weapons are so widely adopted throughout the industrialized world (107 countries). Subject injury rates are cut by $\approx 2/3$. In other words, the use of alternative force options, including hands-on physical force, tends to triple (3x) the injury rate compared to the CEW.[88-98,107] The number of law enforcement firearms shootings prevented has been estimated at over 160,000 based on the 3.66 million CEW field uses.[66,108] In agencies using the CEW with minimal restrictions, the *fatal* officer shooting rate falls by $\approx 2/3$.[109]

**Table 1. Primary risks from CEW probe-mode applications.**

| Risk | Findings | Notes |
|---|---|---|
| *Primary (Direct) Risks* | | |
| Electrocution | Theoretical possibility with fully embedded dart directly over heart in subjects under 46 lbs.[51] In general, electrocution events in adults is an urban legend.[16,35,110] | Present CEWs satisfy all world electrical safety standards. |
| Loss of vision | Demonstrated with probe penetrating the eye.[2,111-113] | |
| *Primary Secondary (Indirect) Risks* | | |
| Head injury from fall. | Fatalities demonstrated.[17] Non-fatal injuries demonstrated.[98,114] | |
| Fume ignition. | Fatalities demonstrated.[9,115] | |

The primary demonstrated and theoretical risks supported by the existing literature are outlined in Table 1. The most common contribution to fatality is a secondary injury from a head impact from an uncontrolled fall. If the subject is running or above a hard or elevated surface, and receives a CEW probe deployment, the unbroken fall can sometimes result in a serious head injury and there have been 16 deaths due to this.[17] This has not been reported with the drive (or contact or touch)-stun mode as there is no muscle lock-up. There have been a handful of secondary fatalities in which flammable fumes were ignited by an electrical spark from the CEW.[9,115] This has not been reported with drive (or contact or touch)-stuns although that remains a theoretical possibility.

The most misunderstood and exaggerated theoretical risk is that of electrocution. This is extremely unlikely as the output of existing CEWs satisfy all relevant world electrical safety and effectiveness standards including those for the ubiquitous electric fence.[5,102,103] The conservative IEC (International Electrotechnical Commission) standard allows up to 2.5 W (watts) for an electric fence and all present TASER CEWs deliver less than 2 W.[104] Underwriters Laboratories (UL) allows 5 W for narrow pulses such as those of TASER CEWs.[105] The primary driver of this myth appears to be the fundraising material of Amnesty International, and some sensationalistic media, that lists Arrest-Related Deaths

(ARDs) along with the innuendo that the CEW somehow electrocuted the subject. Notably, they have never attempted to explain how a CEW that satisfies all world electrical safety standards could ever electrocute anyone.

Swine are 3 times as sensitive to electrical current as humans.[116] The largest swine electrocuted by an X26E CEW was that of Valentino with a 10 second CEW discharge and it weighed 36 kg (79 lb).[117] Nanthakumar also electrocuted a *single* 50 kg swine with a 15 second CEW discharge but he used a drug trick which made the swine's weight equivalent to ≈ 30 kg.[118] Hence the largest swine ever directly electrocuted by a CEW weighed only 36 kg.

The levels of dangerous electrical current scale with body mass just like most drug dosage. Since swine are 3 times as sensitive to electrical current (as humans) this is translated to the single Valentino 36 kg pig to a 12 kg (26 lb) human.[116] This calculation uses a direct proportion relationship of dangerous current levels to the body mass. Some authorities have published that the danger level scales with the square root of body mass.[119] With such a relationship the Valentino pig is equivalent to a larger 21 kg (46 lb) human. Taking the more conservative calculation, the best evidence suggests that the risk of CEW electrocution is limited to humans weighing less than 46 lbs.

Most authorities agree that electrocution is a theoretical possibility with an extremely thin individual and a fully penetrated dart directly over the heart in a very thin person with a very small dart-to-heart distance (DTH).[50,62,120]

**Table 2. Summary of benefits and risks of CEWs.**

|  | Item | Rate |
|---|---|---|
| Benefits: | Subject injury | 2/3 reduction |
|  | Subject death | 2/3 reduction |
| Risks: | Fatal fall | 1:200,000 |
|  | Fatal or nonfatal major burn | 1:360,000 |
|  | Blindness from dart | 1:200,000 |

The very rare risks of CEW complications are swamped by the lives saved and serious injuries minimized from the reductions of ARDs. For every ARD from a CEW complication (fatal fall or fire) there are 50 ARDs prevented by reducing firearm shootings and over-exertional deaths. Additionally, there is 1 temporal ARD for every 1,000 traditional uses of force, or 1 temporal ARD for every 3,500 uses of CEWs.[121]

## Relevance to This Case:

1. No CEW dart was sufficiently near Mr. Maldonado's heart to electrocute him as shown in the later analysis from the autopsy photographs.

# A Brief Primer on Electrocution.

Low-power electrocution is death from an electrical current from a source under 1000 watts (W).[43] This is contrasted from "high-power" electrocution from power lines or lightning strikes. The death is almost always the result of the electrical current inducing VF (ventricular fibrillation). The electrical induction of VF takes a few seconds at most.[122-133] (A massive electrical injury such as a lightning strike can also directly cause death by brain and nerve damage but that is not relevant here.) Modern CEWs fall in the "low-power" category. The TASER® CEWs deliver ≤ 1.8 W.

In VF, the heart muscle cells continue to contract but at nearly random times. This is a common cause of cardiac arrest. Hence, there is no coordination among the cells and no blood is pumped from the heart. Loss of consciousness occurs in 13 ± 4 seconds if the person is supine (laying down).[134] If someone is standing or sitting then the collapse occurs within 1-5 seconds.[135,136] Also, the person loses their pulse immediately. Once VF is induced there is no pulse. There are 6 primary diagnostic criteria required to diagnose an electrocution as shown in Table 3.

Table 3. Primary diagnostic criteria for electrocution.

| # | Criterion | Timing |
|---|-----------|--------|
| 1 | Sufficient current delivered to heart. | 1-5 seconds of duration.[133] See Background section: *Electricity Does Not Build Up Like Poison.* |
| 2 | Loss of pulse. | Instant[137] |
| 3 | Loss of consciousness. | 13 seconds if laying down.[134] 5 seconds if sitting up.[134-136] |
| 4 | Loss of normal breathing. | 15-60 seconds.[137,138] Agonal breathing (typically 3 minutes) with a maximum of 6 minutes.[139-141] |
| 5 | Successful defibrillation. | 14 minutes with any cardiopulmonary resuscitation (CPR); 9.5 minutes without.[45] |
| 6 | VF rhythm. | 30-40 minutes after which the VF typically deteriorates to asystole or PEA.[42,142-145] |

A final note on electrocution is that it is a stand-alone cause of death. Electrocution is not like a soup recipe where salt and pepper both contribute to the flavor. It does not "contribute" to other causes of death.[28] For example, if someone with late-stage cancer were to receive sufficient current, they would be dead within seconds and the cancer had nothing to do with it. However, if the same person received a lower level of current and died 30 days later, that person was not electrocuted. People have died as a result of falls from ladders after being startled by an electrical shock. The shock was certainly temporally related to the death but this is not an electrocution, the fall from the ladder was secondary to the electrical shock. With rare partial exceptions — generally not salient to

ARDs — the presence of other disease states does not make someone significantly harder or easier to electrocute. Conversely, low-power electrical currents do not hasten deaths from other diseases.

The CEW has an insignificant effect on a subject's adrenergic and metabolic state.[1] However, the effects of metabolic and adrenergic stress on the electrocution threshold have also been extensively studied. The effects, while statistically measurable, are immaterial in the ARD scenario. Adrenergic stress will temporarily lower the VF threshold (VFT) for a few minutes after which the VFT increases.[146,147] The impact for electrical weapons is that the critical dart-to-heart distance (DTH) could increase temporarily to 4-5 mm. Metabolic acidosis also has a similar immaterial effect.[148] Cocaine, a sodium channel blocker, *increases* the VFT and hence makes electrocution even more difficult.[149,150]

## Relevance to This Case:

1. Mr. Maldonado continued to breath fairly normally for 3:14 (min:sec) after the attempted probe-mode electronic control with the CEW.

2. Mr. Maldonado resisted handcuffing for 47 seconds after the brief CEW current delivery and this *per se* eliminates electrocution as a cause of death.

3. Mr. Maldonado's cardiac arrest presenting rhythm was asystole (flatline). This rhythm is not associated with electrocution but rather with excited delirium, alcohol, heart disease, drug, and some other deaths.

alcohol analgesia that Maldonado had which allowed him to quickly remove the lower probe wire without being distracted by pain.



**Figure 5. CEW armed and pointed at Maldonado just before deployment.**

A probe spread of only 4.8 inches will not cause sufficient muscle contractions for any type of control in the front of the body as seen in Figure 6.[154]



**Figure 6. A frontal probe spread of 9 inches is required for electronic control.**

Figure 7 is the frame taken just 134 ms after the probe deployment and shows the rapid flexor reflex (of the left arm) after the probe landing. This is when Maldonado tore the wire from the lower probe with his right hand. Ofc. Kaplan reported that Maldonado seemed to be trying to pull the dart from his stomach area which would match the lower probe location. This is consistent with the photo in Figure 2 (showing the lower probe with no wire attached) and the

sworn testimony that officers heard the distinct sound of a disconnected open-air arcing CEW.



**Figure 7. Maldonado in flexor reflex after probe impact.**

As seen in Figure 8, Ofc. Kaplan held down the trigger while holding back Ramos — even though the CEW was producing only noise. This is the expected officer behavior during the use of both hands as discussed later in the section on "Misunderstanding the Trigger-pull Download" beginning on page 48.



**Figure 8. Ofc. Kaplan maintaining trigger pull while holding Ramos back.**

## Duration of Electrical Current Delivery

The holding cell video and the testimony allows us to accurately estimate the duration of current delivery to Mr. Maldonado.

| Video Time | Event | Source | Time from trigger pull (s) |
|---|---|---|---|
| 2:04:47.09 | CEW light ON | Video | -0.57 |
| *2:04:47.66* | *Estimated time of trigger pull* | *100 ms reflex* | |
| 2:04:47.76 | Maldonado begins left arm reflex. | Video | 0.10 |
| | Ofc. Kaplan remarked that Maldonado was pulling out the probes. | Deposition of Sgt. Lis p 99 | |
| 2:04:48.42 | Maldonado extending right elbow. | Video | 0.76 |
| | Sgt. Lis heard loud popping sound of a disconnected CEW | Deposition of Sgt. Lis p 100 | |
| 2:04:48.87 | Sgt. Lis moving towards Maldonado | Video | 1.21 |

Note that the video time above is not real-time but the video-clip elapsed-time which is about 1 s greater.

Mr. Maldonado shows a flexor reflex at 2:04:47.76. Allowing 100 ms for the rapid Hoffman-type reflex we can time the trigger pull to 2:04:47.66.[155] At 2:04:47.66 Maldonado is seen extending his right elbow which is consistent with tearing the lower probe wire. That gives an elapsed time of 0.76 s (3/4 second) for the total time of current delivery. These times are highly consistent with the sequence of events as recalled by Ofc. Cohen and Sgt. Lis.



**Figure 9. Maldonado begins extending his right elbow.**

*Mr. Maldonado received about ¾ second of electrical current.*

## 2. Agonal Breathing and the Time of Cardiac Arrest

As an outgrowth of my scientific research into defibrillation, I was a co-founder of SurVivaLink (now called Cardiac Science) which is still a major supplier of automated external defibrillators (AEDs). We developed the first AED with a single-button operation and our primary focus was on law enforcement officers who did not have AEDs at the time (1992). I am very comfortable and qualified to describe the signs of cardiac arrest, (of which abnormal breathing is key).

About half of cardiac arrest subjects have a period of agonal breathing after the cardiac arrest. [139-141] (The other half simply stop breathing) It is important to note that civilians generally recognize the difference between normal breathing and the agonal respirations associated with cardiac arrest. A study from Seattle, Washington, of 445 civilian calls to 911 for cardiac arrest clearly shows this. [141] Humans are so attuned to the breathing patterns of people around them that this is reflected even in poems and rock and roll songs. In fact, the American Heart Association no longer teaches pulse-checking in CPR classes. The diagnostic test is: "nonresponsive and no normal breathing." Studies of out-of-hospital cardiac arrests have used this as the definition of agonal breathing. Here is a quote from the Bång study of agonal breathing during emergency calls:

> A patient was considered as having agonal breathing if the witness acknowledged that the patient was not breathing normally. This definition was adopted from an empirical study describing the incidence of agonal respirations in cases of [cardiac arrest]. [158]

Agonal breathing can simply be a very low rate sometimes described as "barely breathing." [141,158] As shown in Table 6, Maldonado's last breath with a normal period was at 2:08:07 after which his breathing rate fell precipitously (to 2-4 BPM) as shown in Figure 10. If Maldonado's slow breathing is interpreted as the first agonal breathing then the estimated time of the cardiac arrest would be ≈ 2:08:00. This is listed as the "earliest time for cardiac arrest" in Table 6.

Sometimes an agonal breath is described as a groan. [141,158-160] Here, the recollections of Mr. Wilson Ramos (Maldonaldo's brother) are helpful. Ramos describes a groan being heard shortly before the officers checked on his brother [2:10:34]. His recollection varies as to who commented on the groan first, but he was clear about a groan being heard.

> Ramos stated he was then taken to a cell and so he couldn't see Maldonado anymore. He heard Maldonado **groan** and asked the officers to check on him. The officer told him that Maldonado seemed like he was breathing. The officers then discussed calling for an EMT, which Ramos also then asked them to. EMT"s were then called. (summary of Ramos statement to Det. Wisner. Emphasis added)

> He asked the officers if Maldonado was okay and an officer replied that he heard him make a grunt/groin (**groan**) noise. Another officer then asked if they should call an EMP (EMT). The Sergeant hesitated, and Ramos then asked if they would check Maldonado's

> pulse, which he believes they did. Ramos then heard the sergeant say to call for an [EMT] (summary of Ramos email to Det. Wisner. Emphasis added)

If Maldonado's groan is interpreted as the first sign of agonal breathing, then then the "Latest time for cardiac arrest" of 2:10:15 is very close to the time the officers checked on Mr. Maldonado.

*Mr. Maldonado's cardiac arrest most likely occurred between 2:08:00 and 2:10:15.*


## 3. Maldonado Sat Up and Resisted After Electronic Control Attempt

Mr. Maldonado sat up, unassisted, at 2:04:54 and remained sitting up until an officer pushed him down at 2:05:09 apparently in order to handcuff him. That was 23 seconds after the ¾ - second CEW current delivery (the electronic control attempt). Maldonado continued resisting the handcuffing until he was finally cuffed at 2:05:33. This was 47 seconds after the attempted electronic control.

Loss of consciousness, after a cardiac arrest, typically takes 13 seconds if the subject is laying down.[134] It takes only 5 seconds if sitting up.[134-136] This extremely short time frame (of a *few* seconds and not *several* seconds) is well recognized and taught in the forensic pathology literature and textbooks. Here is an example from Wecht:

> When electrocution kills by causing ventricular fibrillation, there may be a period of a few seconds following the shock in which the victim can carry out activity, speak, or yell before losing consciousness.[161]

*Mr. Maldonado's sitting up and resistance — more than 5 seconds after the electronic control attempt — eliminates the possibility that he was electrocuted by the electrical weapon.*


## 4. The Lower CEW Dart was Significantly Far from the Heart

The autopsy found the lower dart at "the level of the costal margin in the midclavicular line on the left." A conservative positioning of the dart is shown in Figure 11 which places it 5 cm from the closest part of the heart. This is across the skin surface and thus the hypotenuse (including the angle needed to contact the heart) would be greater, or at least 6 cm. Moving the dart more left (patient's left — photo's right) towards a more mid-clavicular line would increase the DTH (dart-to-heart distance) spacing beyond 6 cm.

Regardless, a 6 cm DTH spacing is ≈ 20 times that required for electrocution by a TASER X26E CEW. Thus, the lower probe can be ignored for further analysis.

### 6. Mr. Maldonado's Cardiac Arrest Rhythm Was Asystole.

Mr. Maldonado's presenting rhythm was asystole (flat-line). The asystole tracing is seen at 2:19:58 in Figure 15.

Asystole and pulseless electrical activity (PEA) are the typical non-shockable cardiac arrest rhythms and are not inducible with electrical stimulation. [164-169] Electrically-induced VF will eventually deteriorate into asystole or PEA. Without chest-compressions, this takes over 30 minutes.[42] With CPR, the time for VF to deteriorate to asystole or PEA is even longer — around 60 minutes or more.[170] Note that this rhythm was recorded between 9:43 to 11:58 from the estimated times of cardiac arrest. I.e. the asystole was documented only 10-12 minutes after cardiac arrest.

It is important to note that many physician experts inappropriately confuse or conflate the faster-deterioration rate of ischemically-induced VF to the demonstrated longer duration for electrically-induced VF. The 2 are not synonymous as ischemically-induced VF tends to deteriorate more rapidly.[171]

Asystole and PEA are the most common cardiac arrest rhythms in deaths associated with drug and alcohol abuse or excited delirium syndrome.[172-179] They are also very common with sudden death due to heart disease.[180]



**Figure 15. Physio-Control rhythm strip labeled 2:19:58**

*Mr. Maldonado had the presenting rhythm of asystole (flat-line) which, with the limited time line, eliminates the possibility that he was electrocuted by the CEW.*

### 7.  Electronic Control is not Dangerous with the Intoxicated

The occasional opinion — that electronic control should not be used with the intoxicated — does not comport with the realities of law enforcement. That reality is that well-adjusted and sober members of society do not tend to be involved in forceful arrests as 79% of recipients of force have a history of mental

illness or substance abuse and 66% have a documented history of mental illness.[96] More specifically to drug abuse, a large study found that 71% of electronic control subjects had drugs in their urine and 73% had a substance abuse history.[181] A large Canadian forceful-arrest study found that 82% of the subjects were being affected by alcohol, drugs, or emotional disturbance.[182] The suggestion that CEWs not be used on the mentally ill (including those in excited delirium) or those intoxicated by drugs or alcohol would exclude the very people that most often resist arrest. Also, prolonged continuous CEW exposure in the setting of acute alcohol intoxication has no clinically significant effect on subjects in terms of markers of metabolic acidosis. The acidosis seen is consistent with what occurs with ethanol intoxication or moderate exertion."[183]

*Sober and rational people generally do not resist law enforcement officers.*

## Comments on Medical Examiner Findings

For my scientific research and consulting, I have reviewed over 600 autopsy reports involving either a real or possible electrocution. I am an internationally recognized expert on electrocution and lectured in Germany this March on the electrocution risk of short pulses. This August I will be lecturing in Switzerland on the electrocution risk of multiple short pulses and then back to Germany in November to lecture on the electrocution risk from the higher voltage electric cars.

As a civilian I appreciate the difficult job that medical examiners perform. Most of them are overworked and underpaid. http://www.courant.com/opinion/editorials/hc-ed-medical-examiner-0221-20170220-story.html

Their diagnostic work centers around the autopsy and — since electrocution usually does not leave any marks — they find an electrocution diagnosis more difficult than that of a bullet wound or a knife in the heart. For these reasons, I have been involved in a fair bit of education involving lectures, book chapters, books, and peer-reviewed articles in forensic pathology journals. This work appears to be appreciated as I am proud to observe that the majority of these lectures and book chapters were invited by the medical examiner community.

I have reviewed Dr. H. Wayne Carver's Autopsy Report and the deposition transcript of Dr. James Gill in this case. I am sorry to report that the (COD) cause-of-death finding and analysis of this office ranks in the top 5 COD findings — that I have ever reviewed — for ignorance of basic principles. The COD findings and analysis also ignore the simple electrocution chapters in the textbooks that Dr. Carver and Gill are expected to own and have studied.[184-186] They also ignore forensic pathology texts that have specific chapters on electrical weapons and arrest-related-death. [187,188]

We need to cover a few basic accepted facts:

1. Death caused by electrical shock has a precise term. Electrocution. The failure to use a correct term is consistent with a lack of understanding of a process or a desire to obfuscate. Every major textbook on Forensic Pathology has either a chapter or section on electrocution.[184-186] Wecht defines it well:

   The word *electrocution* connotes a fatality caused by the passage of electrical current through the body.[161]

Ironically, Dr. Carver's boss, Dr. Gill knows the correct term and has used it in his publications:[189]

> For example, it does not make physiologic sense for a cause of death to be *electrocution* in a person who becomes unresponsive 10 min after an electromuscular disruption device (EMDD) shock.... Could a person who was in an excited delirium die from direct EMDD electrical effects on the heart causing a lethal cardiac arrhythmia? This is essentially asking if the EMDD is capable of causing death by *electrocution.* Over the years, training classes conducted on EMDDs by their manufacturer have delivered more than 100,000 EMDD applications to participants with no reported cardiac arrests or deaths. Even though this population may not be representative of an individual in excited delirium, it is compelling evidence that EMDDs rarely, if ever, cause death by an *electrocution* mechanism. (emphasis added)

2. Electrocution is a stand-alone cause of death.  It does not combine with other physiological insults like salt and pepper combine in a soup recipe. The only way that electricity combines with a head injury is when the shock caused someone to lose their balance and suffer a secondary-injury fatal fall.[17] That would also not be an electrocution.

3. Electrocution is not diagnosed by exclusion. (Guilty until proven innocent.)

We can take the "Handbook of Forensic Pathology (2nd Ed) for an example of how electrocution is to be diagnosed by the medical examiner.[186] Here are some of the diagnostic criteria: (bullets added)

* Fatal ventricular fibrillation can occur if as little as 0.05 ampere (or 50 milliamps [mA]) passes through the heart. Note: That is equivalent to 6.8 mA of pulsed DC which is almost 4 times the output of the X26 CEW.
* Almost all electrocutions are accidental, as are certainly all lightning strikes. The major forensic aspect is that many electrocutions are open to civil legal actions and liability issues, especially if the electrocution occurs at the workplace or by a potentially defective commercial electrical product. Therefore, a timely and thorough scene investigation is critical, especially in low voltage electrocution, where few or no physical findings at autopsy are common. The defective device may be the only evidence of electrocution after a thorough investigation and examination.
* Any electrical devices associated with the deceased should be secured and brought in with the body.
* Interviews with all witnesses in the area of the incident are also critical. A victim of low voltage electrocution may suddenly arch backwards, yell loudly, or state that they were just shocked and take several steps before collapsing.
* Examination of the components of the circuit involved in the electrocution is necessary. The depth of the investigation depends on the circumstances of the case. In low voltage electrocution, this usually includes the electrical outlet and the entire electrical device. It is important to note that most forensic pathologists are not skilled in the examination of electrical devices and do not have specialized training in diagnosing defects in electrical devices. If a defective electrical device is the instrument of electrocution, it is best to have the device examined by an electrical expert. A reliable

electrical engineering consultation should be obtained. The electrical engineer consultant must generate a detailed written report of their examination and opinion, and then return the instrument to the pathologist.

The Handbook goes on to list classic errors in an electrocution case: (bullets in original)

Pitfalls in the Determination of Electrocution
- Not conducting a timely and thorough scene investigation.
- Not interviewing potential witnesses and family members.
- Not securing any potentially defective electrical devices capable of causing the electrocution.
- Not obtaining an independent electrical engineering consultant to examine the potentially defective electrical device in legal liability cases.
- Not carefully examining the clothing, personnel effects, or body for small thermal injuries.
- Not anticipating potential civil litigation and its intensely adversarial nature.

Note that the Medical Examiner's Office failed to test the CEW involved in this case even though Dr. Gill testified, in his deposition, to his belief that some CEW's deliver more current then the manufacturer's specifications. Dr. Gill has also mentioned this conspiratorial bias in a publication.[189] One problem with Dr. Gill's misplaced belief is that it is belied by the literature.[190]

The diagnosis of exclusion — for electrocution — is not supported in either the peer-reviewed literature or textbooks. For example, Wecht's Forensic Pathology (4th Ed.) only mentions the diagnosis of exclusion for drowning. I did a content search of major electrocution articles in my library and found no mention of an exclusion diagnosis.[63,191-211] Nevertheless, on page 54 his deposition, Dr. Gill admitted that he used a diagnosis of exclusion to inappropriately implicate the CEW. As discussed herein, the diagnosis of exclusion actually definitively excludes the CEW of electrocuting Maldonado. That is because there are many pieces of evidence that exclude electrocution.

## Conclusions of Dr. Carver:

Dr. Carver signed the Autopsy Report (28 July 2014) for Mr. Maldonado and then Dr. Gill signed the cover page on 30 Jul 2014. The "Final Cause of Death" was given as:

> Cardiac arrhythmia following precordial electrical shock and blunt injury of head.

First, this opinion is only "temporal," (following), and not "causal," and, no-where does it state that it is to a reasonable degree of certainty; thus, it is highly unreliable. It is also important to consider that the ME's report lacks even a single citation to supportive peer-reviewed literature or applicable science. This *ipse dixit* conclusion is contrary to Dr. Carver's training and contrary to the peer-reviewed scientific knowledge of electrocution and electrical weapons. It is also among the most bizarre COD death finding I have ever reviewed out of approximately 600 autopsy reports.

Death caused by electrical shock has a precise term. Electrocution. The failure to use a correct term is consistent with a lack of understanding of a process or a desire to obfuscate.

Note that Plaintiff's expert Dr. Robert Myerburg does not support Dr. Carver's bizarre soup-recipe finding. He directly contradicts it with, "Postmortem examination of the brain did not reveal findings that would suggest a cardiac arrest as a consequence of trauma to his head..."

Here is the checklist for low-power electrocution: (emphasis added for the items most relevant to this case)

1. VF is either induced or not induced within 1-5 seconds. [128,129,212-214] There is no build-up of "electrical poison."
2. ***Cardiac rhythms of asystole and PEA (pulseless electrical activity) are not induced by the electrical pulses. Note that Myerburg points this out.***
3. The cardiac pulse disappears immediately. [122]
4. The patient loses consciousness within 5-15 seconds.
5. A sufficiently strong defibrillation shock—either internal or external—restores a cardiac sinus rhythm 99% of the time. [45,214]
6. ***With an electrocution, normal breathing ceases in 12-15 seconds.[137,139]***

Carver's unsupported *ipse dixit* temporal speculation does not discuss any of these above diagnostic factors.

Standard forensic pathology textbooks give the amount of current required to electrocute. These include Spitz, Dolinak, and Froede.[184-186] The amount of AC current required to kill is typically considered to be 100 mA. The Spitz book

gives 100-300 mA but later says as little as 70 mA (probably referring to small children) can be fatal. Dolinak says 100 mA (0.1 amperes). Froede's textbook goes as low as 50 mA passing thru the heart (implying a higher current thru the body since there is muscle carrying current on detours avoiding the heart).

The current delivered by an X26E CEW is 1.8 mA DC equivalent to 13 mA AC. ***Thus, Dr. Carver's opinion is contradicted by the standard medical examiner textbooks.*** It also is contradicted by well accepted electric fence safety standards. The X26E CEW delivers about 1.8 watts (W) which is far less than the 5 W allowed by the Underwriters Laboratories electric fence standard. In fact, it even satisfies the very conservative European and IEC electric fence standard limit of 2.5 W.[102]

## Deposition of Dr. Gill

It is important to consider that Dr. Gill has published at least 2 documents that contain limited information on CEWs, a book chapter in 2009,[189] and a paper in 2014.[215] While both cite to "literature," many of the statements and selective citations are out of context, out of date, or just flat out wrong. As a glaring example, in his 2009 book chapter Dr. Gill states "A recent study has reported that an EMDD produces considerably more power and current than claimed by the manufacturer."[189] Dr. Gill's supporting citation for this statement is a 2005 expert witness newsletter (non peer-reviewed) paper by a high-school dropout named James Ruggieri.[216] (Mr. Ruggieri was fired by the Coast Guard for falsly claiming to have an engineering degree.) By taking limited information out of selective literature and context without knowing the full body of the literature sometimes leads to such unsupported inaccurate statements. Dr. Gill makes numerous inaccurate statements regarding CEWs in his 2 documents.

Dr. Gill could not recall consulting any scientific literature for this case (p 17). He also did not recall making any measurements of the dart-to-heart distance (p 62) even though that is required to have the possibility of CEW electrocution.[217,218] It was not even estimated.

Dr. Gill went on to demonstrate a significant lack of understanding of the CEW and electrical injury in general. On p 100 he stated:

> The current will find low-resistant routes within the body (for example, blood vessel and nerve pathways)

Nerves have electrical insulation so outside currents tend to not enter them. They are also of small cross-sectional area compared to the major vessels and muscles. Therefore, they do not play any significant role in the electrical current path. To be fair, Dr. Gill is not the only physician to have this confusion but that does not make it any less wrong. The skeletal muscles (not mentioned by Dr. Gill) carry the majority of the electrical current.[219]

On p 101 we have this exchange:

> Q And for that reason, even though Taser darts might be a relatively small distance apart from each other, they could incapacitate an entire person, so to speak?
> A Yes.

This is, of course, completely incorrect as discussed earlier and shown in the peer-reviewed literature.[154]

On p 103 Dr. Gill stated:

> A I think most people now accept that there is a risk. Again, it's a very small risk. I think even, you know, Taser, you know, kind of accepts that risk now, and describes, you

know, you should Taser someone on their back, not on their front, away from the
heart and so forth. I think -- again, I can't speak for all forensic pathologists, but I think
most will say that if you have the right circumstances and if it's a thin person and the
leads are right over the heart, that that certainly is possible for causing cardiac cap-
ture and wouldn't say that Taser can never cause an arrhythmia death.

First, several papers and entities state that the chest *need not* be avoided be-
cause of the hypothetical risk of electrocution.[220,221] Second, Dr. Gill general-
izes that he cannot speak for "all forensic pathologists," as he should not, but
he should be familiar with their relevant literature.[222] While Dr. Gill makes sev-
eral generality errors in this statement, he does correctly understand that the
one of the critical issues is the DTH (dart-to-heart) distance, as he has previ-
ously published this: "Tissue thickness and electrode location on the body may
be a factor in cardiac disruption."[223] In spite of the fact that Mr. Maldonado was
a weight-lifter (and not thin), Dr. Gill's office did not bother to measure the DTH
distance.

Beginning at p 130 there is this exchange:

> Q Right. On page 103, there's a reference to when hearts are stopped by electrocution
> and the amount of current flowing, and you write, "Fatal cardiac arrhythmias typically
> are caused by higher currents (50 milliamperes for two seconds.)" Is that right? Did
> I get that right?
> A Yes. Yup.
> Q So that's the amount that is typically seen that is sufficient to cause a heart to stop?
> Fifty milliamps for two seconds?
> A If that's what been described, yeah.
> Q And the Taser manufacturer reports an average 2.1 milliamps and others have re-
> ported ranges from three to 10 milliamps. Is that right?
> A That's what's written, yup.
> Q The amount of current that comes from application of either a Taser or one of the
> others is anywhere from one-twentieth to one-fifth of the amount typically seen that
> will stop a heart?
> MR. COHEN: Objection.
> BY MR. GERARDE: Q Is that what we get from this data?
> A A couple sentences further down, it talks that maybe some of these current claims by
> the manufacturer are not quite -- other analyses have been done.* Clearly, I think
> they can show that it can cause capture. So again, this may be a little dated.

*Referring to this statement in his 2009 book chapter:[189]
> Fatal cardiac arrhythmias typically are caused by higher currents (50 mA for 2 s) than
> those that are reported to occur with EMDDs (Tasers's® manufacturer reported average
> 2.1 mA and other reported ranges: 3.3-10.9 mA). In addition to the current magnitude,
> one also must consider the body weight, duration, current frequency, and whether it is
> continuous. A recent study has reported that an EMDD produces considerably more
> power and current than claimed by the manufacturer.

The defensive answer by Dr. Gill is very curious. His own publication suggests
that the current from the X26E CEW is insufficient to electrocute. Rather than

admit that his office might have made a mistake, he suggests that the manufacturer may be lying about the output of their weapons. Anyone could take an oscilloscope and measure the device outputs as about 1 million have been sold worldwide. In fact, the device outputs are measured regularly for Canadian law-enforcement and the results published.[190] The idea that a manufacturer could get away with misstating something as simple as an electrical output is simply bizarre.

Dr. Gill's own paper suggests a duration of 2 seconds is required for electrocution. There is no evidence that his office bothered to estimate the duration of current delivered to Mr. Maldonado which was about ¾ second.

# Expert Report of Dr. Robert Myerburg

I read the report of Dr. Myerburg and wish to comment on some opinions.

On page 5, Dr. Myerburg states:

> Asystole and PEA occur in a number of different circumstances. In contrast to VF and pVT, PEA and asystole have always been more common mechanisms of cardiac arrest when it is secondary to breathing problems, such as restraint of breathing, asphyxia, or pulmonary embolism, or when it is due to severe blood loss, or to shock due to overwhelming infections. These mechanisms also occur as the primary mechanism in patients with end-stage heart disease, or other disorders such end-stage cancer, and commonly after failure to revert pVT or VF because of prolonged cardiac arrest response times.

Dr. Myerburg omitted a common cause of asystole, namely alcohol intoxication.[179] With deaths associated with alcohol and drug abuse, the most common rhythm is asystole and it is seen in 67% of such cases.

Dr. Myerburg's most useful comment is on page 6: note that he uses "SCA" for sudden cardiac arrest.

> Among electrical causes of SCA, there has been focus for many years on accidental electric shocks in the home as a cause of SCA, which occurs by initiating VF or pVT. In addition, during the years of major rural electrification projects in the early part of the 21st century, electrocution of linemen working with high voltage equipment was a major problem in the electrical industry. Because such electrical deaths were uniformly by the mechanism of VF/pVT, it was the electrical industry, and not the medical profession. that initiated the movement for development of defibrillators in the 1920's.

This appears to be taken from a boiler-plate discussion of sudden cardiac arrest as it tends to contradict Dr. Myerburg's final opinion in this instant case. Had Maldonado been electrocuted by the East Hartford police officers then he should have presented in VF or pVT according to Dr. Myerburg's "general" opinion about electrocution. Instead, Maldonado presented in *asystole* consistent with his high level of alcohol intoxication. [179]

On page 7, Dr. Myerburg states:

> The concept of the Taser emerged much later based on the goal of using less lethal interventions for law enforcement personnel to interrupt violent behavior. After coming into widespread use, it became apparent that Tasers were not entirely risk-free, although the magnitude of the risk was debated. [Cites to Zipes 2012 and Myerburg 2012][224,225] It is now generally accepted that risk of SCA associated with Taser deployment is low, but can occur and can be minimized, if not completely eradicated, by avoiding delivery of shocks to the anterior chest in the area over the heart (precordium).

Dr. Myerburg's entire cited support for his belief that a CEW can electrocute (cause sudden cardiac arrest) is the expert-witnessing case series of Dr. Douglas Zipes and his attorney co-author John Burton. Dr. Myerburg also cites to his own supportive editorial. It is generally believed that Dr. Myerburg was a reviewer of Zipes' case series and a primary reason why this junk science was published in *Circulation*. After *Circulation* recognized their error, they invited a paper from the other side and that is where the true debate can be seen.[36,226]

On pages 9 and 10 Dr. Myerburg states:

> A Taser shock was delivered to Mr. Maldonado's anterior chest in the precordial area. RELEVANCE: Reliable experimental and observational evidence indicate that the risk of cardiac arrest associated with Taser deployment is *limited to shocks delivered the anterior chest wall.* (emphasis added)

Dr. Myerburg is inappropriately attempting to conflate a *necessary* with a *sufficient* condition. Of course, the swine studies show that the risk is limited to the anterior chest wall as the dart tip must come within 6 mm in swine or 3 mm in humans in order to electrocute. Published human studies have shown that probes and electrodes right over the heart have not affected it.[154,163,227,228] Studies and independent reviews have concluded that the chest *need not* be avoided because of the hypothetical risk of electrocution.[220,221]

On page 10 Dr. Myerburg states:

> Maldonado lost consciousness between 6 and 11 seconds after the Taser shock. RELEVANCE: Reliable scientific evidence documents that sudden and complete cessation of blood perfusion of the brain by any mechanism results in loss of consciousness in approximately 10 seconds. Cardiac arrest results in instantaneous loss of blood flow, followed by loss of consciousness in the time frame cited. If cardiac arrest is preceded by a short run of pVT , the time to loss of consciousness may be a few seconds longer .

Dr. Myerburg does not state how he timed the loss of consciousness. His estimate of COD 6-11 seconds after the ¾ - second CEW current delivery are contradicted by the sitting up at 23 seconds and resisting handcuffing until 47 seconds. This is a case where seconds count as a standing or sitting person will lose consciousness within 5 seconds of a cardiac arrest; it takes 13 seconds for a person laying down. [134-136] By Dr. Myerburg's own criterion of 10 seconds above, Maldonado's sitting up and resistance eliminates electrocution by the CEW.

On page 10 Dr. Myerburg further states:

> No other plausible cause of loss of consciousness was identified or suggested by any available evidence.

Apparently, Dr. Myerburg has not heard of subjects "passing out" from alcohol abuse. He is also ignoring the timing of the vigorous struggle. Maldonado was already acidotic from the alcohol overdose and the struggle exacerbated that. Thus, he may have had his cardiac arrest caused by acidosis-induced asystole. Dr. Myerburg is also ignoring sudden cardiac death caused by other factors such as stress and channelopathies.[229,230] He is also ignoring the significant probability of a negative autopsy (morphologically normal heart) up to 53%, after a stress-induced sudden cardiac arrest.[229,230]

On page 10 Dr. Myerburg further states:

> Taser-associated cardiac arrest is caused by the initiation of VF or pVT.
> RELEVANCE: Scientifically reliable medical evidence demonstrates, and biological plausibility supports, that cardiac arrest associated with Taser shocks to the anterior chest is due to the initiation of VF or pVT. This occurs because the electric current from the Taser interacts with, and disorganizes, the electrical impulses of the heart.

Dr. Myerburg is certainly correct that a hypothetical CEW electrocution would lead to VF or pVT. That is one reason why Maldonado's presentation in asystole eliminates CEW electrocution.

Plausible is barely more reliable than possible and obviously not to a sufficiently reliable degree of reasonable certainty. Also, Myerburg ignores that this has only been seen in smaller swine and none that were CEW-law enforcement field-use conditions.[231] This is also not found in larger swine equivalent to a human weighing over 46 lbs.

On page 10 Dr. Myerburg further states:

> In the context of Mr. Maldonado 's medical status at the time of the cardiac arrest, PEA or asystole would be the more likely initial rhythm only if there had been restraint of breathing by the police officers. There was no suggestion of any restraint of that type on the video, further supporting the likelihood that pVT/VF induced by the Taser shock to the chest was the causative factor.

This statement suggests an unfamiliarity with the literature on alcohol deaths — which are usually associated with asystole. [179]

On page 10 Dr. Myerburg finally states:

> The recognition that Maldonado was in cardiac arrest was delayed because his collapse was not evaluated or responded to properly. When there is a delay in responding to a

cardiac arrest, an initial VF or pVT may deteriorate to PEA or asystole over time result-
ing in PEA or asystole being perceived as the first documented rhythm. In the case of
Maldonado, the delay between the Taser-associated collapse that heralded the onset
of cardiac arrest and the first recording of the cardiac rhythm was 12 minutes.

It is true that electrically-induced VF will deteriorate to asystole eventually.
However, this typically takes 30-40 minutes. [42,142-145] There was no "Taser-asso-
ciated collapse" as the device failed to work due to the close probe spread,
Maldonado's extreme intoxication, and his pulling the lower wire out immedi-
ately. If Dr. Myerburg meant to say "Taser-associated *hemodynamic* collapse"
(as opposed to a postural collapse) then he is engaging in circular reasoning as
that speculated "Taser-associated *hemodynamic* collapse" is his conclusion
and is not evidence.

Dr. Myerburg is not even correct on the timing between the CEW applica-
tion and the cardiac rhythm recording which was 15:12 and not 12 minutes.
There may be a Freudian slip here as 12 minutes before the recording was
2:07:58 which was around the time that I estimate was the earliest time for the
cardiac arrest. Or perhaps Dr. Myerburg actually agrees that the cardiac arrest
occurred around 2:08:00. That would directly contradict some of his other opin-
ions that the CEW led to the cardiac arrest since he acknowledges that there
would have been a loss of consciousness within 10 seconds. Dr. Myerburg
should be asked to explain this 3-minute discrepancy in his analysis.

On page 11 Dr. Myerburg states: (numbering added)

> Maldonado's loss of consciousness was due to a cardiac arrest caused by a Taser shock
> to the anterior chest.
> BASIS:
> 1.  The timing and characteristics of Maldonado's loss of consciousness affirm that the
>     cardiac arrest was due to the Taser shock to the anterior chest wall. since there
>     were no other plausible causes of loss of consciousness, under the circumstances
>     documented by the video tape, and there was subsequent documentation of a car-
>     diac arrest without any other intervening events that associate with triggering of
>     cardiac arrest.
> 2.  The video evidence leads to a scientifically reliable conclusion that the Taser shock
>     to the chest initiated a cardiac arrest that led to rapid loss of consciousness, and
>     ultimate death.
> 3.  Moreover, the autopsy revealed no evidence of pre-existing cardiovascular dis-
>     ease that would have placed Maldonado at risk for cardiac arrest independent of
>     the Taser shock.
> 4.  Postmortem examination of the brain did not reveal findings that would suggest a
>     cardiac arrest as a consequence of trauma to his head when he was punched by a
>     police officer and subsequently pushed into the wall.
> 5.  Finally, toxicology studies confirmed the absence of drugs associated with cardiac
>     arrest risk and a blood alcohol concentration lower than that associated with alco-
>     hol-associated fatalities.

My Comments:
1,2. As discussed earlier, the LOC occurred too late to have been associated with the 1-second CEW shock.
3. This is a strawman as no cardiac pathologist studied the cardiac tissue.
4. This opinion contradicts the medical examiner's report.
5. This is directly contradicted by the Heatley study of alcohol-associated fatalities which puts Maldonado at the 30th percentile for alcohol-associated fatalities.[232]

On page 12 Dr. Myerburg further states:

> Maldonado's cardiac arrest more-likely-than-not was due to VF (or pVT progressing to VF), followed by degeneration to asystole because of the delayed response time.
> BASIS: Cardiac arrest associated with Taser shocks to the anterior chest is due to the initiation of VF or pVT, because the electrical current from the Taser interacts with the electrical system of the heart, disrupting and disorganizing activation of heart muscle and loss of its pumping function. There is no scientific basis for a Taser shock initiating PEA or asystole as a primary mechanism. By delaying the initiation of evaluation and institution of life support for 12 minutes, Maldonado's heart rhythm transitioned to asystole, a nonshockable rhythm, resulting in loss of survival possibility. During the course of the delayed life-support activities, the ECG tracings from the AED suggest a transition from asystole to PEA, also a non-shockable rhythm. This transition had no implications for changing outcome expectations at that point, and do not forgive the consequences of the delayed response to the cardiac arrest.

There is zero evidence that Maldonado was ever in VF. Myerburg also has the implied deterioration time (< 12 minutes) wrong.[42] The rhythm tracings were taken from a Physio-Control LIFEPAK defibrillator-monitor and not from an AED.

On page 12 Dr. Myerburg finally states:

> Had Maldonado been responded to and initiated CPR immediately and an AED deployed within a few minutes after onset of the cardiac arrest, it is more-likely-than not that he would have survived without significant brain damage.
> BASIS: In the absence of advanced structural heart disease, other end-stage diseases, or transient risks for recurrent episodes of cardiac arrest, return of a normal heart beat and survival following CPR and an AED shock is greater than 50% generally. For the specific case of Maldonado, survival probability approaches 70%, given his age, absence of any structural heart disease whatsoever, and the opportunity for a response time as short as 2 minutes.

Comments:
1. The prognosis for a recovery from asystole without brain damage is dismal and on the order of 0.4 -4.0%.[233-235]

2. Dr. Myerburg is confusing the treatment and prognosis of VF with the asystole that Maldonado actually had. There is no evidence that Maldonado was ever in VF.
3. AEDs do not help with asystole. The defibrillator is not called a "de-asystolator" for good reason.
4. Even if Maldonado had been in VF, it is much harder to defibrillate with high levels of alcohol.[236]

Notably, Dr. Myerburg never considered the critical dart-to-heart distances in this case. Nor, does he explain how such a low-current device could electrocute.

1 or 2 CEW exposures, (2) 85% of fatalities were preceded by 3 CEW exposures or less, and (3) concluded that there was no correlation between the number of CEW exposures and the mortality rate.

2. White studied 188 ARDs where a CEW had been used and similarly found that 87% of them had 3 trigger pulls or less which is the equivalent of 15 seconds of discharge or less.[314]

The widespread dogmatic urban myth that 15 seconds is safe while 16 seconds is dangerous is contradicted by all of the relevant scientific studies and statistics.

*The direct electrical induction of VF by electrical currents takes 1-5 seconds.*

## J. The TASER CEW Has Led to Dramatic Reductions in Injury.

Numerous published studies have now clearly demonstrated substantial injury reductions from the use of TASER CEWs compared to alternative control techniques.[88-98,107]

A partial list of these studies includes:

1. Bozeman compared to other force options, including physical force.[107]
2. MacDonald which compared the CEW to pepper spray and "physical force."[90]
3. Taylor which compared the CEW to pepper spray, baton strikes, and "hands-on."[89]
4. Mesloh who studied CEW usage in comparison to many control options.[97]
   a. Gentle hold
   b. Handcuff
   c. Leg restraints
   d. Pepper spray
   e. Compliance holds
   f. Takedown
   g. Empty hand strike
   h. FN303/Pepperball
   i. Impact weapon
   j. Canine

The largest epidemiological study was the 2009 MacDonald study of 24,380 uses of force.[90] This study found that CEW usage dramatically reduced both

subject and officer injury (by 2/3) compared to alternative force options. Additional studies demonstrating injury reduction are memorialized in the papers of Taylor (13,983 subjects), Mesloh (n = 4303), Smith (n = 1645), Butler (n = 562), White (n = 243), and Bozeman (n = 893).[89,90,97,107,258,312,313]

On average, the use of the CEW reduces subject injuries by about 2/3. To put it another way, the use of alternative control techniques triples (3x) the risk of injury to subjects. Fatal suspect shootings are also reduced by 2/3 when electronic control is used without excessive restriction.[109]

a. The deployment and use of TASER CEWs has been shown to reduce injuries to officers and subjects over other force options, including physical force.
b. The deployment and use of TASER CEWs has been shown to reduce use-of-force civilian complaints and law enforcement internal affairs complaints against law enforcement officers.[315]
c. The deployment and use of TASER CEWs has resulted in the reduced need to use of deadly force.
d. Rates of injury from TASER CEWs is comparable to, or less than, some collegiate contact and exertion sports.
e. Rates of injury from TASER CEWs is less than several other common law enforcement force options, including, but not limited to: physical force, chemical aerosols, batons, impact tools, canines, rubber bullets, and bean bags.
f. TASER CEWs are a safer alternative than other comparable law enforcement force options tools or techniques.
g. TASER CEWs are shown to reduce subject injuries when compared to physical force options.
h. TASER CEWs have greater accountability features than any other force option.
i. TASER CEWs are the most studied force option available to law enforcement.
j. TASER CEWs are the most effective force option in accomplishing intended effects for U.S. law enforcement.
k. TASER CEWs are the most effective force option in gaining compliance without need for deployment or application (up to 81%).[316]
l. According to the peer-reviewed literature, the TASER CEW causes less-severe physiologic and metabolic effects than other force options.
m. According to the peer-reviewed literature, the TASER CEW is the safest force option available to law enforcement.

*The TASER CEW reduces subject injuries and fatalities.*