# **EXHIBIT B**

Case 3:16-cv-00166-VLB   Document 167-2   Filed 06/17/19   Page 2 of 12

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
             DISTRICT OF CONNECTICUT
 2
 3   WILSON RAMOS, As
     Administrator of the
 4   Estate of JOSE A.           CIVIL ACTION
     MALDONADO, and                FILE NO.
 5   Individually,            3:16-cv-00166 (VLB)
 6         Plaintiffs,
 7         vs.
 8   TOWN OF EAST HARTFORD,
     OFFICER JASON KAPLAN,           Certified
 9   SERGEANT JAMES LIS,              Copy
     OFFICER JASON COHEN, and
10   CHIEF SCOTT SANSOM OF THE
     EAST HARTFORD POLICE
11   DEPARTMENT,
12         Defendants.
13
14         TELEPHONE DEPOSITION OF
15          MARK W. KROLL, Ph.D.
16
17             9:00 a.m.
18           June 12, 2018
19
20
21          5401 Gamble Drive
               Suite 101
22        St. Louis Park, Minnesota
23
24
25
```

**Deposition of Mark W. Kroll - 6/12/2018**
**Wilson Ramo vs. Town of East Hartford**

### Page 6

1    MR. GERARDE: I represent all the
2    same defendants as Michael Brave and
3    Michael will be speaking for those
4    Defendants today.
5         MARK W. KROLL, Ph.D.,
6    having been first duly sworn, was examined and
7    testified as follows:
8                 EXAMINATION
9    BY MR. COHEN:
10   Q.   Dr. Kroll, we have not met in person, but
11   my name is David Cohen. Thank you for joining us for
12   your deposition today.
13   A.   My pleasure.
14   Q.   This is a telephone deposition in the
15   litigation known as Wilson Ramos, et al., versus Town
16   of East Hartford pending in the United States
17   District Court for the District of Connecticut.
18        We are taking the deposition by telephone
19   pursuant to Federal Rule Civil Procedure 30(b)(4) and
20   by stipulation?
21        We had sent out a package of exhibits for
22   the deposition. Do you have those, Dr. Kroll?
23   A.   I do.
24   Q.   All right. And we will be referring to
25   those exhibits and possibly some additional ones

### Page 7

1    during the course of the deposition that have been
2    forwarded to us by counsel for the Defendants, Mr.
3    Brave.
4         So before we begin the questions and
5    answers, I just want to assure you that even though
6    we are at a distance, if you need a break during the
7    course of the deposition for any reason, just notify
8    me by phone and we will suspend the telephone portion
9    and then resume when everybody is ready. Does that
10   make sense?
11   A.   Yes. Thank you.
12   Q.   All right. And, Dr. Kroll, you have been
13   deposed many times; is that correct?
14   A.   Yes.
15   Q.   And you testified in court many times as
16   well?
17   A.   Yes.
18   Q.   Okay. You have before you the notice for
19   this deposition which has been marked as Plaintiff's
20   Exhibit 103; is that correct?
21   A.   I saw it in -- it is some place on the
22   table here.
23   Q.   Well, could you capture it at this time
24   and just take a look at it. I would like to refer
25   specifically to the Schedule A attached to it.

### Page 8

1    A.   Very good.
2    Q.   Schedule A requests the production of a
3    number of documents and records in connection with
4    this deposition. So my question to you globally is
5    did you search your records and provide to Attorney
6    Brave all of the material that you have that is
7    responsive to these eight requests?
8    A.   Yes.
9    Q.   And is there any documentation or records
10   that you withheld from that production that are
11   described in the eight categories of the request?
12   A.   No, but I want to clarify that, to avoid
13   duplication, I did not provide duplicate copies of
14   that which we believe is generally available among
15   all the parties.
16   Q.   Sure. Makes sense. I did not find in the
17   materials that were produced to me by Attorney Brave
18   any engagement letter between the Defendants and you
19   in this case. Is it the case that there was no such
20   letter?
21   A.   Probably. I rarely get engagement
22   letters.
23   Q.   All right. What is your role at Axon
24   Enterprises, Inc., formally TASER International?
25   A.   I have two roles. I sit on the corporate

### Page 9

1    board and I sit on the Scientific and Medical
2    Advisory Board. I should add that that leads into a
3    role two-and-a-half which is scientific consultant to
4    them.
5    Q.   And let me deal with the last first. So
6    scientific consultant. Do you have an employment
7    agreement or consulting agreement with Axon?
8    A.   No.
9    Q.   Do you have any written agreement with
10   Axon or did you have one previously with TASER?
11   A.   No.
12   Q.   Do you get compensated for your consulting
13   services on behalf of the company?
14   A.   Yes.
15   Q.   And how are you compensated?
16   A.   They pay me $250 an hour up to a maximum
17   of 100K per year for this consulting.
18   Q.   Sure.
19   A.   My administrative assistant sends them an
20   invoice every month.
21   Q.   Okay. And in a typical year, let's say
22   the last four years, has your compensation in your
23   role as consultant exceeded $100,000?
24   A.   It used to. Right now, it is maxed at
25   100K. So in 2017, it was exactly 100K and it will be

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

### Page 30

1  know. I don't know what all of the thinking behind
2  it is. I know when I read a paper, I would like to
3  know who has sponsored the research; although in my
4  line of work, I generally know because I know who
5  works with whom.
6       MR. BRAVE: Counsel, if I may. On
7  your Exhibit 114 that you sent, it shows
8  highlighting and also shows the Plaintiff's
9  exhibit tab in yellow. It was printed in
10 black and white and the highlights are not
11 shown so just so you're aware.
12      MR. COHEN: All right. Thank you.
13 I think I'm guilty -- I'm the guilty party as
14 far as the highlighting.
15      MR. BRAVE: Counsel, no. All I'm
16 trying to point out is that on your
17 electronic version as its came through to
18 me, it has the yellow sticker and yellow
19 highlighting, but whoever printed off 114
20 printed it in black and white and did not
21 use the color printer, so the highlighting
22 is not shown up.
23      MR. COHEN: I see. Thank you.
24 ///
25 BY MR. COHEN:

### Page 31

1    Q.  All right. Let's talk about your academic
2  background, Dr. Kroll. And we have extracted from
3  your report the relevant pages pertaining to your
4  academic qualifications. That is Exhibit 107. Do
5  you have that?
6       MR. BRAVE: Object to form.
7       THE WITNESS: We are missing a few
8  pages, but I think I know the background
9  well enough that I don't need to look at
10 that piece of paper.
11 BY MR. COHEN:
12   Q.  Okay. Now, the presentation of your
13 academic background at page 2 of this document is
14 somewhat unusual because you have not stated the
15 fields in which certain of your degrees were awarded.
16 Is that correct?
17   A.  I'm sorry. What was the question?
18   Q.  You listed the academic degrees on the
19 second page but you have not listed the fields in
20 which you received your Masters and Ph.D.?
21   A.  Oh, okay. I'm happy to fill it in.
22   Q.  Let's go into the specifics here. You
23 received a Bachelor's Degree of mathematics from the
24 University of Minnesota; is that correct?
25   A.  That is correct.

### Page 32

1    Q.  And you received a Master's Degree in 1983
2  in what field?
3    A.  I got that from the electrical engineering
4  department.
5    Q.  At the University of Minnesota?
6    A.  Yes.
7    Q.  Okay. And then your resume states you
8  attended graduate school at the University of
9  Minnesota from 1975 to 1979. And your Masters Degree
10 was issued in 1983. Can you explain that?
11   A.  I wrote my Masters thesis while I was also
12 working full-time so it took a few years.
13   Q.  And the resume then states that you
14 received your Ph.D. in 1987 in -- what school granted
15 the Ph.D., first of all?
16   A.  That is the graduate school of the
17 University of Minnesota.
18   Q.  All right. And in what field did you
19 receive your Ph.D.?
20   A.  Electrical engineering.
21   Q.  Is there any reason why that has been
22 omitted from the resume?
23   A.  I don't have that in front of me so it is
24 not ringing a bell. I'm not sure why. It is
25 considered possibly the hardest major in college so

### Page 33

1  I'm certainly not trying to hide it.
2    Q.  All right. And then, again, the Ph.D. was
3  issued -- you received that in 1987, but had left the
4  graduate school in 1979. Can you explain the eight
5  year hiatus?
6    A.  There was no hiatus. I was working on my
7  Ph.D. thesis part-time while I was also working
8  full-time.
9    Q.  All right. Then you received an MBA in
10 1990. Was that from the University of St. Thomas in
11 Minneapolis?
12   A.  Yes.    *(concentration)*
13   Q.  Was there any field of compensation that
14 was related to your MBA or was it simply an MBA?
15   A.  A general MBA.
16   Q.  Okay. Have you attended medical school?
17   A.  No.
18   Q.  Have you completed any medical school
19 courses?
20   A.  No.
21   Q.  Have you taken and completed any courses
22 in cardiology?
23      MR. BRAVE: Objection. Form.
24      THE WITNESS: I taught cardiovascular
25 physiology at Cal Poly University so I put

## Deposition of Mark W. Kroll - 6/12/2018
## Wilson Ramo vs. Town of East Hartford

### Page 34

1 together a course. I don't think I
2 actually sat through a formal course of
3 that topic.
4 BY MR. COHEN:
5     Q. Did you teach the course that you referred
6 to by yourself or in conjunction with others?
7     A. I brought in some other scientists to help
8 me teach it, probably about four of us.
9     Q. What school was that? I'm sorry.
10     A. California Polytechnical University, San
11 Obispo, California.
12     Q. That was not a medical school? That was a
13 technological school; is that correct?
14     A. That's correct.
15     Q. And have you taken and completed any
16 courses in electrophysiology at any medical school?
17     A. I'm going to help you with the question
18 there. Medical schools do not teach
19 electrophysiology, so the answer is no, but you
20 should know the reason why.
21     Q. All right. Thank you. Have you taken and
22 completed any courses in electrophysiology in any
23 school?
24     A. No, but to help you out there, there is no
25 such thing as a course in electrophysiology except

### Page 35

1 for three and four day intensive seminars that you
2 attend and pay through the nose for to hear lectures
3 from experts. I have both taken those as a student
4 and lectured at several of them.
5     Q. Have you taken and completed any courses
6 in forensic pathology?
7     A. I have to think about that because I have
8 participated a lot with the forensic pathology
9 community, and I have spoken at a lot of their
10 meetings. So I guess it has gone both ways. I think
11 of the advanced death investigation course in
12 St. Louis many years ago. I spoke there.
13         And then I sat through the other people's
14 lectures. That is all that comes to mind right now.
15     Q. Was that a course at a medical school?
16     A. Yes. It was St. Louis University School
17 of Medicine.
18     Q. And did you receive a certificate of
19 completion or a course credit for that participation
20 in that course?
21     A. I don't recall what I got out of that. I
22 don't recall getting a certificate. I didn't ask for
23 one.
24     Q. Apart from that experience at St. Louis
25 University, have you taken any medical school courses

### Page 36

1 in pathology?
2     A. No.
3     Q. Have you taken and completed any courses
4 in toxicology?
5     A. No.
6     Q. Have you attended law school?
7     A. No.
8     Q. Have you taken and completed any law
9 school courses?
10     A. No.
11     Q. Have you trained any police officers in
12 the use of force?
13         MR. BRAVE: Objection. Form.
14         THE WITNESS: That is a little
15 trickier because I have given a lot of
16 lectures to law enforcement groups covering
17 the effects of electrical weapons. Whether
18 or not you would consider that formal
19 training is hard to say. It is probably
20 not considered formal training.
21 BY MR. COHEN:
22     Q. Okay. Now, we discussed -- we began
23 discussing your engagement in this case, and you
24 indicated that there was no formal engagement letter
25 and you seldom use those. Is that fair?

### Page 37

1     A. That is correct. I do not recall seeing
2 an engagement letter. And I rarely get those.
3     Q. Can you tell us when you were engaged as
4 an expert for this case, Ramos versus East Hartford?
5     A. All I can say is it was over a year ago.
6     Q. All right. And so sometime in or before
7 June of 2017; is that correct?
8     A. Yes.
9     Q. The document produced by Attorney Brave
10 sometime I think over the weekend, and it had some
11 information about your -- it is Exhibit 112. Can you
12 locate that? It is a two-page invoice, Doctor.
13     A. I think I recall that I looked at that.
14 We are looking at it right now.
15         MR. BRAVE: Just so you know, I'm
16 showing it to him on my computer to make it
17 faster.
18         MR. COHEN: Thank you. And thank you
19 for bringing your computer as well.
20 BY MR. COHEN:
21     Q. Now, this -- since you were engaged
22 sometime in June of 2017 or earlier, am I correct in
23 thinking that the invoice that has been marked as an
24 exhibit was not the first one that you rendered in
25 connection with your involvement in this case?

**Deposition of Mark W. Kroll - 6/12/2018**
**Wilson Ramo vs. Town of East Hartford**

### Page 66

1  Kroll, who was on the other side of the coin, that
2  is, who was recommending that the warning against
3  chest shots be issued generally?
4     A.  Yes.
5     Q.  Who was that?
6     A.  Chief Counsel Doug Klint.
7     Q.  Anyone else?
8     A.  That is the only one I can recall.
9     Q.  And since 2009, have you had any role in
10  reviewing the subsequent occasions where warnings
11  were issued or modified over time?
12     A.  None that I can recall today.
13     Q.  I'm going to ask you to look at these
14  exhibits and, in general, my questions will by the
15  same throughout. That is, do you object to the
16  warning given by the TASER Corporation?
17        These are instances from 2013 -- and I
18  think your answer implies that you were not
19  consulted, but I'm going to ask you whether you
20  object to the issuance by the company of the warnings
21  in several respects.
22        Let's take a look at Plaintiff's Exhibit
23  90.
24     A.  Yes. I have it.
25     Q.  Do you know whether any other scientists

### Page 67

1  consulting for the company reviewed the warnings that
2  were issued in printed materials at this time?
3        MR. BRAVE: Objection. Form.
4  BY MR. COHEN:
5     Q.  Should I restate that?
6     A.  I would just like a clarification. We
7  were talking about Exhibit 2, which has warnings, and
8  now I thought we are Exhibit 90, which is training.
9  Are you talking about are there warnings embedded in
10  the Training Version 19?
11     Q.  Yes. I'm using them interchangeably and
12  perhaps I should not. Let me reask the question to
13  clarify that.
14        Exhibit 90 was authored -- was issued in
15  early 2013. I take it from your prior answer that
16  you had no contemporaneous involvement in the
17  contents of this training program. Is that correct?
18     A.  That's correct. I'm not involved in the
19  training program.
20     Q.  All right. And do you know whether some
21  other scientist acting on behalf of the company,
22  either as a consultant or as an employee, was
23  involved in advising on the training program in 2013?
24        MR. BRAVE: Objection. Form.
25        THE WITNESS: I don't know either

### Page 68

1  way.
2  BY MR. COHEN:
3     Q.  All right. If we turn to page 3 of this
4  exhibit, there is some warning information on the --
5  well, it is one of the upper slides, the one on the
6  right-hand side on page 3.
7        And the slide begins, "TASER CEWs Are Not
8  Risk Free." Do you agree with that warning?
9     A.  Of course. It is a weapon.
10     Q.  And underneath the designation of Warning
11  is an exclamation and a triangle with a box, and it
12  says, "Conducted Electrical Weapon can cause death or
13  serious injury." Do you object to that warning?
14     A.  Not in its generality.
15     Q.  Do you agree that a warning of this type
16  ought to have been given by the company in connection
17  with training on the use of the TASER weapon?
18        MR. BRAVE: Objection. Form.
19        THE WITNESS: I'm not a trainings
20     expert. I'm not a warnings expert. I do
21     not have an opinion on that.
22  BY MR. COHEN:
23     Q.  Okay.
24     A.  Just so we are totally clear here, the
25  deaths have been -- that were contributed to were

### Page 69

1  from falls and fires. There has never been an
2  electrocution.
3     Q.  That is your claim.
4        MR. BRAVE: Objection. Form.
5  BY MR. COHEN:
6     Q.  You were -- okay. I will withdraw that.
7  On page 4, there are three slides in this power point
8  presentation headed Cardiac. Now, I gather that you
9  were not consulted in connection with the contents of
10  this cardiac-related information or warnings, is that
11  correct, Doctor?
12        MR. BRAVE: Objection. Form.
13        THE WITNESS: That is not totally
14     correct. I was asked in 2009 how I felt
15     about warnings to avoid the chest, and at
16     that time, I was against them. I have
17     since changed my opinion for reasons that
18     have nothing to do with cardiac effects.
19  BY MR. COHEN:
20     Q.  What is your opinion now about warning
21  officers using TASERS not to fire at someone's chest?
22     A.  The number one serious injury is blindness
23  if a probe goes in the eyes.
24     Q.  Okay.
25     A.  And if a subject ducks and you're

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

Page 74

1 warning -- or the training says, "CEW cardiac risks
2 are not zero," and "CEW cardiac risks are
3 sufficiently remote that making accurate risk of
4 probability estimates are very difficult."
5     Do you agree with those statements?
6 A. I'm sorry. What slide are you on again?
7 Q. If you look at page 4 of this exhibit we
8 have been discussing, Exhibit 90. On the right-hand
9 side, the upper slide.
10 A. Thank you. I'm there. Sorry. Do I agree
11 with that statement?
12 Q. Yes.
13 A. Yes, in that very careful calculations
14 have been made of the risks. And the fundamental
15 problem is that extensive animal studies have shown
16 that the risk is probably confined to human beings
17 weighing less than, say, 60 pounds; or people
18 weighing more with an extremely thin body habitus so
19 that the probe could nearly touch the heart.
20     It is just hard to estimate how often that
21 happens. We have done some really good modeling on
22 this and we think the risk is about one in 3 million,
23 but who knows? Tomorrow, an officer could run into
24 two methamphetamine addicts that are emaciated down
25 to 90 pounds and there is no fat or skin depth over

Page 75

1 their heart -- well, obviously, they have skin depth
2 but they don't have the fat or muscle over their
3 heart and a probe could land right there.
4     And if the probe would actually touch the
5 heart, then you could electrocute them, so that is
6 the issue here.
7     The best estimates are one in 3 million,
8 and that is published in the peer-reviewed literature
9 in two different papers.
10 Q. The bottom slide on that same page, just
11 below where you were reading, under the heading
12 Cardiac, this training or -- it is a warning that
13 says, "To reduce cardiac risks (when possible),
14 target the back; avoid targeting chest; avoid
15 prolonged and repeated exposures."
16     Do you agree with that warning as going
17 out to police officers that would be users of the
18 TASER?
19 A. Yes and no. There is absolutely zero
20 scientific support for that because no one has ever
21 been electrocuted, but for reasons that I mentioned
22 before, because of the lack of effectiveness of
23 probes in the chest and the very real risk of
24 blindness from a probe in the eye, this is probably
25 good.

Page 76

1     As far as prolonged and repeated
2 exposures, that is more of an excessive force issue
3 than a scientific issue so I can't support that
4 scientifically because a very simple rule of thumb
5 that we have learned over the last century of
6 research, electricity is not to look like poison. It
7 is not like bullet wounds or stab wounds or baton
8 strikes.
9 Q. Well, this training program identifies all
10 of these elements as cardiac risks. I think your
11 answer to me is that you object to correlating these
12 with cardiac risks, that you think there are other
13 risks, but you think it is improper as identifying
14 these as cardiac risks to a subject?
15 A. That is fair. You have summarized my
16 thinking.
17 Q. Okay.
18 A. And no one has studied this in more detail
19 than I have so I think I'm qualified to disagree with
20 that slide.
21 Q. Am I correct in understanding that you
22 didn't object to the issuance of this training
23 version of these warnings? They were not offered to
24 you for your review? Is that fair?
25 A. Yes, but I can clarify the answer. I'm

Page 77

1 not involved in the training. In fact, sitting here
2 today is the first time I have ever seen this
3 material.
4 Q. All right. And then on page 5, same
5 exhibit. I'm going to ask you to read what I'm
6 calling the first slide, the one in the upper left,
7 Doctor, and ask you if you agree with the warning or
8 information given about the CEWs in this slide, if
9 you disagree with it, or neither of them?
10 A. Shall I start from the top?
11 Q. Just that first slide. Read it to
12 yourself, if you would.
13 A. I have.
14 Q. Do you agree with the information given
15 there or do you disagree with it?
16 A. The weapons do produce physiologic
17 effects. If not, they wouldn't be used. They lock
18 the muscles. There are some minor metabolic effects.
19 If you lock up muscles, you're going to generate
20 lactate and that is measurable.
21     And the longer the CEW, the greater
22 potential effects, that is probably not true. It
23 looks like the effects pretty much level out after 5
24 or 10 seconds. So that is stretching things a little
25 bit.

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

Page 78

1  And the bottom sentence, "As with any use
2  of force, reasonable efforts should be made to
3  minimize the number and duration of exposures." I
4  think that is driven more by excessive force concerns
5  than scientific data.
6      I agree with part of this and part of it
7  is a stretch.
8      Q.  All right. Then going down to the lower
9  right-hand corner. It has the heading in large type
10 Avoid Extended Durations. Could you read that to
11 yourself and tell me whether you agree with the
12 warnings given there or information given there or
13 disagree?
14     A.  I've read it. And this is the baseball
15 rule. I agree that several law enforcement advisory
16 groups have adopted the baseball rule. I can also
17 tell you that there is zero scientific data behind
18 it.
19     Q.  So you disagree that the warnings should
20 be given as a matter of prudence from a scientific
21 standpoint?
22         MR. BRAVE: Objection. Form.
23         THE WITNESS: I can tell you that
24     there is no scientific data to support the
25     baseball rule. And there is no

Page 79

1      pathological difference between three
2      trigger pulls and two trigger pulls, but
3      there are a lot of good reasons to adopt
4      this in that there is an excessive force
5      issue.
6          And if you have three trigger pulls,
7      you probably have a broken wire so you're
8      wasting your time, and there should be a
9      new probe deployed or transition to a
10     different type of force.
11 BY MR. COHEN:
12     Q.  If you look on the next page, page 6,
13 there is a specific reference to PERF Guideline 21,
14 the Police Executive Research Forum. Information was
15 also referred to in the prior slide that we just
16 discussed.
17         Do you agree with the guidance that
18 discourages the use of a TASER weapon -- a discharge
19 beyond 15 seconds whether through multiple
20 applications or continuous cycling?
21     A.  So we are going to skip the first sentence
22 in that slide and go to the second one?
23     Q.  Well, all right. We will come to that.
24 Fair enough. Let's go back to the first sentence.
25 It says, "Personnel should use a CEW for one standard

Page 80

1  cycle (5 seconds) and then evaluate the situation to
2  determine if subsequent cycles are necessary."
3      Do you agree with that guidance or
4  disagree?
5      A.  It is my understanding, and I'm no expert
6  on use of force in general on the case law, but I
7  have been told that this is case law in several
8  circuits in the United States. So this probably
9  makes sense even though it has no scientific data
10 driving it.
11     Q.  Okay. And then the second point on this
12 slide is, "Personnel should consider that exposure to
13 the CEW for longer than 15 seconds (whether due to
14 multiple applications or continuous cycling) may
15 increase the risk of death or serious injury."
16         Do you agree with that or disagree?
17     A.  Scientifically, as far as electrocution
18 goes, of course, it is silly because there is no
19 difference in the electrocution risk between 16
20 seconds of current versus two seconds of current.
21 And that is well-established in hundreds of papers.
22         However, in the practical issue of a field
23 use, if an officer has the trigger pulled down that
24 long, then a wire is broken or the probe is
25 disconnected, or the probes are so close in an

Page 81

1  intoxicated person that they are not responding to
2  pain and the reduced probe spread is not causing
3  muscle lockup, in which case they are going to have
4  to transition to another use of force or possibly
5  attack by the suspect.
6      That is actually a good reason, but has
7  not anything to do with electrocution -- I am sorry.
8  Let me rephrase that. That is actually a good rule,
9  but would be misleading to assume that it increases
10 the risk of electrocution.
11     Q.  And then do you have any position on the
12 third statement in this slide, "Any subsequent CEW
13 applications (beyond 15 seconds) should be
14 independently justifiable and the risks should be
15 weighed against other force options?"
16     A.  Same answer as part 2.
17     Q.  Okay. Would you agree that this guidance,
18 the guidelines that you just referred to and the
19 warnings that we have referred to on the prior page,
20 were generally disseminated and available and
21 accepted prior to April 13, 2014, the date of the
22 Maldonado incident?
23     A.  I have no idea.
24     Q.  Also I have marked -- I confirmed that you
25 have Exhibit 92.

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

Page 86

1  Metabolic is the same as exhaustion, so
2  you don't have to hit that again. And associated
3  medical risks, whatever those are. It is sort of a
4  hodgepodge of concerns.
5      Again, I didn't write this warning and I
6  would say it is probably more driven by excessive
7  force concerns than scientific data.
8  Q.  Let's go over to the next page. There is
9  a warning box towards the bottom of that page as
10 well. The title for this warning is Cardiac Capture.
11 It says, "CEW exposure in the chest area near the
12 heart has a low probability of inducing extra heart
13 beats, cardiac capture."
14     Do you agree with that statement, Dr.
15 Kroll?
16 A.  Yes, I do agree with that in general. It
17 is not the situation of this case that we are
18 discussing, of course, but, in general, there is a
19 low probability of cardiac capture.
20 Q.  And then in the next sentence, "In rare
21 circumstances, cardiac capture could lead to cardiac
22 arrest." Do you agree with that?
23 A.  Yes. And that is even more rare because
24 millions of people walk around with pacemakers and
25 they have cardiac capture every second of every day

Page 87

1  and it is almost unheard of that that would lead to
2  cardiac arrest. Again, it is theoretically accurate.
3  Q.  And then the warning is really the third
4  sentence that says, "When possible, avoid targeting
5  the frontal chest area near the heart to reduce the
6  risk of potential injury or death."
7      Do you agree with that warning?
8  A.  Yes, especially when you look at the
9  clarification in the next sentence out of the box.
10 This is really an issue in children and extremely
11 thin adults.
12 Q.  Do you agree that the TASER darts in the
13 Maldonado case, the wounds that were identified in
14 the autopsy, were in the frontal chest area near the
15 heart?
16     MR. BRAVE: Objection. Form.
17     THE WITNESS: They were in the
18     frontal chest area, but they were not near
19     the heart.
20 BY MR. COHEN:
21 Q.  All right. I would like to review with
22 you some of the key elements of your conclusion that
23 the TASER was not responsible for Jose Maldonado's
24 death, but before I get there, I neglected to discuss
25 one aspect of your relationship with Axon

Page 88

1  Enterprise -- Corporation previously.
2      Do you have Plaintiff's Exhibit 113, Dr.
3  Kroll?
4  A.  I don't know. Can you describe it to me?
5  Q.  Yes. It is a printout of the Edgar
6  disclosure from the Securities and Exchange
7  Commission website.
8  A.  I see it now on Mr. Brave's computer.
9  Q.  All right. I'm only going to ask you a
10 question related to the first page, I think. You had
11 mentioned earlier that you had received TASER or Axon
12 stock from time to time as compensation for your
13 services to the corporation; is that correct?
14 A.  Yes.
15 Q.  This disclosure, which was
16 cross-referenced in the information that Attorney
17 Brave sent us over the weekend, has, on the first
18 page, a reference to Axon Enterprise, Inc., and an
19 award in May -- last month of 2,577 shares of Axon
20 stock. Is that correct?
21 A.  Yes.
22 Q.  And, then it lists on the next page the
23 number of securities owned and the information is
24 that you own 57,205 shares. Is that correct?
25 A.  I don't believe it is correct because that

Page 89

1  number would include stock options where I just have
2  the right to purchase the stock at a reduced price.
3  Q.  Do you have any information about the
4  number of shares that you own outright at this time?
5  A.  I'm sorry. I stand corrected. I'm
6  confusing my situation with Haemonetics.
7  Haemonetics, I do have options as well as shares.
8  But I sold all of my Axon options a long time ago.
9  So these are shares held outright.
10 Q.  On the right-hand side, it identifies your
11 holdings as common stock?
12 A.  Thank you.
13 Q.  Do you see that?
14 A.  Yes. That is consistent with my
15 correction. Thank you.
16 Q.  All right. And then I will represent to
17 you that the share -- I checked the share price as of
18 this morning, which is as of the close of market
19 yesterday, for Axon stock as 65.20 per share. Does
20 that sound accurate to you, Doctor?
21 A.  I didn't check it this morning, but I know
22 the stock has gone to the moon this year and it is
23 very high.
24 Q.  All right. Well, the mathematics is that
25 at a share price of 65.20 and a holding of 57,205

Deposition of Mark W. Kroll - 6/12/2018
Wilson Ramo vs. Town of East Hartford

## Page 90

1  shares, the total shares, as of the close of the
2  market yesterday, would have a value of $3,729,766.
3  Were you aware that your holdings in that stock
4  have --
5      A.   No, no. I'm amazed. Wow. I guess that
6  means I owe a lot of taxes. It looks like that
7  stock -- is that May 24th?
8      Q.   May 24th.
9      A.   Oh, man. I'm going to owe a lot of taxes.
10 I had no idea it had gotten that valuable.
11     Q.   Is that the sum total of your holdings of
12 Axon stock at this point?
13     A.   I can't think of any other shares I own
14 anyplace else. That is the sum total of shares that
15 I'm aware of.
16     Q.   Okay. Let's return to the elements of
17 your conclusion that the TASER was not responsible
18 for Jose Maldonado's death. One of your grounds for
19 concluding that the TASER was not responsible is the
20 theory that he removed a torn TASER wire shortly
21 after Officer Kaplan fired; is that correct?
22     A.   No, that actually doesn't go to the main
23 conclusion. I just put that in there because
24 sometimes -- that's not referring to you, in
25 particular, but I have been in situations where a

## Page 91

1  Plaintiff's lawyer tried to confuse a jury by arguing
2  that electricity built up like poison. Rather than
3  trust that they will understand the science, I want
4  to make sure that the numbers are clear, that it is
5  really less than a second of current delivery rather
6  than counting the total trigger pulls.
7      Q.   I guess, getting back to the point you had
8  made earlier, though, whether the TASER was connected
9  for -- or the TASER wire was connected for the first,
10 say, two seconds or for the entire encounter is of no
11 consequence scientifically from your standpoint; is
12 that correct?
13     A.   That is what the data show, but I -- well,
14 I do not wish to withdraw this opinion. And I
15 will -- I expect to present this to the jury, because
16 the effects of electricity are very subtle and I
17 don't want the jury to be confused by the seconds,
18 because the intuition is since most things build up
19 like poison, whether it is baton strikes or bullet
20 wounds, electricity must build up also.
21          So this is an important part of my
22 opinion, even though I get to the noncontribution
23 from another scientific path -- from multiple
24 scientific paths.
25     Q.   Well, does anything about your training

## Page 92

1  and experience as an electrical engineer give you
2  expertise in assessing the credibility of the
3  contemporaneous reports by the officers that don't
4  refer to any popping sound or tearing of the wires --
5  the wire, in comparison to their testimony four years
6  later where they refer to a popping sound?
7      A.   In the interest of time, I'm going to
8  re-clarify the question. I actually don't work as an
9  electrical engineer. That is not what I do. I
10 realize it is confusing because three of my eight
11 credentials involve electrical engineering, but that
12 is not what I do.
13          With that in mind, and I apologize for
14 forgetting the rest of the question, so would you be
15 so kind as to repeat the question?
16     Q.   Sure. I will reframe it. Your expertise
17 in biomedical science doesn't help you in assessing
18 the credibility of statements made contemporaneously
19 by the officers involved versus statements made four
20 years later, does it?
21     A.   That is correct. I'm not a scientist --
22 I'm sorry. I'm not a psychologist and I have no role
23 in assessing credibility of witnesses. I can tell
24 you that that recollection of Sergeant Lis is
25 perfectly consistent with the forensic evidence.

## Page 93

1      Q.   And what about the statement by Officer
2  Kaplan in his officer's report that indicated that
3  Jose Maldonado was under power until just before he
4  was handcuffed; in other words, 20 seconds after the
5  TASER was initially fired?
6      A.   I don't have that deposition in front of
7  me, but that recollection would be consistent with my
8  standards and even some police officers are often
9  confusing the crackling sounds with the delivery of
10 current because it clearly reflects electricity.
11          We all know what an electrical arc sounds
12 like and that would be a misunderstanding because the
13 presence of a loud crackling means the opposite. It
14 means that a current is not being delivered.
15     Q.   You also rely on -- in reaching your
16 conclusions in this case, you rely on the observation
17 that Jose Maldonado had essentially normal breathing
18 for three minutes and 14 seconds after he was TASER'd
19 by Officer Kaplan. That is pages 8, 23 and 25 of
20 your report.
21     A.   I'm there.
22     Q.   Is it your position that if that was the
23 case, that is, that he had essentially normal
24 breathing for more three minutes after being TASER'd,
25 he was not in sudden cardiac arrest as a result of

**Deposition of Mark W. Kroll - 6/12/2018**
**Wilson Ramo vs. Town of East Hartford**

### Page 102

1  MR. BRAVE: Objection. Form.
2  THE WITNESS: Assuming that is
3  true -- it may be too general. You assume
4  they are in VF, not asystole, and they can
5  get them to defibrillation and advanced
6  life support within minutes, it really
7  doesn't matter. They are not breathing
8  normally, which means either gasping or no
9  breathing, obviously, the sooner you help
10 them, the better they will do.
11    Now, if they are in asystole or PEA,
12 it is generally hopeless, of course, as you
13 know.
14 BY MR. COHEN:
15   Q.   Another point you make in your report is
16 that Jose Maldonado resisted handcuffing after he had
17 been TASER'd. At page 25 of your report, you state
18 that Jose Maldonado resisted being handcuffed for 47
19 seconds after the TASER was fired into his chest; is
20 that correct?
21   A.   Yes.
22   Q.   And you find that Jose resisted being
23 handcuffed until 2:05:33.
24   A.   Was there a question?
25   Q.   Is that -- is that your finding, that he

### Page 103

1  was resisting handcuffing until 2:05:33?
2   A.   Yes.
3   Q.   Can you tell us what the specific behavior
4  was by Jose Maldonado that you considered to have
5  been resisting handcuffing after Officer Kaplan fired
6  the TASER at him?
7   A.   Not without the video. I mean, we
8  could -- some things are obvious. We have him
9  pulling the wire off at 2:04:48 and the 40 second
10 frame. I would consider that resisting. And then in
11 the intervening time, it looks like the officers are
12 working pretty hard to get at his hands for cuffing,
13 but without playing the video in high definition in
14 front of me, I couldn't give you a lot of details.
15   Q.   The video doesn't show him pulling the
16 wire out. Can we agree on that?
17   A.   No, we are not going to agree on that.
18   Q.   There is no -- the video camera is behind
19 him and does not disclose him pulling the wire out,
20 does it?
21   A.   I disagree.
22   Q.   All right. And you claim that you know
23 that he was pulling the wire out because you detected
24 his elbow was bent? Isn't that correct?
25   A.   His movement -- that is part of it. The

### Page 104

1  movements that he shows around that time are very
2  consistent with someone pulling the probe out. And I
3  have studied a lot of videos of that.
4   Q.   Well, the probe was never pulled out. It
5  was still in his body when he got to the autopsy;
6  isn't that correct?
7   A.   Thank you for making me clarify that. I
8  meant to say that he pulled the wire out, but the
9  videos I have reviewed that covered both the wire
10 alone and the probe and wire together being pulled
11 out. Thank you.
12   Q.   Other than reviewing, again, the
13 videotape, you have no recollection of why it was
14 that you claim Jose Maldonado was resisting for 47
15 seconds after he was TASER'd; is that correct?
16   A.   I think it -- I can't think of anything
17 besides the video that we have to go on. There is
18 probably sworn testimony about the delays in
19 handcuffing, but it is not coming to mind right now.
20   Q.   You state that loss of consciousness
21 typically takes 13 seconds if the subject who had
22 suffered a cardiac arrest is lying down, and 5
23 seconds if he or she is sitting up, correct?
24   A.   Yes.
25   Q.   You call these typical times, but there is

### Page 105

1  some normal variations in them; isn't that right?
2   A.   That is correct. In the case of the
3  supine patient, it is 13 plus or minus 4 seconds from
4  the Luki study, L-u-k-i.
5   Q.   Can you spell that again?
6   A.   L-u-k-i.
7   Q.   Thank you. And your memory is good
8  because you said that -- I don't know the citation,
9  but at page 12 of your report, you have it recorded
10 at 13 plus or minus 4 seconds?
11   A.   Yes.
12   Q.   Would you agree that the loss of
13 consciousness within approximately 13 seconds of a
14 sudden cardiac arrest is consistent with a death
15 associated with ventricular fibrillations?
16   A.   The ventricular fibrillations would be
17 irrelevant. In any cardiac arrest, you would expect
18 loss of consciousness within roughly 13 seconds if
19 the person is laying down. It is faster if they are
20 standing up. The sitting up 5 seconds -- we don't
21 have data on people standing up that -- people have
22 estimated three to four, but we actually don't have
23 data on that.
24   Q.   If you observe an individual who has
25 lapsed into unconsciousness within 15 seconds after

```
 1    STATE OF MINNESOTA

 2    COUNTY OF DOUGLAS                    CERTIFICATE

 3    ----------------------------------------------------

 4        I hereby certify that I reported the deposition of
      MARK KROLL, Ph.D, and that the witness was by me
 5    first duly sworn to tell the whole truth;

 6        That I was then and there a Notary Public in and
      for the County of Douglas, State of Minnesota;
 7
          That the testimony was transcribed by me and is a
 8    true record of the testimony of the witness;

 9        That the cost of the original has been charged to
      the party who noticed the deposition, and that all
10    parties who ordered copies have been charged at the
      same rate for such copies;
11

12        That I am not a relative or employee or counsel of
      any of the parties or a relative or employee of such
13    attorney or counsel;

14        That I am not financially interested in the action
      and have no contract with the parties, attorneys, or
15    persons with an interest in the action that would
      affect my impartiality;
16
          That the right to read and sign the deposition by
17    the witness was not waived.

18       WITNESS MY HAND AND SEAL this 18th day of June,
      2017.
19
                    MARCIA WYFFELS WELCH
20                  NOTARY PUBLIC - MINNESOTA
                    My Comm. Exp. Jan. 31, 2020
21
         _____
22       Marcia W. Welch, RPR
         My commissions expires January 31st, 2020.
23

24

25
```