UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILSON RAMOS, As Administrator  :
of The Estate of Jose A.  :
Maldonado, and Individually,  :          No. 3:16-CV-166 (VLB)
    :
    Plaintiff,  :
    :          July 2, 2019
    v.  :
    :
TOWN OF EAST HARTFORD *et al.*,  :
    :
    Defendants.  :

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [DKTS. 125, 126]

Plaintiff Wilson Ramos ("Ramos"), as administrator of the Estate of his deceased brother Jose A. Maldonado (the "Estate" or "Maldonado"), and individually, brings this action against the Town of East Hartford and Officers Jason Kaplan, James Lis, Jason Cohen, and Chief Scott Sansom (collectively, "Defendants"). Plaintiff brings various state and federal claims stemming from the fatal altercation he observed between Maldonado and Defendants Kaplan, Lis, and Cohen on April 13, 2014.

Before the Court are two motions for summary judgment. Defendants Town of East Hartford, Lis, Cohen, and Sansom filed a Motion for Summary Judgment ("Defendants' Motion for Summary Judgment"). *See* [Dkt. 126 (Mot. for Summ. J.)]. Defendant Kaplan filed a separate Motion for Summary Judgment ("Defendant Kaplan's Motion for Summary Judgment"). *See* [Dkt. 125 (Def. Jason Kaplan's Mot. for Summ. J.)]. For the following reasons, the Court GRANTS IN PART AND DENIES

**IN PART Defendants' Motion for Summary Judgment and Defendant Kaplan's Motion for Summary Judgment.**

## I.     Factual Background[1]

On April 12, 2014, Ramos and Maldonado attended a party and Maldonado drank beer and cognac to the point of intoxication. They left early because Maldonado was so intoxicated. [Dkt. 126-5 (Ramos Dep.) at 44:21-25, 49:16-52:6]. Ramos and Maldonado were half-siblings. *Id.* at 10:2-8. Ramos had never seen Maldonado as drunk as he was that night. *Id.* at 43:24-44:1.

While Ramos and Maldonado were walking towards Ramos's car, a vehicle occupied by Angel Arroyo, Liz Bigio, and three children stopped, and an argument ensued during which Maldonado punched and shattered the glass of the driver's side window. *Id.* at 62:19-64:23; *see also* [Dkt. 126-6 (Bigio Dep.) at 18:8-13]; [Dkt. 126-7 (Arroyo Dep.) at 16:23-25]. Ms. Bigio called the police and Sergeant Lis was the first to arrive on the scene alone. [Dkts. 126-5 at 69:22-70:6; 126-6 at 38:16-26; 126-8 (Lis Dep.) at 54:7-19]. Sergeant Lis spoke with Ms. Bigio and observed damage to her vehicle. [Dkt. 126-8 at 54:7-23]. Ms. Bigio pointed to Ramos and Maldonado and stated that one of them broke her window. *Id.*

Sergeant Lis approached Ramos and Maldonado and observed Ramos pushing Maldonado into the passenger seat of a motor vehicle. [Dkt. 126-5 at 70:18-71:14]. Sergeant Lis instructed Ramos to move away from the vehicle, so he could speak to Maldonado, but Ramos refused. [Dkt. 126-8 at 57:8-16]. At his deposition,

---

[1] **The facts are taken from the parties' Local Rule 56(a) Statements and the exhibits submitted in support of and in opposition to Defendants' Motion for Summary Judgment and Defendant Kaplan's Motion for Summary Judgment.**

Ramos admitted he heard Sergeant Lis's command, but could no longer recall what Lis said.  [Dkt. 126-5 at 71:5-8].  Ramos admitted he did not comply with Sergeant Lis's command and told Lis to wait until he got Maldonado fully into the vehicle.  [Dkts. 126-5 at 116; 132-6 (Ramos Aff.) at ¶ 4; 126-8 at 57:3-58:25, 71:1-20].  After Ramos got Maldonado into the vehicle, he turned around and Sergeant Lis sprayed him with pepper spray.  [Dkts. 126-5 at 71:1-4; 132-6 at ¶ 4; 126-8 at 56:21-57:23].  Ramos claims he did not have a chance to acknowledge Sergeant Lis's  command voluntarily because he was pepper sprayed almost immediately after the command.  [Dkts. 132-3 (Ramos Dep.) at 72:13-18; 132-6 at ¶ 4].  Sergeant Lis, with the help of Officer Miller who arrived on the scene, handcuffed Ramos and brought him to the ground.  [Dkts. 126-8 at 59:3-10; 132-3 at 72:24-73:6].

Next, Sergeant Lis turned to Maldonado who was walking towards him with clenched fists and saying, "Fuck you, motherfucker."  [Dkt. 126-8 at 59:22-60:11].  Sergeant Lis struck him in the face.  *Id*.  Then, Officer Parlapiano arrived, sprayed Maldonado with pepper spray, and both officers brought Maldonado into custody.  *Id*. at 60:12-13.  Once Maldonado was handcuffed, he continued to resist and try to pull away.  [Dkt. 126-10 (Cohen Dep.) at 65:21-24, 66:16-22].   Ramos did not see this interaction between Maldonado and the officers because he was handcuffed and face down on the ground.  [Dkt. 132-3 at 74:15-75:11].  Officers Parlapiano and Cohen observed Sergeant Lis struggling to take Maldonado into custody.  [Dkts. 126-9 (Parlapiano Dep.) at 16:5-19; 126-10 at 62:24-63:2].  Mr. Arroyo and Ms. Bigio also observed that the officers had a hard time controlling Maldonado.  [Dkts. 126-6 at 37:2-23; 126-7 at 22:12-21].  Mr. Arroyo described Maldonado like "a bullet

going everywhere" and Ms. Bigio described him as "The Hulk."  [Dkts. 126-6 at 37:2-23; 126-7 at 25:1-20].

After he was handcuffed, the officers observed that Maldonado was intoxicated and continued to be uncooperative.  [Dkts. 126-8 at 71:18-24; 126-10 at 65:12-66:22; 126-11 (Kaplan Dep.) at 133:21-134:12].  He struggled during the pat down and refused to get into the police cruiser.  [Dkts. 126-8 at 75:8-12; 126-11 at 133:24-134:6].  Ramos was compliant with the officers for the remainder of the night and no additional force was used.  [Dkt. 126-8 at 66:9-21].  Maldonado and Ramos were put in separate police cruisers and transported to the East Hartford Police Department headquarters by Officers Kaplan and Cohen, respectively.  [Dkts. 126-10 at 70:5-8; 126-11 at 145:9-19].  Maldonado was spitting at Officer Kaplan during the transport, but Ramos was transported without incident.  [Dkt. 126-11 at 145:12-17].

Upon arrival at the headquarters, Officers Kaplan and Cohen brought Maldonado to the eyewash decontamination area in the booking room to let him rinse his eyes, but he refused. [Dkt. 126-10 at 72:2-12; 126-11 at 145:20-147:6]. Plaintiff disputes that Maldonado refused, but he cites no evidence in support of his assertion. Officers Kaplan and Cohen then escorted Maldonado into the holding cell inside the booking area, uncuffed him, and locked him inside the cell.  [Dkts. 126-17 (Holding Cell Video); 126-10 at 73:3-5; 126-11 at 146:17-147:6].  After he was alone in the cell, Maldonado began pacing and disrobing.  [Dkt. 126-17 at 2:00:49-2:04:35].

Next, Officers Cohen and Kaplan escorted Ramos into the booking area and allowed him to rinse his face in the eye decontamination area. [Dkts. 126-10 at 73:15-74:2; 126-11 at 147:11-148:10]. By this time, Sergeant Lis arrived in the booking room. [Dkt. 126-8 at 77:21-78:5]. Maldonado had removed all of his clothing except for his underwear and his right pant leg which was stuck around his ankle over his shoe. [Dkt. 126-17 at 2:00:49-2:04:35]. The officers asked Ramos if he was comfortable going into the holding cell with Maldonado and Ramos said yes. [Dkt. 126-5 at 84:24-85:3]. Officers Kaplan and Cohen escorted Ramos to the holding cell door and told Maldonado, who was inside the cell, to step away from the door. *Id.* at 90:1-6. The officers removed Ramos's handcuffs. *Id.* at 89:12-14. One of the officers unlocked the holding cell door.

What happened during the next two minutes was captured by two cameras, neither of which recorded audio:

| Time on Camera[2] | Event |
|---|---|
| 2:04:36 | Maldonado begins moving towards the door of the holding cell. |
| 2:04:38 | Maldonado grabs the sliding door of the holding cell. |
| 2:04:39 | Maldonado pushes the sliding door of the holding cell open and steps into the threshold of the door. |
| 2:04:40 | Maldonado reaches the officers standing immediately outside of the sliding door of the holding cell. |
| 2:04:41 | Maldonado is punched and pushed backwards towards the holding cell. |
| 2:04:42 | Maldonado is pushed backwards and reenters the holding cell. |

---

[2] Two timestamps are visible on the video. The Court uses the timestamp in the upper left corner of the video in large white text. [Dkt. 126-17].

| Time on Camera[2] | Event |
|---|---|
| 2:04:43 | Maldonado struggles with the officers who are crowded in the entrance of the cell. Maldonado punches forward towards the officers with his right arm. |
| 2:04:44 | Maldonado continued to struggle with the officers. |
| 2:04:45 | While struggling with the officers, Maldonado extends his left arm and tries to keep Sergeant Lis at bay. Officer Kaplan takes out his taser and aims it at Maldonado. |
| 2:04:46 | Officer Kaplan takes a step forward still aiming the taser at Maldonado. Maldonado's arms are bent at a ninety-degree angle. Maldonado takes a step to the side with his left leg. He does not appear to be advancing. |
| 2:04:48 | Sergeant Lis punches Maldonado in the face with his left arm. Maldonado doubles over, spins approximately 180° and is facing the back of the holding cell. |
| 2:04:49 | Sergeant Lis pushes Maldonado from behind towards the holding cell wall directly opposite from the door. Maldonado extends his arms to catch himself. He falls forward and his head makes contact with the wall. |
| 2:04:50 | Sergeant Lis runs towards Maldonado and hovers over him. |
| 2:04:51 | Sergeant Lis stays near Maldonado leaning over him. |
| 2:04:52 | Officer Kaplan continues to hold the taser aimed at Maldonado. With his other hand, he holds Ramos against the side of the holding cell against the cell wall. |
| 2:04:53 | Maldonado braces his right arm on the floor and lifts his upper body off the floor. |
| 2:04:54 | Maldonado sits on the floor with his upper body slumped forward over his legs. |

| Time on Camera[2] | Event |
|---|---|
| 2:04:55 | Sergeant Lis steps back from Maldonado. Officer Kaplan holds Ramos in the corner of the holding cell against the wall. He continues to hold the taser in his other hand. |
| 2:04:56—2:04:59 | Maldonado remains seated leaning forward as his torso rocks slightly from side-to-side. |
| 2:05:00 | The officers stand back from Maldonado who is still seated and leaning very far forward. |
| 2:05:01—2:05:03 | Sergeant Lis takes out his handcuffs and moves towards Maldonado. |
| 2:05:04 | Sergeant Lis and Officer Cohen continue to move towards Maldonado. |
| 2:05:05—2:05:09 | Sergeant Lis and Officer Cohen move Maldonado in preparation for handcuffing him. |
| 2:05:09 | Sergeant Lis moves away from Maldonado towards Officer Kaplan and Ramos in the corner of the holding cell. |
| 2:05:09—2:05:16 | Officer Cohen moves Maldonado to his side and begins handcuffing his wrists. |
| 2:05:17 | Officer Kaplan joins Officer Cohen to assist in handcuffing Maldonado. |
| 2:05:17—2:05:32 | Officers Kaplan and Cohen pull Maldonado's arms behind his back and cuff him. |
| 2:05:33—2:05:41 | Officers Kaplan and Cohen stand up behind Maldonado. |
| 2:05:42—2:05:46 | Officer Cohen moves away from Maldonado towards the door of the holding cell. |
| 2:05:47—2:05:57 | All three officers are stand in a circle around Maldonado. Ramos remains in the corner of the holding cell. |
| 2:05:57—2:06:07 | Sergeant Lis moves towards the door of the holding cell, but all three officers remain in the holding cell with Maldonado. Ramos remains in the corner of the holding cell. |
| 2:06:08 | Sergeant Lis, looking at Ramos, waves his hand towards the door of the holding cell. |

| Time on Camera[2] | Event |
|---|---|
| 2:06:09—2:06:11 | Ramos exits the holding cell followed by Sergeant Lis. Officers Cohen and Kaplan move towards the door of the holding cell. |
| 2:06:12—18 | Officer Kaplan exits the holding cell followed by Officer Cohen. |
| 2:06:18—2:06:23 | All three officers leave the holding cell and remain in the area outside the open door of the holding cell. |
| 2:06:23—2:06:29 | One of the officers slides the door of the holding cell closed. |
| 2:06:30 | The door of the holding cell is fully closed. Maldonado is left alone inside the holding cell lying on his side with his hands cuffed behind him. |

During the altercation with Maldonado, Defendant Kaplan deployed the taser for twenty seconds. [Dkt. 132-2 (Taser Deployment Report)]. The maximum recommended deployment time for a taser is fifteen seconds. [Dkts. 132-40 (ECW Guidelines) at 18; 132-41 (Taser Training) at 5]. Tasing for longer than fifteen seconds may increase the risk of serious injury or death and should be avoided. [Dkt. 132-25 (Minor Dep.) at 110:17-25]. The taser prongs struck Maldonado in the chest. [Dkt. 132-7 (Postmortem Examination) at 2]. Taser training warns against targeting a person's chest. [Dkts. 132-40 at 37; 132-41 at 4; 132-25 at 119; 132-24 at 88:3-7, 91:6-21; 132-18 at 36:6-23; 132-23 at 32:17-33:9].

Ramos washed his eyes again and afterwards he sat unhandcuffed on the floor outside of the holding cell, approximately eight feet away from Maldonado. [Dkts. 126-5 at 99:18-100:10, 102:21-103:5, 102:21-23; 126-8 at 113:14-19; 126-17 at 2:09:40]. Officer Parlapiano arrived and observed Maldonado lying on the floor in the holding cell. [Dkt. 126-9 at 37:20-22]. The officers did not reenter the cell to

check on Maldonado until 2:10:34 AM–after approximately four minutes passed. [Dkt. 126-17 at 2:10:34].  During that four-minute period, Maldonado remained lying on the floor of the cell on his side with his hands cuffed behind his back moving slightly every couple of seconds.  The  holding cell camera depicts his movements:

| Time on Camera | Event |
| --- | --- |
| 2:06:26—2:06:31 | Maldonado seen moving slightly. |
| 2:06:46—2:06:50 | Maldonado seen moving slightly. |
| 2:07:05—2:07:08 | Maldonado seen moving slightly. |
| 2:07:10 | Maldonado seen moving slightly. |
| 2:07:22—2:07:25 | Maldonado seen moving slightly. |
| 2:07:27—2:07:29[3] | Maldonado seen moving slightly. |
| 2:07:46—2:07:50 | Maldonado seen moving slightly. |
| 2:07:53 | Maldonado seen moving slightly. |
| 2:07:56—2:07:57 | Maldonado seen moving slightly. |
| 2:08:02 | Maldonado seen moving slightly. |
| 2:08:06—2:08:08 | Maldonado seen moving slightly. |
| 2:08:12 | Maldonado seen moving slightly. |
| 2:08:35 | Maldonado seen moving slightly. |
| 2:09:03 | Maldonado seen moving slightly. |
| 2:09:15 | Maldonado seen moving slightly. |
| 2:09:25 | Maldonado seen moving slightly. |
| 2:10:04—2:10:05 | Maldonado seen moving slightly. |

---

[3] There is a gap in the video from 2:07:31 to 2:07:45.  [Dkt. 126-17].

Plaintiff's expert Dr. Robert Myerburg described these slight movements as "gasping respirations," which, to a trained eye, indicate that Maldonado suffered potentially lethal brain trauma. [Dkt. 126-14 (Myerburg Dep.) at 114:12-115:9]. Dr. Myerburg also testified that it is unlikely a police officer would not appreciate the significance of the movements. *Id.* at 115:10-116:1. Dr. Myerburg testified that while awareness that while gasping respiration was not something he was sure he would hold a police officer to appreciate, "it does not matter because what they didn't do was respond to an unconscious patient." *Id.* at 115:21-116:1. Defendant Kaplan's expert, Sergeant Henry Minor, testified that police officers are trained to know the difference between normal breathing and agonal respiration. [Dkt. 132-25 at 56:19-25].

Defendants Kaplan, Lis, and Cohen were near the holding cell throughout the four-minute period. The holding cell is surrounded by a chain link enclosure. The officers observed Maldonado without entering the cell several times. [Dkts. 126-16 (Booking Room Video) at 2:07:41, 2:07:49, 2:07:58-2:08:03, 2:08:37, 2:10:14]. Ramos also observed Maldonado from the outside of the holding cell door. *Id.* at 2:09:26. Ramos initially thought Maldonado was sleeping but became concerned and asked the officers to check on him. [Dkt. 126-5 at 100:21-101:17].

The officers entered the cell at 2:10:34 AM. That was .29 seconds after the last time the video depicted Maldonado moving. [Dkt. 126-17 at 2:10:34]. Prior to that, the longest period Maldonado was still was .28 seconds between 2:08:35 and 2:09.03. [Dkt. 126-17 at 2:08:35-2:09.03].

The officers tried to rouse Maldonado, but they were unable to do so.  [Dkt. 126-17 at 2:10:37-55].  Officer Cohen grabbed Maldonado and lifted his torso upright.  [Dkt. 126-17 at 2:11:00].  He tried to check for a pulse, but he was not sure if he detected one.  [Dkts. 126-17 at 2:11:44; 126-10 at 108:3-21].   Sergeant Lis directed Officer Parlapiano to call for paramedics.  Officer Parlapiano made the call and requested assistance "as soon as possible." [Dkts. 126-9 at 38:22-39:7; 126-18 (Audio Recording No. 6093498)].  Officer Parlapiano then took Ramos to a cell in the cell block.  [Dkt. 126-9 at 41:14-25].  Three minutes later, Officer Parlapiano made a second radio call.  [Dkts. 126-9 at 46:9-23; 126-19 (Audio Recording No. 609512)].  Although Officer Parlapiano did not examine Maldonado between the first and second calls, he informed the paramedics that Maldonado was unconscious.  [Dkt. 126-19].   None of the officers performed CPR or other emergency medical procedures while waiting for the paramedics.

Paramedics entered the cell at 2:16:36 AM and began CPR at 2:17:57 AM. [Dkt. 126-17].  Maldonado was eventually transferred to Hartford Hospital where he was pronounced dead.  [Dkt. 132-31 (Prehospital Care Report Summary)].

## II.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  An issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. "[T]he substantive law will identify which facts are material in a given case."

*Herbert Construction Co. v. Continental Ins. Co.*, 931 F.2d 989, 990 (2d Cir. 1991) (quoting *Anderson*, 477 U.S. at 248).  A material fact is one which establishes an essential element of a claim or defense.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> **(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or**
>
> **(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.**

Fed. R. Civ. P. 56(c)(1).  A party asserting that a fact is or is not true must present admissible evidence to support their assertion. Fed. R. Civ. P. 56(c)(2). At the summary judgment stage of the proceeding, "allegations alone, without [admissible] evidence to back them up, are not sufficient."  *Welch-Rubin v. Sandals Corp.*, No. 3-CV-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see also Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).  The moving party bears the burden of proving not only that no genuine factual disputes exist but also that it is entitled to judgment as a matter of law because the non-moving party cannot present admissible evidence to establish the claim. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

Where a defendant presents admissible evidence tending to show there is no genuine issue of material fact for a jury to decide and she is entitled to judgment as a matter of law, a plaintiff must produce admissible evidence raising a genuine

issue of material fact to defeat summary judgment.   Fed. R. Civ. P. 56(c).

Conclusory statements unsupported by admissible evidence, speculation,

conjecture, or surmise do not create a genuine issue of fact for a jury to decide and

will not defeat summary judgment. *See Gottlieb,* 84 F.3d at 518; *see also Fincher v.*

*Depository Trust & Clearing Corp.*, 604 F.3d 712, 726-27 (2d Cir. 2010); *Welch-*

*Rubin*, 2004 WL 2472280, at *1.

        "In determining whether that burden [of showing the absence of any genuine

issue of fact] has been met, the court is required to resolve all ambiguities and

credit all factual inferences that could be drawn in favor of the party against whom

summary judgment is sought."  *Vivenzio*, 611 F.3d at 106 (citing *Anderson*, 477 U.S.

at 255); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986). This means that "although the court should review the record as a

whole, it must disregard all evidence favorable to the moving party that the jury is

not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

151 (2000); *see Welch-Rubin*, 2004 WL 2472280, at *1.  Determinations of the weight

to accord to the evidence or assessment of the credibility of the witnesses are

improper on a motion for summary judgment as those assessments are the sole

province of the jury. *See Hayes v. New York City Dep't of Corrs.*, 84 F.3d 614, 619

(2d Cir 1996); *see also United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).  Put

another way, "[i]f there is any evidence in the record that could reasonably support

a jury's verdict for the nonmoving party, summary judgment must be denied." *Am.*

*Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16

(2d Cir. 2006) (internal citation and quotation omitted). Only where there is no

evidence upon which a jury could properly render a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, may summary judgment lie.

### III.    Abandoned Claims

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F. Supp. 2d 197, 206 (D. Conn. 2008) (internal quotation marks omitted); *see also Olschafskie v. Town of Enfield*, No. 15-CV-67, 2017 WL 4286374, at *11, n.8 (D. Conn. Sept. 27, 2017).  Plaintiff alleges numerous claims in his complaint and Defendants moved for summary judgment on all of them.  In his Motions in Opposition to Summary Judgment, Plaintiff fails to oppose all of Defendants' arguments. Therefore, where noted in this decision, the Court deems certain claims abandoned and grants summary judgment in favor of Defendants.  *See Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn.  2009) ("grounds alleged in the complaint, but not relied upon in summary judgment are deemed to be abandoned").

### IV.     Federal Claims

### A.     Section § 1983 Claims

In a convoluted Count One, Plaintiff alleges a bevy of different § 1983 claims against Defendants Kaplan, Lis, and Cohen with no clear or concise indication of which claims are alleged against which officers.[4]

Section 1983 provides that "any person who, acting under color of law, 'subjects or causes to be subjected, any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws' of the United States shall be liable to the injured party in actions at law." *Shattuck v. Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002) (quoting 42 U.S.C. § 1983).  By comparing the operative complaint and the briefing, the Court construes the operative complaint to allege the following active claims: (1) unreasonable search and seizure by Ramos against Defendant Lis; (2) excessive force by Ramos against Defendant Lis and by the Estate against Defendants Kaplan, Lis, and Cohen; (3) failure to intervene by the Estate against Defendants Kaplan, Lis, and Cohen; and (4) deliberate indifference to medical needs by the Estate against Defendants Kaplan, Lis, and Cohen.

### 1.     Count 1 – Unreasonable Search and Seizure

### i.     By Ramos Against Lis

Ramos alleges that Defendant Lis arrested him without probable cause or arguable probable cause in violation of the Fourth Amendment.[5] The Fourth

---

[4] Plaintiff is reminded of Federal Rule of Civil Procedure 8(d) which states, "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d).

[5]  In Defendants' Motion for Summary Judgment, they address unreasonable seizure claims based on the investigative detention of Ramos and Maldonado.  In his opposition

Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV.  A warrantless arrest violates the Fourth Amendment unless it is supported by probable cause.  *See United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (internal quotation marks omitted) ("[A warrantless] arrest must be supported by probable cause or else it violates the Fourth Amendment"). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."  *Id.* (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)); *see also Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007). The existence of probable cause to arrest constitutes justification and "is a complete defense to an action for false arrest." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002).

We consider the elements of the offense for which an individual was arrested to assess the objective reasonableness of the officers' belief.  *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995). "[T]he arresting officer need not have in hand evidence which would suffice to convict," but an arrest "without a warrant must stand upon firmer ground than mere suspicion."  *Wong Sun v. United States*, 371 U.S. 471, 479 (1963).  "The validity of the arrest does not depend on whether the suspect actually

---

briefing, Plaintiff does not address the investigative detention argument and therefore, the Court assumes that Plaintiff alleges only unreasonable seizure based on Ramos's arrest. Defendants also address an unreasonable search and seizure claim by Ramos against Defendant Cohen and by Maldonado against Defendants Lis and Cohen.  Plaintiffs do not address these arguments in their opposition briefing. Therefore, the Court deems them abandoned. *See* [Dkt. 154 (Mot. to Amend Compl.)].

committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

Conn. Gen. Stat. § 53a-167a provides that "[a] person is guilty of interfering with an officer when such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." CONN. GEN. STAT. 53-167a(a). *See Palmer v. Ruggiero*, No. 10-CV-779, 2012 WL 3442411, at *4 (D. Conn. Aug. 14, 2012) ("Given [the plaintiff's] failure to comply with [the officer's] orders to leave the area . . . probable cause existed for arresting him on a charge of interfering with an officer"); *see also Lagasse v. City of Waterbury*, No. 09-CV-391, 2011 WL 2709749, at *4 (D. Conn. Jul. 12, 2011) (collecting cases).

Ramos's unreasonable search and seizure claim against Defendant Lis must fail because his arrest for interfering with an officer was indisputably supported by probable cause. Sergeant Lis appeared at the scene of the altercation, was informed by the complainant that that Maldonado, Ramos, or both quarreled with her and broke her car window while she and her children were seated inside. [Dkt. 126-8 at 54:7-23]. Sergeant Lis approached and observed Ramos pushing Maldonado into the passenger seat of their car. [Dkts. 126-5 at 70:18-71:14; 126-8 at 56:20-57:16]. Sergeant Lis instructed Ramos to move away from the car where Maldonado was seated. [Dkts. 126-5 at 71:9-11; 126-8 at 57:11-16]. Ramos admitted that he heard Sergeant Lis say something, which at the time of his deposition he could no longer recall. [Dkt. 126-5 at 71:5-8]. However, he tacitly admitted it was a command with which he refused to comply, stating he told Sergeant Lis to wait so

he could get Maldonado fully into the vehicle.  [Dkts. 126-5 at 71:1-20, 116; 132-6 at ¶ 4; 126-8 at 57:3-58:25].  Specifically, Ramos testified, "I believe [Sergeant Lis] said something [before he used mace], I don't recall what it was."  [Dkt. 126-5 at 71:5-8].  Ramos testified that Sergeant Lis "probably" wanted Ramos to move away from the car.  *Id.* at 71:9-11.  Ramos further testified, "I said to [Sergeant Lis] that this is my brother and I was just trying to be helpful."  *Id.* at 71:12-14.  When Ramos turned around, he was pepper sprayed by Lis.  [Dkt. 126-8 at 57:18-23].

In his opposition briefing, Ramos submitted an affidavit further acknowledging that he refused to comply.  He admits he "heard the police [officer] say something to [him], and [he did not comply because he] was trying to complete getting Jose squared away so that [he and Jose] could respond to them."  [Dkt. 132-6 at ¶ 4].  Despite Ramos's efforts to recharacterize his refusal to cooperate with Defendant Lis's commands, the Court finds that the uncontroverted evidence, including Ramos's own admissions, shows that Ramos resisted Sergeant Lis's instruction  and obstructed the officer's investigation of the complaint to which he was responding.  For these reasons, Ramos's unreasonable search and seizure claim fails as a matter of law and Defendants' Motion for Summary Judgment on this claim is GRANTED.

### 2.    Count 1 – Excessive Force

Ramos and the Estate bring excessive force claims against Defendants Kaplan, Lis, and Cohen. Excessive force claims are governed by the Fourth Amendment's "objective reasonableness" standard.  *See Graham v. Connor,* 490 U.S. 386, 388 (1989).  A police officer may use force to compel compliance, but "the

use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (citing *Graham*, 490 U.S. at 388). "Police officers' application of force is excessive . . . if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004) (internal citation and quotation marks omitted).

Application of the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted). Further, this evaluation must consider all the facts of the case, including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest. *Id.* at 396; *Carey v. Maloney*, 480 F. Supp. 2d 548, 556 (D. Conn. 2007). Though the Second Circuit has not yet ruled on the issue, many courts have viewed the "immediate threat to the safety of the officers or others" as the most important *Graham* factor. *See A.K.H. v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490

U.S. at 396 (internal citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  For an officer to be "grant[ed] summary judgment against a plaintiff on an excessive force claim, . . . no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

### i.     By Ramos Against Lis

Ramos claims that Defendant Lis used excessive force against him when effectuating his arrest by spraying him with pepper spray.  The Second Circuit has held pepper spray "has a variety of incapacitating and painful effects" and "constitutes a significant degree of force." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010) (holding that district court erred in granting summary judgment for officer where a reasonable jury could find that "the use of pepper spray deployed mere inches away from the face of a defendant already in handcuffs and offering no further active resistance constituted an unreasonable use of force.").

Whether the use of pepper spray is excessive depends on the circumstances under which it is used.  Generally, the use of pepper spray alone when necessary to compel a potentially dangerous person to comply with an officer's orders has not been found to be excessive. Thus, when an arrestee has not yet been handcuffed or is resisting arrest, various courts within this district have found that pepper spray is a reasonable use of force.  In addition, courts have held it

appropriate to deploy pepper spray when necessary to eliminate a risk of harm. *McKnight v. Vasile,* No. 11-CV-6328P, 2017 WL 1176051, at *28 (W.D.N.Y. Mar. 30, 2017) ("[W]here an individual is actively resisting arrest and refusing orders, and the scene presents a risk to officer safety—courts have granted judgment to the officers on the grounds that the use of pepper spray was not excessive or that the officers were entitled to qualified immunity.") (collecting cases); *see also Buckley v. Niagara Frontier Transp. Auth., Mfrs.*, No. 13-CV-1205, 2016 WL 7403812, at *2-3 (W.D.N.Y. Dec. 21, 2016) (granting summary judgment in favor of officers on excessive force claim where plaintiff was pepper sprayed after resisting arrest, flailing about, and attempting to flee while a crowd was forming); *see also Roach v. Okun*, No. 13-CV-866, 2017 WL 3638464, at *4-5 (N.D.N.Y. June 6, 2017) (granting summary judgment in favor of officer on excessive force claim where plaintiff was pepper sprayed after climbing on a sink in a holding cell and threatening to hurt himself), *adopted by*, No. 13-CV-866, 2017 WL 3638197, at *1 (N.D.N.Y. Aug. 23, 2017); *see also Dawson v. City of Yonkers Police Dept.*, No. 99-CIV-9877, 2001 WL 969005, at *4 (S.D.N.Y. Aug. 21, 2001) (granting summary judgment in favor of officers on excessive force claim where plaintiff was pepper sprayed after he forced officers into a high speed chase and violently resisted arrest).

Here, as explained above, Defendant Lis deployed pepper spray to compel compliance with his command and to protect himself, the complainant and her children, and possibly the Plaintiff from harm. When Defendant Lis came onto the scene alone he spoke with Liz Bigio who told him that Maldonado had punched and shattered her car window with her children inside.  Defendant Lis observed the

broken glass at the scene. He did not know for certain whether Ramos, Maldonado or both men were involved in the altercation and responsible for the broken window. He had reason to believe that a violent crime had been committed by Ramos, Maldonado, or both. The undisputed facts show that Defendant Lis approached Ramos, who was trying to push Maldonado into a car, and ordered Ramos to move away from the car. Ramos expressly refused to comply with Defendant Lis's command. Ramos continued to try to push his brother into the car even though he knew that Defendant Lis wanted him to stop. As Ramos huddled with Maldonado in the car, refusing to comply with his command, Sergeant Lis could not see everything they were doing. He could not see if they were preparing to persist in resisting his authority. When Ramos turned around Defendant Lis did not know whether Ramos was going to continue to resist and obstruct, become aggressive, or submit to his authority. *See Bozung v. Rawson*, 439 Fed. App'x 513, 520 (6th Cir. 2015) (in determining that force used was reasonable, court noted "it may have been difficult for the officers to judge [arrestee's] intentions" to harm officers). In light of the circumstances on the scene, the Court finds it was objectively reasonable for Defendant Lis to compel compliance with his command, and to be concerned for his safety and that of others on the scene, and therefore it was objectively reasonable for him to pepper spray Ramos when he turned around. Thus, Defendants' Motion for Summary Judgment as to Ramos's excessive force claim is GRANTED.

ii.      By the Estate Against Kaplan, Lis, and Cohen

The Estate argues that Defendants Kaplan, Lis, and Cohen all acted with unreasonable and excessive force.  First, the Estate argues that Defendant Kaplan used excessive force by firing a taser into Maldonado's chest at close range for over twenty seconds.  Second, the Estate claims that Defendant Lis acted with excessive force by punching Maldonado in the head in the holding cell after he was already struck with the taser by Defendant Kaplan and shoving him into the back of the cell wall.  Lastly, the Estate argues that Defendant Cohen acted with excessive force by spraying Maldonado with pepper spray after he had been shoved to the ground by Defendant Lis and was handcuffed and seated on the cell floor.  In response, Defendants claim that summary judgment should be granted in their favor because the undisputed facts show that their use of force was reasonable under the circumstances.  The Court will consider each use of force in turn.

The relevant facts, as viewed in the light most favorable to the Estate, support its excessive force claims against Defendants Kaplan, Lis, and Cohen.  Maldonado was highly intoxicated, combative, and physically aggressive. He cursed and charged at the officers after Ramos was pepper sprayed.  He spit on Officer Kaplan while he was in the back of Officer Kaplan's cruiser in route to the police station.

Maldonado continued to act erratically at the police station.  After being placed in the holding cell, he paced the cell removing his clothing.  He was in the holding cell in the booking room while Defendants Kaplan, Lis, and Cohen

attempted to place Ramos in the cell.  He had almost completely disrobed and his pants were hanging from one ankle.  The officers unlocked the sliding door of the holding cell but left it closed when Maldonado grabbed it with both hands and forced it open.   Undoubtedly, the officers had the right to use a reasonable degree of force to compel Maldonado's compliance and to repel the force Maldonado exerted.  The question is whether the facts raise a genuine issue as to whether the officers used a degree of force greater than that required to achieve their legitimate objective.

After forcing the door open, Maldonado stepped over the threshold of the cell and swung at the officers. [Dkt. 126-17 at 2:04:39-40]. Officer Lis pushed Maldonado backwards into the cell.  *Id*.  About the same time Officer Kaplan fired the taser into his chest, Maldonado attempted to punch the officers.  *Id*. at 2:04:39-43. Maldonado and the officers continued to struggle. *Id*. at 2:04:45. Officer Kaplan continued to aim the taser at Maldonado who stepped to the side.  *Id*. at 2:04:46-47. Sergeant Lis punched Maldonado, who doubled-over, and Lis struck Maldonado again from behind propelling him to the back of the holding cell where Maldonado hit his head on the wall.  *Id*. at 2:04:48-49.  While still holding Ramos, Officer Kaplan continued to aim the taser at Maldonado, who sat slumped over on the floor.  *Id*. at 2:04:51.  Maldonado remained subdued and he was handcuffed.  *Id*. at 2:05:10. The fight evolved rapidly, and the entire altercation lasted approximately twenty seconds. Nevertheless, as set forth in detail below, the Court cannot find that Defendant Kaplan, Lis, and Cohen's use of force was objectively reasonable as a matter of law.

a.      **Taser by Defendant Kaplan**

Courts in the Second Circuit have found that tasers constitute a "significant degree of force" and a "serious intrusion" on the individual's Fourth Amendment rights.  *See Bryant v. Meriden Police Dep't*, No. 13-CV-449, 2017 WL 1217090, at *7 (D. Conn. Mar. 31, 2017) (collecting cases); *Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (holding that a taser is a "serious intrusion into the core of the interests protected").

This use of force must be balanced against the *Graham* factors outlined above – the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest.  *Graham*, 490 U.S. at 396. "Courts have [also] endorsed consideration of additional factors, including: (1) the existence of less intrusive means of accomplishing the law enforcement objective, (2) the nature and quality of any warnings that preceded the use of force, and (3) the law enforcement objective justifying the use of force." *Bryant*, 2017 WL 1217090, at *10 (internal citations and quotation marks omitted). The Court will consider each factor in turn.

The Estate relies heavily on *Bryant v. Meriden Police Department*, but that case differs in several key ways from the matter at hand.  2017 WL 1217090.  The *Bryant* Court found that an arrest for "simple possession of narcotics, not with distribution or with possession with intent to distribute" did "not support the government's interest in tasing [the arrestee]."  *Id*. at *11.  Here, Maldonado was arrested for a serious violent offense.  When Sergeant Lis arrived on the scene, he saw broken glass from Ms. Bigio's car window and she identified Maldonado as the

perpetrator.  Maldonado was highly intoxicated and shattered the glass with his fist when Ms. Bigio was inside the car with her boyfriend and her three children.

Not only was Maldonado arrested for a far more serious crime, his behavior at the station differed drastically from the arrestee in *Bryant*.  When the arrestee in *Bryant* was brought to the holding cell, he "had not offered any resistance since his arrest and the officers, having found nothing during the arrest, had no reason to believe he was armed."  *Id.*  In contrast, as detailed above, Maldonado resisted from the moment he encountered Sergeant Lis and was combative, using retaliatory profanity.  He violently resisted arrest and was only brought into custody with the assistance of multiple officers and pepper spray.  Then, he refused to get in the police vehicle for transportation to the station and spit on Defendant Kaplan during the ride.   At the station, Maldonado refused to rinse his eyes in the eyewash station. His aggression continued when he charged the cell door, forced it open, attempted to force himself out of the holding cell, where three police officers were standing, and physically resisted the Defendants' efforts to contain him.

The circumstances in *Bryant* also differ sharply from the present case with regard to the final two *Graham* factors—threat to the safety of others and resisting arrest.  The *Bryant* Court found that the arrestee "posed no immediate threat to the officers or others at the time of the tasing."  *Id.*  He was handcuffed and offered no active resistance.  *Id.*  Here, the opposite is true.  While Defendants Lis, Kaplan, and Cohen were outside of the holding cell door uncuffing Ramos to place him inside, Maldonado took the officers by surprise and overcame their force. He

pushed the holding cell door open with two hands and lunged forward.  Defendants pushed and punched him before he moved backwards.  Maldonado continued his aggression and swung at the officers. The parties dispute whether Maldonado made contact with any officers, but Plaintiff does not suggest that Maldonado did not attempt to strike them.  The undisputed evidence show Maldonado actively and violently charged at Defendants Lis, Kaplan, and Cohen in the small space of the holding cell in what can only be described as a melee.  The video depicts Ramos attempting to stay out of the scuffle.

Turning to the additional factors for consideration, the Court finds that they support the initial use of the taser.  First, the officers attempted to close the holding cell door and when that failed used physical force to contain Maldonado prior to using the taser. They pushed and punched him, but he continued to fight back.  *See Campos v. City of Glendale*, No. CV-06-610, 2007 WL 4468722, at *5 (D. Ariz. Dec. 14, 2007) (finding that taser use was reasonable when prior use of physical force did not lead to compliance).  Second, the parties dispute whether Defendant Kaplan warned Maldonado before using the taser.  Defendant Kaplan testified that he yelled taser more than once and Ramos testified that he did not. [Dkt. 126-11 at 160:7-9]; *see also* [Dkt. 126-5 at 91:10-16].  "Courts have consistently held that a failure to warn before the release of a K-9 or the use of taser can constitute excessive force depending on the circumstances."  *Whitfield v. City of Newburgh*, No. 8-CV-8516, 2015 WL 9275695, at *16 (S.D.N.Y. Dec. 17, 2015).  Here, the Court finds that even if Defendant Kaplan did not warn Maldonado, it was reasonable under these circumstances because the fight evolved unexpectedly and rapidly,

and a warning was not feasible.  *See Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010) (finding failure to warn tended to show force was unreasonable where warning was feasible). Finally, the objective was to prevent imminent harm to Ramos and the officers.  *See Bryant*, 2017 WL 1217090, at *8 ("Though the Second Circuit has not yet ruled on the issue, many courts have viewed the immediate threat to the safety of the officers or others as the most important *Graham* factor.") (internal citations and quotation marks omitted).

Although the Court has established that the initial use of the taser was reasonable under the circumstances, it must consider the duration of the taser use. The undisputed evidence shows that Defendant Kaplan deployed the taser for twenty seconds.  [Dkt. 132-22 (Taser Deployment Report)].  The parties dispute whether Maldonado was resisting or posing a threat to the Defendants, and the Court finds that the video is inconclusive on this issue.

Ramos testified that Maldonado was "paralyzed from the Taser."  [Dkt. 126-5 at 92:6-7].  The Defendants disagree.  Defendant Lis testified that he thought the taser was not working because Maldonado was still upright, but bent over and had his hands near the taser probes.  [Dkt. 126-8 at 99:2-25].  He explained further that, "[t]he majority of times when I see somebody get tased, they're they completely lock up.  They're not able to bend over or put their hands near the probes like they're going to pull it out.  That was my first inclination.   And the second inclination was there was a loud popping sound to the Taser.  When we have our training that's not a connection that's being made. . . . when it's a good Taser hit and good connection, it's very quiet. . . . the combination of everything with him

bending over, him putting his hands near the probes, Officer Kaplan saying he's going to pull out the probes, the sound of the Taser, I don't think any of it was working."  *Id.* at 99:25-100:17. Similarly, Defendant Kaplan testified that he expected Maldonado to become incapacitated, but instead he "made fists with his hands while yelling and flexing up towards [Defendant Kaplan]."  [Dkt. 126-11 at 160:15-24].

It is well settled that force "should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer."  *Tracy*, 623 F.3d at 98; *see Whitfield*, 2015 WL 9275695, at *18 ("It is well-settled that an officer may not continue to use force against a suspect who, although previously resistant, has been subdued."). Therefore, the reasonableness of force used by Defendant Kaplan depends on when Maldonado was subdued and no longer a threat to Defendants or to Ramos. Considering the video evidence and the testimony of the parties, the Court cannot pinpoint as a matter of law when Maldonado was no longer resisting the Defendants or posing a threat to their safety, in addition to Ramos's safety. Therefore, Defendant Kaplan's Motion for Summary Judgment on the Estate's excessive force claim for use of a taser is DENIED.

> b.  **Punch and Shove by Defendant Lis**

The Estate argues that Defendant Lis used excessive force by punching Maldonado and pushing him into the wall of the holding cell because Maldonado was already under the power of the taser at that time and was not resisting or posing a threat to the officers.  Like the use of the taser by Defendant Kaplan, the

reasonableness of Defendant Lis's use of force against Maldonado depends on when Maldonado was subdued and no longer a threat to Defendants or to Ramos. As explained above, the Court cannot determine as a matter of law when Maldonado was no longer resisting the Defendants or posing a threat to their safety, in addition to Ramos's safety.  In addition, a reasonable jury could find Maldonado was no longer a danger after before he was last struck by Sergeant Lis. Therefore, Defendants' Motion for Summary Judgment on the Estate's excessive force claim for the punch and shove is DENIED.

> c.    Pepper Spray by Defendant Cohen

The Second Circuit has found that it was objectively unreasonable for an officer to use pepper spray "mere inches away from the face of a defendant already in handcuffs and offering no further active resistance." *Tracy*, 623 F.3d at 98.  The Estate argues that a reasonable jury could find that Defendant Cohen used excessive force by spraying him with pepper spray after he was handcuffed.  The Court agrees. Here, the parties dispute the threshold issue of whether any force was used at all.  Ramos claims Maldonado was pepper sprayed by Defendant Cohen.  Ramos testified, "I was outside of his cell sitting down, while I was like, looking when I said earlier that I was 8 feet away and I was seeing him and he was facing down when they handcuffed him. They had a knee behind him and one of the officers took his spray from his waist and sprayed him while he was on the floor. That's why I said, You didn't have to do that, there's no reason for that, he was already handcuffed." [Dkt. 132-3 at 152:13-153:20].  Officer Cohen testified that he pointed his pepper spray can at Maldonado, even though Maldonado was

handcuffed, as a precaution should he resist, but did not spray.  [Dkt. 132-18 at 114:5-119:23].  Officer Cohen also admitted that at the time he placed the pepper spray cannister in Maldonado's face, Maldonado posed no risk of harm to anyone. *Id.* at 117:14-19.  A reasonable jury could credit Ramos's testimony and find that Officer Cohen pepper sprayed Maldonado while he was subdued and handcuffed on the cell floor, and therefore, Defendant Cohen used excessive force against Maldonado. For these reasons, Defendants' Motion for Summary Judgment on the Estate's excessive force claim for use of pepper spray is DENIED.

### 3.   Count 1 – Failure to Intervene

#### i.   By the Estate Against Kaplan, Lis, and Cohen

Maldonado brings a claim for failure to intervene against Defendants Kaplan, Lis, and Cohen arguing that they should have intervened to prevent the use of excessive force by their fellow officers. "It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted).  In this Circuit, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . (1) that excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official. *Id.* (citations omitted).  "In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "Whether an officer had sufficient time to

intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* Liability hinges on whether an officer "permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Failure to intervene claims are 'contingent upon the disposition of the primary claims underlying the failure to intervene claim.'" *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013) (quoting *Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012)). Where the record does not disclose an underlying excessive force violation, and does not suggest that an officer who observed the disputed incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate. *See Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 308 (D. Conn. 2009).

As explained above, there is a genuine dispute of material fact regarding whether Defendants Kaplan, Lis, and Cohen used excessive force against Maldonado. However, even if a jury did find excessive force was used, because the events evolved so rapidly and the officers were in such close proximity to one another and to Maldonado, no reasonable jury could find that any of the officers had an opportunity to anticipate, prevent or stop the force used by the others. Therefore, the Court finds as a matter of law that Defendants did not fail to

intervene to prevent the use of excessive force by their fellow officers against Maldonado and their Motions for Summary Judgment on this claim are GRANTED.

4.    Count 1 – Deliberate Indifference to Medical Needs

i.    By the Estate Against Kaplan, Lis, and Cohen

The Estate alleges that Defendants Kaplan, Lis, and Cohen were deliberately indifferent to his medical needs while he was a pretrial detainee. "A pretrial detainee's claims are evaluated under the Due Process Clause [of the Fourteenth Amendment rather than the Eighth Amendment, as] '[p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise.'" *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)).  To prevail on such a claim, a plaintiff must demonstrate: (1) that an official "denied [him] treatment needed to remedy a serious medical condition," and (2) that the official did so "because of his deliberate indifference to that need." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).  When analyzing the sufficiently serious prong, the Court must determine "whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  If so, the Court must then consider "whether the inadequacy in medical care is sufficiently serious." *Id*. at 280.  For the mens rea prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35.

Here, the Estate has sufficiently raised a genuine issue of material fact as to whether Defendants were deliberately indifferent to his medical needs.  As to the first prong, the Estate has produced evidence that Defendants denied Maldonado prompt medical care and the delay was sufficiently serious to his health, given the length of the tasing and the location where Maldonado was tased. Defendants were required to conduct a medical assessment after an individual was tased.  [Dkts. 131-20 at 108:3-22; 131-23 (Lis Dep.) at 114:21-115:18].  They left the holding cell at 2:06:18 AM and did not return to physically check on Maldonado until 2:10:34 AM, approximately four and one-half minutes later. When they determined that Maldonado did not have a pulse, they did not perform CPR.  Although Defendants were not designated first responders, Defendants Kaplan and Lis were trained to perform CPR.  [Dkts. 131-24 (Kaplan Dep.) at 57:6-59:16; 131-23 at 42:24-43:5].

The Estate's experts also opine that Maldonado was deprived of adequate medical care. Plaintiff's expert Dr. Maria Haberfeld stated that "[b]ased on departmental guidelines, as well as their training and experience, it should have been evident to the officers that Mr. Maldonado was in need of medical assistance and they should have provided or summoned such assistance immediately."  [Dkt. 132-19 (Haberfeld Report) at 9].  Another expert, Roger Clark, agrees: "[a]ny reasonably trained officer who was present when Mr. Maldonado was Tased in the chest for an extended period of time, was punched in the head, struck his head against the cement wall, and appeared so suddenly flaccid, would know that he was significantly injured and in a medical crisis that required immediate medical care."  [Dkt. 132-11 (Clark Report) at 19].

In addition, Maldonado's condition was sufficiently serious—it is undisputed that when the Defendants reentered the holding cell, Maldonado was unconscious and Defendants did not know if he had a pulse.  Paramedics entered the cell at 2:16:36 AM, approximately six minutes after the officers returned to physically check on Maldonado.  The last time Kaplan is seen pointing the taser at Maldonado is 2:05:09 AM. [Dkt. 126-17 at 2:05:09]. Medical assistance arrived more than ten minutes after the officers left the cell and approximately twelve minutes after Kaplan appears to have tased Maldonado last.

Further, Maldonado was tased for a total of twenty seconds.  As Defendant Kaplan's expert testified, taser training teaches that tasing for longer than fifteen seconds may increase the risk of serious injury or death and should be avoided. [Dkt. 132-25 at 110:17-25].  Taser training materials also indicate that tasing for more than fifteen seconds should be avoided.  [Dkts. 132-40 (ECW Guidelines) at 18; 132-41 (Taser Training) at 5].  In addition, as Defendants were aware, taser training cautions against tasing in the chest. [Dkts. 132-40 at 37; 132-41 at 4; 132-25 at 119; 132-24 at 88:3-7, 91:6-21; 132-18 at 36:6-23; 132-23 at 32:17-33:9].  Dr. Myerburg opined that Maldonado could have survived if Defendants began lifesaving treatment.  [Dkt. 132-27 at 131:20-134:22].

Turning to the mens rea prong, the Estate has also created a genuine issue of fact as to whether Defendants recklessly failed to act with reasonable care to mitigate a risk they knew or should have known to Maldonado's health or safety.  It is undisputed that Maldonado was tased in a single interval for a continuous period

of twenty seconds.  Defendant Kaplan was aware that a taser can be lethal.  [Dkt. 125-7 (Kaplan Dep.) at 84:12-24].

Defendant Kaplan also knew that the regular taser cycle was five seconds. *Id.* at 96:7-21.  He was instructed to fire at five-second bursts then assess impact, and he knew it was better to not exceed the five-second interval.  *Id.* at 97:4-24. Kaplan used the taser for a prolonged period, approximately four times that recommended because he suspected it was not working; however, he did not know for certain whether the taser was working and whether Maldonado received excessive electrical charges.  *Id.* at 260:13-261:9.

Defendant Kaplan was also instructed to try not to target a person's chest, among other areas, because it could interfere with the heart. *Id.* at 88:3-10. Defendant Cohen and Defendant Lis also knew that the chest was not the best spot to target. [Dkt. 131-18 (Cohen Dep.) at 35:13-36:23; 131-23 (Lis Dep.) at 32:22-33:23]. When Defendant Kaplan initially began tasing, he was responding to Maldonado's unexpected and rapidly evolving aggression and was in very close quarters. A reasonable officer under those conditions is unlikely to have the time and space to target the taser.  However, for at least a portion of the time he used the taser Officer Kaplan did have the opportunity and space to target another part of Maldonado's body.

Contrary to Defendants' claims, the Court finds that a reasonable jury could find that Defendants, with knowledge of Maldonado's exposure to the taser in his chest for an excessive period of time, knew that Maldonado needed immediate medical attention and that his affect suggested he may have suffered a serious

injury. Notwithstanding this knowledge, Defendants failed to provide reasonably timely medical care.  Therefore, Defendants' Motions for Summary Judgment as to the Estate's claim for deliberate indifference to medical needs is DENIED.

### 5.    Count 2 – *Monell* Claim

i.    By Ramos and the Estate Against Town of East Hartford and Sansom

Ramos and the Estate bring a § 1983 claim against Defendants Town of East Hartford and Chief Sansom.  To state a claim under § 1983 against a municipality, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007).   A plaintiff must prove "both the existence of a municipal policy or custom and a causal connection between that policy or  custom and the deprivation of his constitutional rights." *Dodd v. City of Norwich*, 827 F.2d 1, 5 (2d Cir. 1987).  "Courts have recognized four ways for plaintiffs to demonstrate a policy or custom: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers; (2) conduct ordered by a municipal official with policymaking authority; (3) actions taken pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels; or (4) a failure to train municipal employees that amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Walker v. City of New York*, No. 12-CV-5902, 2014 WL 1259618, at *2 (S.D.N.Y. Mar. 18, 2014) (internal citations and quotation marks omitted).

Defendants argue they are entitled to summary judgment because Plaintiff asserts only conclusory allegations unsupported by record evidence.  In response, Plaintiff claims he has clear record evidence of the following customs by Defendant Town of East Hartford and Defendant Sansom: (1) condoning the firing of tasers into suspects' chests contrary to taser warnings; (2) discouraging officers from providing lifesaving treatment; (3) failing to train its officers to obtain timely emergency treatment; (4) condoning use of excessive force by the officers in this case by its failure to perform a genuine internal affairs investigation.

The Court considers Plaintiff's claims that the Defendant Town of East Hartford and Defendant Sansom maintained various improper customs or practices collectively.  "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "To demonstrate an official policy or custom, a plaintiff must show the existence of a . . . practice that is so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or that a municipal custom, policy, or usage can be inferred from the evidence of deliberate indifference of supervisory officials as to such abuses." *EZ Pawn Corp. v. City of New York*, 16-CV-3852, 2019 WL 2393780, at *15 (E.D.N.Y. June 5, 2019) (internal quotation marks omitted) (quoting *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015)) (summary order).  Plaintiff's argument falls "far short of

establishing a practice that is so persistent and widespread as to justify the imposition of municipal liability." *Giacco v. City of New York*, 308 Fed. App'x. 470, 472 (2d Cir. 2009) (internal quotations omitted) (finding that four examples of a particular practice was not sufficient to establish pervasiveness to survive a motion for summary judgment).

First, Plaintiff argues that Defendant Town of East Hartford has a custom of condoning the use of a taser in a suspect's chest, and such custom is evidenced by the fact that there were sixteen instances of taser firing in the chest over a two-year period, from 2014 to 2015. [Dkt. 132-49 (EHPD Taser Statistics 2014-2015)]. Plaintiff presents no contextual evidence for the Court to determine the significance of these numbers. *See Tieman v. City of Newburgh*, 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) ("The lawsuits cited by Plaintiff in the PAC, even when combined with the allegations regarding the public forum comments and the Matrix Report, are insufficient to plausibly support an inference of a widespread custom . . . the fact that there were allegations of thirteen instances of excessive force during arrests over four years (none of which involved findings or admissions of culpability) during which hundreds, if not thousands, of arrests were made does not plausibly demonstrate that the use of excessive force during arrest was so frequent and pervasive to constitute a custom.") (collecting cases). Testimony from Defendant Sansom similarly fails to indicate a widespread policy. He indicated that the sixteen incidents of tasing to the chest would not trigger a supervisory response by him, but he also indicated that he does not review the use of force unless it has been flagged by a reviewing officer as outside of the protocol.

[Dkt. 132-20 (Sansom Dep.) at 136:9-14; 132:15-25; 120:5-121:23]. There is no evidence that any of the sixteen incidents were flagged as outside of the protocol. Nor is there any evidence they should have been flagged. There is no evidence of the circumstances surrounding the taser incidents to suggest they were not reasonable under the circumstances. Therefore, the Court finds that there is insufficient evidence for a reasonable jury to find a widespread policy.

Even if Plaintiff could establish a policy, however, Plaintiff has produced no evidence of a causal link between the alleged custom and the alleged violation of Ramos and Maldonado's constitutional rights. There must be "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (internal quotation marks omitted); *see also Jie Yin v. NFTA*, 188 F. Supp. 3d 259, 275-76 (W.D.N.Y. 2016) (granting summary judgment in "the absence of any showing of a custom or practice as well as a direct causal link between that custom or practice and the alleged violation of Plaintiff's constitutional rights"). Here, Plaintiff has presented no evidence that Defendants Kaplan, Lis, and Cohen understood that there was a custom of permitting officers to fire a taser into a suspect's chest such that Defendant Kaplan understood he could do so with impunity. On the contrary, the evidence shows the officers were aware that tasering someone in the chest should be avoided. Therefore, Defendants' Motion for Summary Judgment on the theory of tasing in the chest is GRANTED.

Second, Plaintiff claims that Defendants discouraged officers from providing lifesaving treatment and condoned use of force by failing to perform a genuine

internal affairs investigation.  In support, Plaintiff cites Defendant Sansom's testimony that officers are not required to be first responders and the policy, especially with regard to emergencies on police department property, was to call the fire department because the department is in the building and the firefighters are the designated first responders.  [Dkt. 132-20 at 24:4-22, 27:19-23].  Plaintiff also claims that the Defendants' failure to follow their own policies regarding in-custody deaths reflects its custom of condoning the use of excessive force.  Defendant Sansom testified that he did not recall what the East Hartford Police Department did in response to the Connecticut State Police's investigation report even though his Department declared it would "review the Connecticut State Police's investigation report prior to declaring the final disposition of this case."  [Dkt. 132-20 at 77:7-20].  Like Plaintiff's claims regarding tasering in the chest, there is no evidence of a widespread custom of discouraging officers from providing lifesaving treatment and failing to perform internal investigations.  Even if such evidence existed, however, there is no evidence that Defendants failed to provide treatment to Maldonado because of any alleged discouragement to do so or used excessive force against Ramos and Maldonado because they believed an internal investigation was unlikely.  Plaintiff fails to present evidence of a practice of failing to investigate.

Lastly, Plaintiff claims that Defendants Town of East Hartford and Sansom failed to train officers regarding timely emergency treatment.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citation omitted).

"To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (internal quotation marks and citation omitted). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 1360 (internal quotation marks and citation omitted). "[T]o constitute deliberate indifference in a municipal failure to train or supervise claim, a plaintiff must show that (1) a policymaker knew to a moral certainty that his or her employees will confront a given situation; (2) the situation would present employees with a difficult choice of the sort that training or supervision would make less difficult, or a history of mishandling the situation; and (3) the wrong choice by a city employee would frequently cause the deprivation of a citizen's constitutional rights." *Jane Doe II v. City of Hartford*, 1-CV-1026, 2005 WL 2009051, at *5 (D. Conn. Aug. 22, 2005) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). A plaintiff "must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.* A need may also be "obvious" enough to permit an inference of deliberate indifference where a supervisory official fails to intervene after personally witnessing an instance of "blatantly unconstitutional" conduct.

*Amnesty Am.*, 361 F.3d at 127 n.8. The municipality's failure to take action must constitute "deliberate indifference, rather than mere negligence or bureaucratic inaction." *Id.* at 128.

Plaintiff must also proffer "evidence as to the city's training program and the way in which that program contributed to the violation." *Id.* at 127 n.8. A plaintiff should present evidence of a training deficiency, including "how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted' under the circumstances." *Id.* at 130 (internal citation and quotation marks omitted). "[T]he factfinder's inferences of inadequate training and causation must be based on more than the mere fact that the misconduct occurred in the first place." *Id.* (internal citation omitted).

Here, the record is completely devoid of evidence that there was an obvious need for more training regarding timely emergency care. Although East Hartford Police Department's policy was for police officers not to perform CPR and to summon the emergency medical responders employed by the fire department located in the same building, Plaintiff presents no evidence of instances where emergency care was not timely provided, or situations where supervisors personally witnessed such failures. Therefore, Plaintiff's claim that Defendants were deliberately indifferent to the needs of pretrial detainees in police custody by failing to train in emergency treatment fails as a matter of law. *Jackson v. Town of Bloomfield*, No. 12-CV-00924, 2015 WL 1245850, at *19 (D. Conn. Mar. 18, 2015) (granting summary judgment where plaintiffs "failed to provide evidence of

deliberate indifference on the part of policymaking officials.").  For these reasons, Defendants' Motion for Summary Judgment on the theory of deliberate indifference to emergency training is GRANTED.

### B.    Qualified Immunity

Defendants argue that they are immune from liability under the doctrine of qualified immunity under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   When considering qualified immunity, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established [and] [t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed.2d 255, 308 (2015) (internal citations and quotations omitted).  For a right to be clearly established, it must be "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012).

The factors to assess in determining whether a right was clearly established are: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were

unlawful." *Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005) (internal citation omitted).  This does not mean that there must be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Anderson*, 483 U.S. at 641).  Since law enforcement officers must make prompt decisions in rapidly evolving situations "there can frequently be a range of responses to given situations that competent officers may reasonably think are lawful."  *Walczyk v. Rio*, 496 F.3d, 139, 154 n. 16 (2nd Cir. 2007). Qualified immunity is a "forgiving" standard. *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Only the most egregious conduct is not protected by qualified immunity.

"Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment." *Bailey v. Pataki,* 708 F.3d 391, 404 (2d Cir. 2013). In assessing the validity of a qualified immunity defense, the Court is "not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene."  *Lennon*,

66 F.3d at 421. "For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001). "[A] court may grant [summary] judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law." *Ozga v. Elliot*, 150 F. Supp. 3d 178, 189 (D. Conn. 2015).

### 1.    Qualified Immunity as to Ramos's Claims

Even if Sergeant Lis's use of force against Ramos was unreasonable, Ramos's claim would still fail because Sergeant Lis is entitled to qualified immunity.   Here, no reasonable jury could conclude that the force used by Defendant Lis under these circumstances was objectively unreasonable in violation of the Fourth Amendment.   In fact, in *Brown v. City of New York*,  the Second Circuit recently affirmed the district court's grant of qualified immunity on similar facts.  862 F.3d 182, 189-92 (2d Cir. 2017).  In *Brown*, the plaintiff repeatedly refused to follow instructions of the officers who were attempting to handcuff and arrest her.  *Id*. at 190.  The officers used pepper spray with prior warning to plaintiff, kicked the plaintiff's legs out from under her to bring her to the ground, and pushed her face into the pavement.  *Id*.  The Court found that "[n]o precedential decision of the Supreme Court or this Court 'clearly establishes' that the actions of [the

officers], viewed in the circumstances in which they were taken, were in violation of the Fourth Amendment." *Id.*

Similarly, in *McKnight v. Vasile*, the plaintiff challenged an officer's use of pepper spray against her while she was resisting arrest by a different officer. 2017 WL 1176051 at *26. The officer observed plaintiff resisting arrest and trying to enter her home. *Id.* at *27. His attempts to physically restrain her failed and he deployed his pepper spray without warning. *Id.* The officer testified that he deployed the spray "after he failed to gain control of her and in the moment that she turned toward him he felt vulnerable to a physical threat, such as a punch." *Id.* The court granted qualified immunity and found that "a reasonable officer in [his] position would not have clearly understood that resort to one burst of pepper spray was unlawful." *Id.* at *28.

Although Ramos did not physically resist arrest, he refused to comply with Defendant Lis's commands and obstructed his investigation of a violent altercation. Defendant Lis was the only officer at the scene and he wanted to ensure that Ramos and Maldonado did not drive away. [Dkt. 126-8 at 56:14-19]. At this time, Maldonado was swearing and trying to get out of the car. *Id.* at 57:1-2. Defendant Lis perceived that Maldonado was the aggressor. *Id.* at 57:4-7. Ramos refused to comply and clenched his fists. Defendant Lis testified that he was fearful because Ramos clenched his fists and was not obeying commands, so he pepper sprayed him to "gain control of him." *Id.* at 57:18-23. The Court finds that under these circumstances a reasonable officer would not have understood that his acts were unlawful and grants Defendant Lis qualified immunity on Ramos's excessive

force claim.  Therefore, Defendants' Motion for Summary Judgment based on qualified immunity is GRANTED.

### 2. Qualified Immunity as to the Estate's Claims

#### a. Failure to Intervene

A police officer is entitled to qualified immunity unless his failure to intervene was under "circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate [the plaintiff's] rights." *Riciutti v. N.Y.C. Transit Auth.*, 941 F.2d 123, 129 (2d Cir. 1997); *see also Berg v. Kelly*, 897 F.3d 99, 113 (2d Cir. 2018). As explained above, the Court finds as a matter of law that no reasonable jury could find that Defendants had any opportunity to prevent or stop the use of force by their fellow officers.  Under these circumstances, it was not objectively unreasonable for Defendants to believe that their fellow officers' conduct did not violate Maldonado's rights. Therefore, Defendants' Motions for Summary Judgment based on qualified immunity are GRANTED.

#### b. Deliberate Indifference to Medical Need

Maldonado's right to be free from deliberate indifference to his medical needs was clearly established on the night of his arrest.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Mills v. Fenger*, 216 Fed. App'x 7, 11 (2d Cir. 2006) (citing *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990)) (vacating summary judgment against pretrial detainee and further finding that "defendants are not entitled to qualified immunity because a pretrial detainee's right not to be recklessly denied treatment for a serious medical condition was 'clearly established' at the time these

events transpired"); *Lewis v. Clarkstown Police Dept.*, 11-CV-2487, 2014 WL 1364934, at *10 (S.D.N.Y. Mar. 31, 2014) (finding that "rights of pretrial detainees to be free from . . . deliberate indifference to their serious medical needs are well established" and denying summary judgment based on qualified immunity).  Here, there is a genuine issue of material fact regarding whether Defendants recklessly denied Maldonado sufficient medical care.  Given these factual disputes, the Court cannot determine that Defendants' actions were objectively reasonable as a matter of law.  Therefore, Defendants' Motions for Summary Judgment based on qualified immunity are DENIED.

### c.  Excessive Force

#### i.  Taser by Defendant Kaplan and Punch and Shove by Defendant Lis

As of the date of this incident, it was clearly established within the Second Circuit that tasing and physically assaulting an individual who was not actively resisting arrest or posing an immediate threat to officers constituted excessive force. *See Whitfield*, 2015 WL 9275695, at *18; *see also Zachary v. City of Newburgh,* No. 13-CV-5737, 2016 WL 4030925, at *9 (S.D.N.Y. July 25, 2016) ("When officers continue to apply force to an arrestee who is already subdued, it may be sufficient for a jury to find such force to be excessive.") (collecting cases).  Here, there is a genuine issue of material fact regarding whether Maldonado was resisting during the entire time the taser was deployed and when Defendant Lis punched him and shoved him towards the holding cell wall.  This fact dispute precludes the Court from granting summary judgment on qualified immunity grounds.  *See Orell v. Muckle*, No. 11-CV-97, 2012 WL 3231017, at *5 (D. Conn. Aug. 6, 2012) (denying

summary judgment on qualified immunity grounds where a reasonable juror could find officer used unreasonable force in deploying taser); *see also Zachary*, 2016 WL 4030925, at *9, 11 (denying summary judgment on qualified immunity grounds where "the Court is simply not able to say as a matter of law precisely when plaintiff was restrained to the point that he no longer posed a threat to officers' safety"). Therefore, Defendants' and Defendant Kaplan's Motions for Summary Judgment on Maldonado's excessive force claim based qualified immunity is DENIED.

ii.     Pepper Spray by Defendant Cohen

At the time of Maldonado's arrest, the Second Circuit had clearly established that "no reasonable officer could have believed that he was entitled to use pepper spray gratuitously against a restrained and unresisting arrestee." *Tracy*, 623 F.3d 90, 99 n.5 (2d Cir. 2010). Since then, many courts have denied qualified immunity to officers for using pepper spray on individuals who were not actively resisting arrest or who had already been restrained. *See, e.g., Knight v. City of New York*, No. 16-CV-7888, 2019 WL 95480, at *5 (S.D.N.Y. Jan. 2, 2019) ("[A]t least since Tracy, deploying pepper spray in the face of [an individual] 'already in handcuffs and offering no further active resistance' constitutes a clearly established unreasonable use of force.") (citing *Tracy*, 623 F.3d at 98); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 669 (E.D.N.Y. 2017) ("It is clearly established that the use of pepper spray against a restrained and cooperative person constitutes excessive force. Once Plaintiff was handcuffed and restrained, any additional use of force was plainly unnecessary and thus violated clearly established law.") (collecting cases); *Bryant*, 2017 WL 1217090, at *15 ("Like other courts before me, I hold as a matter

of law that it was clearly established in March 2011 that officers could not employ a significant degree of force, such as a taser, against a suspect who was handcuffed, surrounded by multiple officers in a police station holding cell, and who did not pose either a threat to the officers or a threat of escape.").

Here, as explained above, the parties dispute whether Defendant Cohen discharged his pepper spray at Maldonado.  Because there are disputed facts as to Defendant Cohen's actions, the Court cannot determine if Defendant Cohen acted reasonably and cannot find as a matter of law that he is entitled to qualified immunity.  For the foregoing reasons, Defendants' Motion for Summary Judgment based on qualified immunity is DENIED.

## V.     State Claims

### A.     Count 3 – Connecticut Constitutional Claims, Art. I, §§ 7, 9

Ramos and the Estate bring claims against all Defendants under two sections of the Connecticut Constitution.[6]  Article First, § 7 provides that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures . . ." CONN. CONST. art. I, § 7.  Article First, § 9 provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." *Id.* at § 9.  In *Binette v. Sabo*, the Connecticut Supreme Court recognized "a common-law cause of action under article first, §§ 7 and 9, of [the state constitution] for the policy reasons articulated in *Bivens v. Six Unknown*

---

[6] Plaintiffs' claims against Defendant Town of East Hartford fail as a matter of law because "damages claims based on violations of the Connecticut constitution cannot be maintained directly against a municipal entity." *McCullough v. Town of Rocky Hill*, No. CV155016831S, 2018 WL 1278220, at *3 (Conn. Super. Ct. Jan. 31, 2018) (internal citation omitted).

*Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388."  244 Conn. 23, 32 (1998); *see also Lopez v. Smiley*, 375 F. Supp. 2d 19, 23 (D. Conn. 2005) ("*Binette* created a narrow cause of action for money damages under the Article First, §§ 7 and 9 of the Connecticut Constitution for illegal searches and seizures of private homes by police officers, a cause of action that is equivalent to the federal *Bivens* action under the Fourth Amendment to the United States Constitution.").

Following *Binette*, the Connecticut Appellate Court, in *Martin v. Brady*, affirmed the dismissal of the plaintiff's complaint finding that it was distinguishable from *Binette* because the alleged conduct was not sufficiently egregious. 64 Conn. App. 433, 441 (2001).  The court noted that the *Binette* complaint "was sustained because of its specific allegations of an unreasonable, egregious search and seizure."  *Id.* at 440.  In *Martin*, plaintiff alleged two improper intrusions into his home, property damage, and physical harm. *Id.* The court found that these allegations were "a far remove from the allegations of misconduct that underlay *Binette.*" *Id.*

Despite *Martin*, "[c]ourts in this District have diverged on the issue of whether *Binette* created a cause of action for every violation of sections 7 and 9 or only for those violations that are sufficiently egregious."  *Gilbert v. Newton,* No. 13-CV-1715 JCH, 2015 WL 3755955, at *2 (D. Conn. June 15, 2015).  Judges Hall and Haight have found that, based on a close reading of *Binette* and its underlying rationale, "a violation of sections 7 and 9 gives rise to a cause of action even if it is not the result of egregious conduct."  *Id.*; *see also Waller v. City of Middletown*,

50 F. Supp. 3d 171, 191-92 (D. Conn. 2014), *order vacated in part on other grounds on reconsideration*, 89 F. Supp. 3d 279 (D. Conn. 2015).

In the majority of cases, this Court has recognized *Binette* claims where officers have entered a plaintiff's premises illegally and seriously injured the plaintiff.  *See e.g.*, *Outlaw v. City of Hartford*, No. 7-CV-1769, 2015 WL 1538230, *14 (D. Conn. April 6, 2015) (denying summary judgment where officers entered without a warrant and seriously injured plaintiff who was not resisting or attempting to flee); *Fago v. Devin*, No. HHD-CV-146053659S, 2015 WL 5135940, at *3 (Conn. Super. Ct. July 31, 2015) (granting motion to strike because allegations that one officer was aggressive and slammed plaintiff against a car and another coerced witnesses for evidence necessary for plaintiff's arrest did not rise to the level of egregious misconduct necessary to state a cause of action); *Faulks v. City of Hartford*, No. 8-CV-270, 2010 WL 259076, at *10 (D. Conn. Jan. 19, 2010) (granting summary judgment where plaintiff was struck with a baton until he fell and could be handcuffed on the grounds that this conduct did not rise to the level of egregious); *Conroy v. Caron*, 275 F. Supp. 3d 328, 352 (D. Conn. 2017) (denying summary judgment where officers unlawfully entered and searched a family's home, used excessive force on a teenager who was verbally objecting to their presence and arrested multiple family members without probable cause).

Here, the Court finds that Ramos and the Estate fail to state claims based on the Connecticut Constitution as a matter of law.   First, there was no illegal entry into their private home.  Ramos and Maldonado were on a public street when they were arrested and placed in police custody in the booking room.  Second, although

the *result* of Ramos and Maldonado's contact with police—Maldonado's death—was the most egregious imaginable, the Court cannot find that the police *conduct* rose to the level and type of egregiousness required by *Binette.* The undisputed facts demonstrate that Maldonado was attempting to exit the holding cell and punched one of the officers.  His conduct is wholly unlike that of other plaintiffs who were compliant with the officers' requests.  In contrast, the record also reflects that Ramos cooperated with the officers after his arrest, but he was not injured in the altercation.  On these facts, the Court finds that the Defendants' conduct was not sufficiently similar to the conduct at issue in *Binette* so as to warrant the creation of a private cause of action.  *See, e.g., Nelson v. City of Stamford*, No. 09-CV-1690, 2012 WL 233994, at *12 (D. Conn. Jan. 25, 2012) (granting summary judgment where one plaintiff admitted to resisting arrest and the other did not sustain an injury because the conduct did rise to the level of egregious); *see also Edwards v. City of Hartford*, No. 13-CV-878, 2015 WL 7458501, at *2, 5 (D. Conn. Nov. 23, 2015) (granting summary judgment where one plaintiff was in close proximity to a taser and pepper spray discharge and the other was pepper sprayed on the grounds that the circumstances and injuries were not egregious).

In addition, as this Court has previously acknowledged, "[t]here are separation of powers considerations at issue which counsel against recognizing a state constitutional claim.  This case deals with police action, which is an extension of the executive branch of municipal government.  If a cause of action under the state constitution is created here, it may lead to 'second-guessing' by the judiciary of executive actions. This second-guessing could have a chilling effect on police

actions." *Faulks*, 2010 WL 259076 at *10.  "The threat of liability . . . may have a chilling effect on the zeal with which [police officers] undertake their responsibilities." *Id.* (quoting *Kelley Prop. Dev., Inc. v. Lebanon*, 226 Conn. at 314, 342 (1993)).

For the foregoing reasons, Defendants' Motions for Summary Judgment on Plaintiff's claims for violations of Articles 7 and 9 of the Connecticut Constitution are GRANTED.

### B.    Count 4 – Negligence Claim

### i.    By Ramos Against All Defendants

Ramos alleges that Defendants breached their duty to act with reasonable care because, among other things, the Defendant officers acted with excessive force and the Defendant Town of East Hartford and Chief Sansom failed to properly supervise the Defendant Officers.  Defendants first argue that Ramos's claim fails as a matter of law because a plaintiff cannot prevail on a negligence claim where he also claims intentional use of excessive force. *See e.g., Frappier v. City of Waterbury*, No. 7-CV-1457, 2008 WL 4980362, at *3 (D. Conn. Nov. 20, 2008) ("Plaintiff may not prevail on a negligence claim when she has brought claims of intentional use of excessive force and intentional infliction of emotional distress."). As Ramos points out, however, other judges within the District of Connecticut have disagreed.  *See e.g., Bussolari v. City of Hartford*, No. 14-CV-00149, 2016 WL 4272419, at *4 (D. Conn. Aug. 12, 2016) ("I do not see why a special exception to this general rule [allowing alternative theories of liability] should or must exist for claims of intentional and negligent police misconduct in the excessive force

context."); *Olschafskie*, 2017 WL 4286374, at *7 ("[O]ther courts in this District have allowed negligence-based and intent-based claims regarding the same conduct to proceed to trial, which is consistent with federal pleading rules.").

In *Bussolari*, Judge Meyer questioned the rationale behind cases that refused to allow alternative theories of liability:

> Those decisions cited above that have disallowed simultaneous intentional/negligent tort claims in this context have not elaborated on their reasoning other than to cite the fact of prior court rulings. They rely in part on cases applying New York law that appears to be different from Connecticut law . . . By contrast, it appears that Connecticut law allows for claims of negligence against police officers, including for negligent arrest and use of force . . . Similarly, Connecticut courts have allowed for recovery under Connecticut's negligence-based municipal liability statute, Conn. Gen. Stat. § 52-577n, in cases involving allegations of excessive force by police officers.

2016 WL 4272419, at *3-4 (internal citations and quotation marks omitted); *see also Olschafskie*, 2017 WL 4286374, at *7.   Judge Meyer concluded that "genuine fact issues remain to allow a jury to consider whether the defendant officers are liable for intentional torts or negligent torts . . . there are genuine issues of material fact that are properly left to a jury regarding how defendants—and plaintiff—acted during the arrest." *Bussolari*, 2016 WL 4272419, at *3-4.  As the Court has stated repeatedly, the nature of the Defendants' conduct is far from clear.  Therefore, the Court will allow the jury to decide whether Ramos can prove intentional or negligent conduct.  As Ramos cannot recover under multiple claims based on the same conduct and harm, Defendants are not prejudiced.

Defendants next claim that Ramos's claim must fail because they are immune.  The Court will first consider immunity as applied to the officers involved

at the scene, Defendants Lis, Kaplan, and Cohen.  The Court will next consider the immunity as to the Town of East Hartford and Defendant Sansom.  Connecticut employees may claim governmental immunity under common law for negligence claims arising from their official acts that are discretionary rather than ministerial in nature.  *See, e.g., Spears v. Garcia*, 263 Conn. 22, 36 (2003); *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 366 (D. Conn. 2008).  "The manner in which a police officer makes an arrest, including when to use force, is a discretionary act."  *See, e.g., Edwards*, 2015 WL 7458501, at \*4; *Galindez v. Miller*, 285 F. Supp. 2d 190, 195 (D. Conn. 2003).  Therefore, Defendants Kaplan, Lis, and Cohen are entitled to claim governmental immunity.  The Court also finds that Defendants Town of East Hartford and Sansom are entitled to claim governmental immunity.[7]

There are three exceptions to the governmental immunity for discretionary acts: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm[;] second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws[;] and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence."  *Spears*, 263 Conn. at 36, 818 A.2d 37.

"Courts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create just such a duty of care."  *Belanger*, 578 F. Supp. 2d at 367 (collecting cases). The Connecticut Supreme

---

[7] The Court discusses the application of governmental immunity to Defendant Town of East Hartford in more detail in Section V.F.

Court has laid out a three-part test for the identifiable person-imminent harm exception to apply: "(1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm." *Doe v. Petersen*, 279 Conn. 607, 616 (2006); *Brooks v. Powers*, 165 Conn. App. 44, 54 (2016) (same).  For the exception to apply, all three elements must be proven.  *Doe*, 279 Conn. at 620.

Ramos alleges that Defendants Kaplan, Lis, and Cohen used excessive force by causing trauma to his head, increased his risk of harm, failed to use generally-accepted law enforcement tactics, and failed to take measures to protect his health. He also alleges that Defendants Town of East Hartford and Sansom failed to properly hire, train, and supervise employees, failed to enforce lawful policies, and tolerated wrongful policies.  Defendants move for summary judgment on Ramos's claim in its entirety.  In his opposition briefing, however, Ramos fails to address the full claim and argues only the following: (1) Ramos was an identifiable victim because he was the person against whom Defendant Lis used force, (2) Ramos was subjected to an imminent harm while in police custody, and (3) it was apparent to Defendant Lis that his conduct was likely to cause Ramos that harm because he is the one who deployed the pepper spray.  To the extent that Ramos alleges a negligence claim, other than the negligence claim against Defendant Lis for spraying him with pepper spray prior to his arrest, the Court deems it abandoned and grants Defendants' Motions for Summary Judgment on that claim.

As to the claim against Defendant Lis, Ramos could constitute an identifiable victim of the alleged harm, pepper spray, caused by the Defendant Lis's force if

such force was shown to be excessive. *See, e.g. Jefferson v. Reddish*, No. 12-CV-1543, 2017 WL 62510, at *5 (D. Conn. Jan. 4, 2017) "[A plaintiff] could constitute an identifiable victim of the alleged harms caused by the force applied if such force is shown to be unauthorized as excessive."). As explained above, however, the Court finds that the undisputed facts show that Defendant Lis did not use excessive force against Ramos at any point on the night of April 13, 2014. Therefore, because the Court finds that Defendants Lis did not use excessive force against Ramos or arrest him in an unreasonable manner as a matter of law, Defendant Lis is entitled to governmental immunity and the identifiable person-imminent harm exception does not apply. For the foregoing reasons, Defendants' Motions for Summary Judgment on Ramos's negligence claim is GRANTED.

### C.   Count 5 – Wrongful Death Claim

#### i.   By the Estate Against All Defendants

The Estate brings a wrongful death claim against all Defendants. In Connecticut, a decedent's estate may recover "from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, including funeral expenses." CONN. GEN. STAT. § 52-555(a). As explained above in Section V.B., state governmental actors may claim immunity for governmental acts that were discretionary and not ministerial. Governmental acts are "supervisory or discretionary in nature" and ministerial acts are those "to be performed in a prescribed manner without the exercise of judgment or discretion." *Ravalese v. Town of East Hartford et al*, No. 16-CV-1642,

2019 WL 2491657, at *10 (D. Conn. June 14, 2019) (quoting *Mulligan v. Rioux*, 229 Conn. 716, 727 (Conn. 1994)) (internal citations and quotation marks omitted).

To determine the nature of Defendants' actions, the Court must consider the Estate's claim against each Defendant.  The Estate alleges that Defendant Kaplan used excessive force against Maldonado and Defendants Kaplan, Lis, and Cohen failed to provide him seek prompt medical attention.  The decision as to the appropriate type and amount of force is discretionary and the Court finds Defendants may be immune unless an exception applies.

The Estate alleges that Defendants Town of East Hartford and Sansom failed to properly train officers, condoned improper practices, and discouraged officers from using lifesaving medical treatment to save detainees' lives.  These acts are discretionary in nature and Defendants Town of East Hartford and Sansom may claim governmental immunity unless an exception applies.

Defendants argue that they are immune, and the parties dispute whether the identifiable person-imminent harm exception applies.  Defendants Kaplan, Lis, and Cohen argue that Maldonado was not an identifiable victim and it was not apparent that their conduct was going to cause him imminent harm.  As the Estate correctly argues, however, "[c]ourts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create just such a duty of care." *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 367 (D. Conn. 2008) (collecting cases); *see also, Keeney v. City of New London*, 196 F. Supp. 2d 190, 202 (D. Conn. 2002) (denying summary judgment on wrongful death claim on

the grounds that "officers' alleged use of force after the plaintiff was handcuffed posed an apparent and imminent harm to [arrestee]"); *see also Jefferson*, 2017 WL 62510, at *4 (denying summary judgment on negligence claim where "plaintiff could constitute an identifiable victim of the alleged harms caused by the force applied if such force is shown to be unauthorized as excessive"); *see also Roguz v. Walsh*, No. 9-CV-1052, 2012 WL 6049580, at *9 (D. Conn. Dec. 5, 2012) (denying summary judgment on governmental immunity and applying imminent harm exception where "plaintiff was a clearly identifiable victim to Walsh, and it is undisputed that Walsh purposefully hit and swung his baton at plaintiff. Plaintiff was put at risk of imminent harm from Walsh's hits and baton swings"). Here, Maldonado was an identifiable victim when Defendant Kaplan tased him, when Defendant Lis punched him and when Defendant Cohen allegedly pepper sprayed him. There is sufficient evidence for a jury to conclude that Maldonado was subject to the possibility of imminent harm and the Defendants were aware that their conduct was likely to subject Maldonado to that harm. *See Marsh v. Town of East Hartford*, No. 16-CV-928, 2017 WL 3038305, at *8 (D. Conn. July 18, 2017) (denying summary judgment on governmental immunity where "there [was] sufficient evidence for a jury to conclude that Marsh was an identifiable victim who was subject to possibility of imminent harm during the course of the arrest"). Accordingly, as to Defendants Kaplan, Lis, and Cohen, summary judgment on the Estate's wrongful death claim is DENIED.

Defendants Lis and Cohen also argue that the Estate's wrongful death claim fails because there is no evidence of proximate cause. They cite Dr. Myerburg's

testimony that there was no evidence that Maldonado's head hitting the wall led to cardiac arrest and ultimately, Maldonado's death.  [Dkt. 126-7 at 77:18-78:11, 104:20-105:7].   In response, Plaintiff argues that Maldonado's cause of death is disputed and cites the medical report which lists "blunt injury of head" as a contributing cause of Maldonado's death.  [Dkts. 132-7 at 6; *see also* 132-35 (Gill Dep.) at 50:5-17 ("I think the precordial and electric shock and the blunt injury of the head are both kind of the processes that resulted in the death and the cardiac arrhythmia.")].  A reasonable jury could conclude that Defendants' actions were a proximate cause of Maldonado's death.  For the foregoing reasons, Defendants' Motion for Summary Judgment on Plaintiff's wrongful death claim as to Defendants Kaplan, Lis, and Cohen is DENIED.  *See Kenney*, 196 F. Supp. 2d at 202.

The Court finds, however, that the identifiable victim-imminent harm exception does not apply to Defendants Town of East Hartford and Sansom.[8] Under the exception, "[i]mminent does not simply mean a foreseeable event at some unspecific point in the not too distant future.  Rather, we have required plaintiffs to identify a discrete place and time period at which the harm will occur." *Haynes v. City of Middletown*, 314 Conn. 303, 318 (Conn. 2014) (quoting *Bonington v. Westport*, 297 Conn. 297, 314 (2010) (collecting cases).  The Estate argues that Defendants condoned improper taser use, discouraged officers from performing lifesaving medical treatment, failed to train officers to perform medical treatment,

---

[8] Since the Connecticut Supreme Court's decision in *Doe v. Petersen*, "the prevailing opinion of the lower courts in Connecticut appears to be in favor of applying the identifiable victim/imminent harm exception to municipal immunity, too." *Seri v. Town of Newtown*, 573 F. Supp. 2d 661, 673 (D. Conn. 2008); *see also Cooper v. City of Hartford*, No. 7-CV-823, 2009 WL 2163127, at *27 (D. Conn. July 21, 2009) (adopting the "prevailing opinion"); *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 193 n.10 (D. Conn. 2015).

and ratified use of excessive force.  The Estate presents no evidence to establish an imminent and specific harm and thereby fails to meet its burden to establish the exception to governmental immunity as a matter of law.  *See Seri*, 573 F. Supp. 2d at 676 (granting summary judgment for town defendant where plaintiff did not allege that it, "acting through a specifically identified public official, was on notice that [plaintiff] was individually subject to a specific and imminent harm so that it was in a position to make a decision that specifically impacted [plaintiff] and caused the resulting harm."); *see also Elliott v. Harnett*, 9-CV-00948, 2014 WL 4199663, at *8 (D. Conn. Aug. 22, 2014).  Because the exception does not apply to Defendants Town of East Hartford and Sansom, they are entitled to immunity.  Therefore, Defendants' Motion for Summary Judgment on the Estate's wrongful death claim as to Defendants Town of East Hartford and Sansom is GRANTED.

D.   Count 6 – Bystander Emotional Distress Claim

i.   By Ramos Against Kaplan, Lis and Cohen

Ramos brings a claim for bystander emotional distress against Officers Kaplan, Lis and Cohen.  To recover on a claim for bystander emotional distress under Connecticut law, Ramos must show "(1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious,

beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response." *Clohessy v. Bachelor,* 237 Conn. 31, 56 (1996).

Defendants argue that Ramos's bystander emotional distress claim fails as a matter of law because the undisputed evidence shows he cannot meet the final prong, serious emotional injury. This prong requires injuries so severe such as to "warrant a psychiatric diagnosis or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands." *Squeo v. Norwalk Hosp. Ass'n*, 316 Conn. 558, 585 (2015). Defendants argue that Ramos cannot show a serious emotional injury under either of these methods. First, Defendants note that Ramos attended only three counseling sessions with Donald Topor, a Licensed Clinical Social Worker ("LCSW"), even though he had the opportunity to attend ten sessions through his employer. Ramos has not sought additional treatment since those three sessions in the summer of 2017 and Defendants claim he has not received a psychiatric diagnosis. Second, Defendants argue that Ramos's full-time employment and pursuit of his master's degree evidence that he is fully capable of coping with life's demands.

In response, Ramos points to evidence which shows a genuine dispute of material fact. With regard to a psychiatric diagnosis, Ramos cites LCSW Topor who diagnosed him with major depression, recurrent. LCSW Topor also noted symptoms which may interfere with Ramos's ability to cope with activities of daily life such as depressed mood, diminished interest and pleasure, insomnia, worthlessness, irritated mood, excessive anxiety, and irritability. Ramos testified that he is triggered by police officers and celebrating family events. He also

testified that he has taken time off work because of his symptoms.  The Court finds that a reasonable jury could conclude that Ramos has established a claim for bystander emotional distress. Therefore, Defendants' Motions for Summary Judgment on this claim are DENIED.

### E.      Count 7 – False Arrest Claim

### i.      By Ramos Against Lis and Cohen

Ramos brings a state law claim for false arrest against Officers Lis and Cohen.  These claims must be dismissed for the same reasons that they were dismissed under § 1983.  *See Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir.2003) ("Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law."). As explained above in Section IV.A.1, the Court found that the undisputed facts show that there was probable cause for Officer Lis to arrest Ramos.  "It is well-established that probable cause is a complete defense to claims of false imprisonment and false arrest."  *Johnson v. Ford*, 496 F. Supp. 2d 209, 213 (D. Conn. 2007); *see also David v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004).  Because Officer Lis has established a complete defense, Ramos's false arrest claims fail as a matter of law.  Therefore, Defendants' Motions for Summary Judgment on the false arrest claim are GRANTED.

### F.      Count 8 – Conn. Gen. Stat. § 52-557n Claim

### i.      By Ramos and the Estate Against Town of East Hartford

Conn. Gen. Stat. § 52-557n provides that a municipality shall be liable for damages to person or property caused by the negligent acts or omissions of its employees acting within the scope of their employment, provided that such acts or omissions do not constitute "criminal conduct, fraud, actual malice or willful misconduct."  *See* CONN. GEN. STAT. § 52-557n.  Defendant Town of East Hartford argues that it is entitled to governmental immunity to the same extent that the individual defendants are entitled to such immunity on Ramos's negligence claim. The Court agrees.  *See* CONN. GEN. STAT. § 52-557n(a)(2)(B); *Cooper*, 2009 WL 2163127, at *27.  As noted above, the Defendants' actions are discretionary governmental acts, thus Defendant Town of East Hartford is immune for the acts or omissions of its officers unless an exception applies. The Court previously found that the identifiable person-imminent harm exception does not apply, and the Defendants are immune from Plaintiff's negligence claim.  Therefore, Defendant Town of East Hartford's Motion for Summary Judgment on Plaintiffs' § 52-557n claim is GRANTED.

G.      Count 9 – Conn. Gen. Stat. § 7-465 Claim

i.      By Ramos and the Estate Against Town of East Hartford

Conn. Gen. Stat. § 7-465 provides that a municipality shall indemnify its employees acting within the scope of their employment for all infringement of civil rights or damage to person or property unless the damage was the result of a willful or wanton act.  *See* CONN. GEN. STAT. § 7-465.  Defendant Town of East Hartford is only liable to indemnify Defendants against Ramos's negligence claim.  Because the negligence claim fails and there is no other claim for which Defendant Town of

- 66 -

East Hartford can indemnify Defendants, Defendant Town of East Hartford's Motion for Summary Judgment on Plaintiffs' § 7-465 claim is GRANTED.

## VI.    Conclusion

For the foregoing reasons, Defendants' Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART. Defendants' Motions for Summary Judgment are GRANTED are to the following claims: (1) unreasonable search and seizure by Ramos against Defendant Lis; (2) excessive force by Ramos against Defendant Lis; (3) failure to intervene by the Estate against Defendants Kaplan, Lis, and Cohen; (4) *Monell* by Ramos and the Estate against Defendants Town of East Hartford and Sansom; (5) Connecticut Constitution Articles 7 and 9 by Ramos and the Estate against all Defendants; (6) negligence by Ramos and the Estate against all Defendants; (7) wrongful death by the Estate against Defendants Town of East Hartford and Sansom; (8) false arrest by Ramos against Defendants Lis and Cohen; (9) Conn. Gen. Stat. § 52-557n by Ramos and the Estate against Defendant Town of East Hartford; and (10) Conn. Gen. Stat. § 7-465 by Ramos and the Estate against Defendant Town of East Hartford.   The following claims remain for trial: (1) excessive force by the Estate against Defendants Kaplan, Lis, and Cohen; (2) deliberate indifference by the Estate against Defendants Kaplan, Lis, and Cohen; (3) wrongful death by the Estate against Defendants Kaplan, Lis, and Cohen; and (4) bystander emotional distress by Ramos against Defendants Kaplan, Lis, and Cohen.

**IT IS SO ORDERED.**

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: July 2, 2019.**